1         UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

4               - - - -

5

6

7                           )

8 PERFECT 10, INC., A CALIFORNIA    ) <br> CORPORATION,                    )

                             )

9              PLAINTIFF,     )

                             )

10       vs.                ) No. CV04-09484-AHM(SHx)

                             )

11 GOOGLE, INC., ET AL.,         )

                             )

12            DEFENDANTS.    )

                            )

13 _____)

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          LOS ANGELES, CALIFORNIA

17          MONDAY, JULY 14, 2008

18

19

20

21

22      _____

23        CINDY L. NIRENBERG, CSR #5059 <br>        U.S. Official Court Reporter

24        312 North Spring Street, #438 <br>        Los Angeles, California 90012

25        *www.cindynirenberg.com*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   APPEARANCES OF COUNSEL:

2

3   FOR THE PLAINTIFF:

                    MAUSNER IP LAW
4                   BY: JEFFREY N. MAUSNER, ATTORNEY AT LAW
                    21800 OXNARD STREET
5                   SUITE 910
                    WOODLAND HILLS, CA 91367
6                   310-617-8100

7

8   FOR THE DEFENDANTS:

                    QUINN EMANUEL URQUHART OLIVER & HEDGES
9                   BY: RACHEL M. HERRICK, ATTORNEY AT LAW
                    555 TWIN DOLPHIN DRIVE
10                  SUITE 560
                    REDWOOD SHORES, CA 94065
11                  650-801-5000

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            LOS ANGELES, CALIFORNIA; MONDAY, JULY 14, 2008

 2                          11:00 A.M.

 3                          – – – – –

 4            THE CLERK:  Calling Item Number 1, Perfect 10, Inc.

 5   versus Google, Inc., et al.

 6            Counsel, state your appearances, please.

 7            MR. MAUSNER:  Good morning, Your Honor.  Jeff Mausner

 8   for Perfect 10.

 9            THE COURT:  Good morning.

10            MS. HERRICK:  Good morning, Your Honor.  Rachel

11   Herrick and Thomas Nolan with Quinn Emanuel for defendant

12   Google.

13            THE COURT:  What's your last name, please?

14            MS. HERRICK:  H-E-R-R-I-C-K.

15            THE COURT:  Oh, Herrick.  Yeah, I have seen your

16   declarations.

17            Okay.  What's your name?

18            MR. NOLAN:  Thomas Nolan, N-O-L-A-N.

19            THE COURT:  Okay.  We're here on Perfect 10's motion

20   to amend which raises different issues than the last case I

21   just called.

22            What's in the box, Mr. Mausner?

23            MR. MAUSNER:  Everything.

24            THE COURT:  Oh, really?

25            MR. MAUSNER:  Yes.
```

1          THE COURT:  If that were true, I would grant your

2     motion in a flash.

3          MR. MAUSNER:  Hopefully everything I need.

4          THE COURT:  Okay.  Did you get these questions that I

5     circulated, Mr. Mausner?

6          MR. MAUSNER:  Yes, Your Honor.

7          THE COURT:  Okay.  Go to the lectern, please.  I know

8     you've undoubtedly had time to read the order --

9          MR. MAUSNER:  Yes, sir.

10         THE COURT:  -- which I have some views about.

11         Don't think for a minute that I think that if I

12    permit you to file this Second Amended Complaint, it's because

13    I've made some kind of preliminary conclusion that you've got a

14    strong case or you are going to win on the merits.  That is not

15    at all to be inferred from anything I've said here.  And I

16    think as an example, the application to the CDA might prompt a

17    fairly quick summary judgment motion or partial summary

18    judgment motion -- summary adjudication motion that could

19    easily be meritorious.

20         But in any event, answer Number 2.  I'm going to ask

21    you to answer all the questions that I've designated for

22    Perfect 10.

23         MR. MAUSNER:  Okay.

24         THE COURT:  Why didn't you look up -- I mean, you

25    have one of the most vigilant -- and it's to his credit.  I'm

1  not here to cast any aspersions at Dr. Zeda.  It just doesn't

2  strike me as consistent with everything I have seen in the

3  years that this litigation has been pending that even though he

4  was aware that there were full-sized images, he didn't make the

5  effort to connect who was responsible, whose server was being

6  used and what the connection was between Google and Blogger.

7       MR. MAUSNER:  Okay.  Dr. Zeda stated that to the best

8  of his recollection, he discovered that there were a few

9  full-sized Perfect 10 images on Blogger in approximately June

10 2006.  I also became aware of that in approximately June 2006.

11      Neither one of us -- I did not become aware that

12 Google was storing thousands of full-sized images on its

13 servers until late 2007, which is when this thing really hit me

14 as this is very significant.

15      THE COURT:  Okay.  Your answer made reference to

16 thousands of images.  Is there anything in the record before me

17 on this motion as to when you became aware of even one image --

18      MR. MAUSNER:  Yes.

19      THE COURT:  -- that Google was -- that it was storing

20 and serving from its own server?

21      MR. MAUSNER:  Yes.  It was sometime after our brief

22 was filed at the Ninth Circuit.  Probably -- yeah, maybe the

23 second half of 2006.

24      THE COURT:  Well, I issued my order in May.  I don't

25 know when the first briefs were filed, but you are conceding

1 now that you had at least an initial indication that could have

2 triggered some further inquiry in late 2006?

3           MR. MAUSNER:  Yes.

4           THE COURT:  And the indication that you had in late

5 2006 was just what, Mr. Mausner?

6           MR. MAUSNER:  That there were a few full-sized

7 Perfect 10 images on Blogger.

8           THE COURT:  So what happened later on that caused you

9 to bring this motion that changed the intended climate of what

10 this hard-fought litigation will encompass?

11          MR. MAUSNER:  Well, it hasn't changed the entire

12 focus.  I mean, certainly, we still are --

13          THE COURT:  I will grant you that.

14          MR. MAUSNER:  In late 2007, I discovered that -- or

15 I -- that's when I found out that Google was storing large

16 numbers of infringing Perfect 10 images on its own servers.

17          And these images were being linked to by the, quote,

18 thumbnails that are returned by a Google image search.  So in

19 other words, you know, you do an image search on the name of a

20 Perfect 10 model.  You get your thumbnails.  You click on it.

21          THE COURT:  And on the screen, it refers to

22 blogspot.com, right?

23          MR. MAUSNER:  Correct.  Correct.

24          THE COURT:  And that could have been a development

25 that came to your attention in late 2006, right?

1          MR. MAUSNER:  Right.  The large numbers of them came

2     to my attention in late 2006, and that's --

3          THE COURT:  No.  2007.

4          MR. MAUSNER:  I'm sorry.  2007, yes.

5          THE COURT:  But the fact that image search or web

6     search disclosed the availability of full-size images on

7     Blogspot came to your attention in late 2006.

8          MR. MAUSNER:  Yes, and it didn't trigger with me, you

9     know, that this was something that was significant.  At that

10    point, we didn't know it was significant because we didn't know

11    there were large numbers.

12         THE COURT:  How do you define large numbers?

13         MR. MAUSNER:  Thousands.  Thousands.

14         THE COURT:  At what point does a number that's not

15    yet large become a large number?  Thousands is too imprecise

16    for me.

17         MR. MAUSNER:  In 2006 what I knew about was a few.

18    You know, less than ten, I would say.

19         THE COURT:  But then there is a full year until late

20    2007.

21         MR. MAUSNER:  Right.

22         THE COURT:  And?

23         MR. MAUSNER:  I just didn't know about it.  It

24    didn't -- you know, we were working on other things in this

25    case and in the other cases, and it just didn't -- you know, in

1  January 2007 when we were considering amending the complaint

2  before, we didn't even think of adding that as an additional

3  claim because it just wasn't that significant.

4         THE COURT:  Why didn't you go through with the effort

5  to amend back in January of 2007?

6         MR. MAUSNER:  Okay.  Well, first, we didn't know the

7  Ninth Circuit appeal was pending at that time.  We didn't know

8  what the effect would be of trying to file an amended complaint

9  while the appeal was pending at the Ninth Circuit.  It could

10 have delayed the appeal or it could have even knocked it off

11 track or delayed it.

12        THE COURT:  Did you think of picking up the phone and

13 calling -- I guess it was Andrew Bridges at the time, right --

14        MR. MAUSNER:  Yes.

15        THE COURT:  -- before Quinn Emanuel came in?

16        -- and saying, "You know, we've got additional

17 theories and new facts that warrant an amended complaint.

18 There may be a procedural snag because the case is pending in

19 the Ninth Circuit.  Will you enter into a tolling agreement?

20 Will you agree that when we get clarification from the Ninth

21 Circuit and make a motion at that time, you won't at all say

22 that it was untimely?"

23        Did you think of doing that?

24        MR. MAUSNER:  We discussed the amended complaint with

25 them, but we did not enter into any kind of a tolling

1   agreement.  We just decided to wait until after the Ninth

2   Circuit had ruled.

3           THE COURT:  Well, what was the tenor of the

4   discussion with Mr. Bridges or his counterpart?

5           MR. MAUSNER:  They were agreeable to us filing the

6   Second Amended Complaint at that time.

7           THE COURT:  Okay.  And then we get the initial

8   decision in 2007.  I think it was in May, and the second

9   opinion in December, right?

10          MR. MAUSNER:  Yes.

11          THE COURT:  What happened between May of 2007 and

12  December?

13          MR. MAUSNER:  Well, we were doing our petition for

14  rehearing and rehearing en banc.  We were working on other

15  aspects of the case.

16          THE COURT:  Did you know that you had a new theory?

17          MR. MAUSNER:  At that point regarding Blogger, no,

18  not at that point.

19          THE COURT:  Well, that's what I am still trying to

20  understand.  When did the light bulb go on?

21          MR. MAUSNER:  In late 2007.  It hit me at that point,

22  and I thought this is extremely significant.  And I saw the

23  footnote that you have that you don't think that Google had

24  misrepresented or concealed this information.

25          THE COURT:  Yeah.  I looked at the RFA's.  I looked

1  at the defining language, and maybe they could have

2  anticipated, or should have, a broader definition than you

3  provided, but they responded accurately.

4          MR. MAUSNER:  Well, I didn't think they had.  And I

5  also -- you know, we cited some of the instances where they

6  made statements in briefs to this Court and to the Ninth

7  Circuit, and in not one of those did they ever say that, well,

8  this is different when it's a Blogger website because it is

9  stored on Google's servers and, therefore, even under the

10 server test, it's a direct infringement.

11         I suppose they wouldn't make that last statement, but

12 they could have said it's different when the website is a

13 Blogger website because then it is stored on Google's servers.

14         THE COURT:  You know, in a kind of ironic manner,

15 it's precisely because you and your client have been so

16 zealous -- to your credit -- so vigilant and so persistent in

17 taking on Google and other defendants that I can accept your

18 representation that you were relying on those answers to

19 discovery and maybe your humanly understandable priority of

20 seeking reconsideration and pushing the case along, but it is a

21 long period.  It's a long period, and it's a little bit

22 surprising that you didn't think that two and two might

23 possibly equal four.

24         MR. MAUSNER:  This stuff is hard.  At least it's hard

25 for me.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                THE COURT:  Well, it's hard for me, too.

 2                MR. MAUSNER:  And, you know, sometimes you just don't

 3    realize something, and they were not helping us realize this.

 4    And I know for myself, when I found out about this, it just

 5    like was like a ton of bricks falling on me, and I said, wow,

 6    this is really significant.  That was not until late 2007.

 7                THE COURT:  Okay.  Answer Number 5, please.

 8                MR. MAUSNER:  The answer is yes.

 9                THE COURT:  And Number 6.

10                MR. MAUSNER:  Probably Dr. Zeda's declaration is

11    correct, but -- also finding out about these things can

12    sometimes be gradual, but I would go with Dr. Zeda's

13    declaration unless I find out otherwise.

14                THE COURT:  I'm looking at the Zeda declaration now.

15                I think it should be the reply declaration that's

16    cited there.

17                No.  The reply declaration doesn't have it.

18                I don't see where it is in Paragraph 16 in the

19    initial declaration, but I may have had a typo there.

20                Anyway, what's the date that you're intending to rely

21    on in the SAC?

22                MR. MAUSNER:  It may be that that's incorrect and

23    Dr. Zeda's declaration is correct, but I'm not sure.

24                THE COURT:  Now answer Number 7, please.

25                MR. MAUSNER:  The answer is yes, we would request
```

1  this, and the reason, Your Honor, is that --

2          THE COURT:  You're going to ask for a constant

3  amendment to the complaint?

4          MR. MAUSNER:  Well, what I would propose is that

5  every couple months, we submit a new copyright chart to Google

6  and that just becomes the operative exhibit to the complaint

7  rather than having to come in for an amendment or rather than

8  having to file additional --

9          THE COURT:  Look, there's a better way.  And,

10 Ms. Herrick, I doubt if you would have any difficulty in going

11 along with this.  It is absolutely unacceptable to have

12 seriatim amendments to the complaint to reflect issuances of

13 registration, unnecessary as well.

14          You can enter into a stipulation that is a single

15 stipulation that says to the extent that the copyright office

16 issues registrations for applied-for copyrights for plaintiff's

17 content for these photographs, each new issuance will result in

18 an incorporation by reference of that registration into the

19 plaintiff's case, and impose upon Mr. Mausner the duty to keep

20 you currently informed as to what the copyright office does.

21          You don't have a problem with that, do you?

22          MS. HERRICK:  Well, Your Honor, I do because at some

23 point the contours of this case simply have to be defined.

24          THE COURT:  Well, I agree with that.

25          MS. HERRICK:  So under that sort of a stipulation,

1    Perfect 10 is never going to have to meet any Rule 15 or

2    Rule 16 good cause requirement for having to amend its

3    complaint, and we wouldn't agree to waive our right to enforce

4    the federal rules in terms of future amendments of the

5    complaint.

6            So I appreciate Your Honor's attempt to work out some

7    sort of a solution that won't require Perfect 10 to keep coming

8    back to the Court, but that would give Perfect 10 carte blanche

9    to include anything and everything right up until the day

10   before trial in this case.  And Google's --

11           THE COURT:  No.  No, you can negotiate a stipulation,

12   not up to the day before trial, but certainly up to an earlier

13   point such as the close of non-expert discovery or the

14   resolution of any dispositive motions by a summary judgment.

15           I think that the Court has the inherent power to cut

16   Perfect 10 off before its -- the issuance of its last

17   registration.  I can see that for purposes of trial

18   preparation, settlement negotiations and others, you need to

19   know where their case ends, but you don't need to require them

20   to file amended complaints, and I'm not going to permit that.

21   I'm not going to require that.

22           I'm ordering you and Mr. Mausner to explore a

23   practical, fair-minded, balanced approach toward adding to the

24   mix of claim copyright violations those registrations which

25   ensue.

```
1          How many do you expect there to be?  How often does
2   he apply for new registrations?
3          MR. MAUSNER:  Whenever there is a new photo shoot or
4   if there is a new acquisition.
5          THE COURT:  Give me some time frames.
6          MR. MAUSNER:  I'd say there are about a thousand now.
7   You know, if we set a cutoff date in six months, I expect there
8   will probably be about 300 more.
9          MS. HERRICK:  Your Honor, if I might make one more
10  point.  It's not in the record before you today -- at least I
11  have not seen it -- as to whether or not the proposed
12  registrations, all 951 of them, which, of course, are each
13  comprised of multiple photographs, were timely sought and
14  timely made.  For instance, there is a big difference
15  between --
16         THE COURT:  Timely sought and timely made before the
17  copyright office, you mean?
18         MS. HERRICK:  Exactly.  So if a photo shoot just
19  happened, of course those claims could not have been included
20  back in 2004 in the complaint.
21         If we are talking about images that were acquired or
22  shot a long time ago and Perfect 10 just never got around to
23  registering until now with this case in play and it wanting to,
24  you know, increase its attempt at gaining more statutory
25  awards, then I would argue those are untimely registrations.
```

1   There would be no good cause for adding registrations to this

2   case that Perfect 10 could have sought five, six years ago.

3           THE COURT:  They couldn't have sought them if they

4   didn't exist.

5           MS. HERRICK:  Exactly.

6           THE COURT:  But there is a way you can deal with

7   that.

8           Look, the Ninth Circuit, which is ruling on an

9   injunction motion, sent some potentially applicable guidance as

10  to the scope of the claims, which without contemplating that,

11  it would, if your approach were adopted, require seriatim

12  amendments, which is inconceivable.  I don't even have to

13  belabor that point.

14          So my order sticks.  Propose the negotiation.  If the

15  two sides can't reach an agreement, which seems to be the

16  vexing theme of this hard-fought litigation, you propose your

17  separate proposals.  I'm telling you that less can be more, and

18  you shouldn't adopt an absolutist position because I agree that

19  Google has a right to know what the case consists of and what

20  it doesn't.

21          Six months strikes me as a reasonable time frame.  If

22  you can't agree, and I adopt one of the proposals and thereby

23  implicitly reject the other, the one who failed to accept the

24  prevailing proposal may be subject to sanctions.

25          All right.  Now hearing from you, Ms. Herrick -- why

1  don't you go to the lectern, please.

2          MS. HERRICK:  Thank you, Your Honor.

3          MR. MAUSNER:  There were just a couple of corrections

4  on the tentative.

5          THE COURT:  I'll hear from you later.  Let me hear

6  from her for a minute.

7          I'll give you a chance to address the basic

8  conclusion of the tentative in a minute, but answer Number 8,

9  first, please.

10          MS. HERRICK:  Sure.  Thank you.

11          We absolutely do believe that adding an entire new

12  set of claims placed upon Google's Blogger product is indeed

13  going to increase discovery.  There is no question about that

14  unless Perfect 10 is going to represent here today that it's

15  not going to serve a set of document requests, a set of

16  interrogatories, a set of RFA's targeting the Blogger service,

17  it will absolutely result in increased and different discovery

18  than has been conducted today.

19          THE COURT:  Yeah, but the next question asked about

20  duplicative discovery.

21          You are not going to be required to undergo any

22  effort that you previously did undergo if I permit this

23  amendment.

24          You may have additional new responses to make.  There

25  is no existing cutoff on discovery.  They would have a right to

1 submit those, and it's just going to mean that you go about

2 getting the information and responding to the discovery pretty

3 much in the same fashion except that it's a new terrain.

4       MS. HERRICK:  Exactly.

5       THE COURT:  It's not the old terrain, right?

6       MS. HERRICK:  Well, I disagree, actually.  We are

7 going to have to start from scratch on a parallel track to

8 what's been done regarding Google search.  As this Court knows,

9 and I believe Exhibit M to my declaration, the Herrick

10 declaration, shows Google offers a number of products and

11 services.  Search is a very, very different product than

12 Blogger, and there have been a series of discovery efforts that

13 have been ongoing for the past three-and-half years regarding,

14 you know, Perfect 10's attempts to obtain discovery and

15 admissions regarding the search product.

16       They are going to start from scratch, I assume, and

17 issue -- or request leave to issue brand new sets of discovery

18 in parallel to those regarding search but now regarding the

19 Blogger service, and this is an effort --

20       THE COURT:  When you say in parallel, it may be that

21 they use their word processor to change some language to extend

22 to Blogger.  But it's the same kind of discovery that they have

23 been conducting all these years is what you are telling me,

24 right?

25       MS. HERRICK:  Two issues.  Number 1, to the extent

1     it's the same, it's absolutely duplicative, and there's an

2     abundance of case law holding --

3           THE COURT: It can't be the same if it's about an

4     entirely new function that Google performs through its

5     ownership of Blogger, right?

6           MS. HERRICK: Right. I am making two points here.

7           The first is all of the discovery that's already been

8     served regarding search, I expect and anticipate that Perfect

9     10 is going to attempt to re-serve parallel discovery aimed at

10     Blogger instead of aimed at Google's search service.

11           THE COURT: You are going to do that, aren't you, Mr.

12     Mausner?

13           MR. MAUSNER: Well, I don't know if it's going to be

14     exactly the same. We are going to take discovery regarding

15     Blogger, but it depends what we need obviously.

16           THE COURT: But it's going to be along the same lines

17     as the discovery you have been conducting all along, right?

18     It's just about Blogger.

19           MR. MAUSNER: I don't know that the discovery request

20     would be the same, but, yes, yes, we are going to take

21     discovery regarding Blogger certainly.

22           MS. HERRICK: So my second point is that obviously

23     Blogger is a different service. It operates differently. A

24     different provision of the DMCA safe harbor applies. That

25     would be Section 512(c) rather than Section 512(d). C covers

1    service providers.

2            THE COURT:  But now you are -- well, I should let you

3    give your answer.  Are you still talking about discovery?

4            MS. HERRICK:  Yes.  And so my point being of course

5    Perfect 10 is going to serve discovery aimed at our affirmative

6    defenses.  It already has and it will, and there is an entirely

7    different set of affirmative defenses and legal issues that are

8    implicated by the nature of the Blogger service that are not

9    implicated by search.

10           For instance, Blogger, like a message board, is kind

11   of a tabla rasa that third parties can come and post their own

12   content on.

13           THE COURT:  Each new issues and the new provision of

14   the DMCA to which you alluded, have they been raised in the You

15   Tube litigation in New York?

16           MS. HERRICK:  I am not representing Google in that

17   action, so I would have to check.  I don't know the answer.

18           THE COURT:  Isn't the theory that -- and the factual

19   nature of what Blogger does very, very much like what You Tube

20   does except for You Tube does it with videos?

21           MS. HERRICK:  I don't -- I mean, based upon my

22   general understanding of the You Tube case, I don't think

23   that's the case.

24           There are different mechanisms for You Tube that have

25   been implemented by Google in terms of screening the uploading

1    of content.  But I really don't feel comfortable speaking to

2    that because I'm not representing Google in that action.

3         THE COURT:  I understand that, but I'm just trying to

4    see what is really novel, if anything, about these claims

5    arising out of the peculiar discovery, late as it may have

6    been, of what Blogger does.

7         And I don't see -- from what little I know about the

8    You Tube case, I don't see a fundamental conceptual difference

9    here, and I'm not aware of any dismissal motions that Google

10   filed -- I know it's not your firm and not you personally -- in

11   the You Tube case.

12        So if I'm right about that, it strikes me as this not

13   being an altogether novel theory.

14        MS. HERRICK:  I'm not sure what the Court means by

15   novel, but certainly there are no You Tube allegations in this

16   case.  So in terms of whether Perfect 10 has met its obligation

17   of showing that leave should be granted here and whether Google

18   has met its obligation of showing that adding Blogger claims to

19   this case will indeed require brand new areas of discovery in

20   this case, that standard has been met here.  Whether similar

21   issues might be raised in the You Tube case I don't think is

22   relevant to whether the Rule 15 standard is met here.

23        THE COURT:  All right.  Now look at the tentative and

24   tell me what you object to in it.  I mean everything in terms

25   of the conclusion.  I don't want you to be that broad-based.

| | |
|---|---|
| 1 | What, if anything, is factually incorrect to start with? |
| 2 | MS. HERRICK:  Thank you, Your Honor. |
| 3 | Fundamentally, we have to look at the Blogger and the |
| 4 | search services differently.  Those proposed amendments have to |
| 5 | be looked at separately because they are very different claims. |
| 6 | Issues regarding untimeliness, issues regarding futility are |
| 7 | very, very different. |
| 8 | THE COURT:  Trust me, I've read your briefs.  Okay? |
| 9 | I know they're different.  You just tell me -- listen to my |
| 10 | question carefully, please, and answer my question. |
| 11 | In this pretty detailed order, which I worked on very |
| 12 | extensively right through the weekend, is there something |
| 13 | that's factually inaccurate? |
| 14 | MS. HERRICK:  I believe there are facts that the |
| 15 | Court might have inadvertently overlooked. |
| 16 | THE COURT:  Tell me what they are, please; material |
| 17 | facts. |
| 18 | MS. HERRICK:  Sure.  So on the timeliness of the |
| 19 | Blogger amendments, the Court correctly notes there are two |
| 20 | issues at play.  The first is when did Perfect 10 come to learn |
| 21 | of full-size infringing images on Blogger; and, secondly, when |
| 22 | did Perfect 10 know or when should it have known that Google |
| 23 | owned Blogger. |
| 24 | And as to the first issue, the Court in its tentative |
| 25 | goes with a date of May of 2006. |

1          THE COURT:  You're talking now about the bottom of

2     Page 6?

3          MS. HERRICK:  Yes, I believe so.  Let me double-check

4     that page.

5          Yes.  The bottom of 6, into the top of 7.

6          In fact, I know there was a lot of material submitted

7     to you in a very short period of time, but looking back through

8     the exhibits that were submitted in Perfect 10's opening

9     motion, Perfect 10 states in Paragraph 8 of Mr. Zeda's opening

10    declaration that it printed out -- that Mr. Zeda personally

11    printed out a full-size infringing image from a Blogspot site,

12    he said -- his declaration says, somewhat amorphously, in 2005.

13         When you actually turn to the exhibit that he's

14    referencing, which is Exhibit 4, you'll see that that website

15    was in fact visited on December 3rd of 2004, which this Court

16    correctly pointed out in a different portion of its tentative

17    ruling.  So if you turn to Exhibit 4 --

18         THE COURT:  Yeah, I have it.

19         MS. HERRICK:  -- the very first of Mr. Zeda's

20    declaration, the very first page of that exhibit shows a

21    Blogger website with a full-size image that Perfect 10 -- that

22    Mr. Zeda has stated in Paragraph 8 of his declaration is a

23    Perfect 10 image that he printed, he says, in 2005.

24         So at a minimum, Perfect 10 can't dispute because it

25    has submitted these very facts that it was aware of at least

1    one full-size infringing Perfect 10 image on a Blogger website

2    on or around December 3rd of 2004 which, of course, is just two

3    weeks after Perfect 10 filed its initial complaint in this

4    matter and three-and-half years ago.

5            So that's one additional fact I'd like to point out

6    for the Court.

7            THE COURT:  Okay.  Page 4, Paragraph 8, at the top of

8    Zeda's declaration, his opening declaration, refers to

9    Exhibit 4.  It says he print-screened it in 2005.

10           MS. HERRICK:  Right.

11           THE COURT:  So what were you just telling me about

12   late 2004?

13           MS. HERRICK:  Because as Your Honor pointed out in a

14   different portion of the tentative ruling, if you look at

15   Exhibit 4, the date on that exhibit is December 3rd, 2004.

16   It's a blog post for that date.

17           THE COURT:  Where does it appear?  I'm looking at the

18   image.

19           MS. HERRICK:  Right above the word black lace scarf,

20   the phrase.

21           THE COURT:  Oh, yeah.  Friday, December 3rd, 2004?

22           MS. HERRICK:  Right, which was two weeks after this

23   case was filed.

24           And, you know, Perfect 10 submitted this in its

25   opening moving papers to the extent that that --

1          THE COURT:  Why does that indicate the date that he

2    printed this out?

3          MS. HERRICK:  Well, whether -- Your Honor's tentative

4    associated Exhibit 4 with a date of December 3rd, 2004, which I

5    agree with, but even assuming that that date is not the date

6    that Mr. Zeda actually visited this website, his own

7    declaration says that he print-screened it in 2005.

8          THE COURT:  Right.

9          MS. HERRICK:  He doesn't narrow that down.  Could be

10   January 2005.  Could be December 2005.  Either way, that's

11   three-plus years ago.

12         THE COURT:  Okay.  What else is factually inaccurate

13   or incomplete?

14         MS. HERRICK:  So the Court also notes in its

15   tentative at Page -- the top of Page 7 that Google had not

16   refuted the reply declarations submitted by Mr. Zeda and

17   Mr. Mausner.

18         THE COURT:  Right.

19         MS. HERRICK:  Of course, we haven't yet had the

20   opportunity to refute them since they were new declarations

21   submitted on reply.

22         THE COURT:  That's true.

23         MS. HERRICK:  We do, in fact, refute them.  And I

24   have brought with me today some additional evidence that we

25   located after we received these reply declarations that also

1  show that the statements are incorrect.  Specifically, we went

2  back through Perfect 10's very large 600-plus gigabyte document

3  production, and we found some very interesting documents that

4  we print-screened for Your Honor that I'm happy to hand up, if

5  I may approach.  And I have a copy for Mr. Mausner as well.

6          THE COURT:  Give them to Mr. Mausner.  Hand them to

7  Mr. Montes, please.

8          Okay.  So what is this showing?

9          MS. HERRICK:  So the first page is a print screen

10  from Perfect 10's -- one of the hard drives that Perfect 10

11  produced to Google in this case.  And as you can see --

12          THE COURT:  April 16th, 2006?

13          MS. HERRICK:  Yes.  The folder is entitled "For

14  Google Miscellaneous."  And as you see, the first folder,

15  Perfect 10 has collected Blogspot alleged infringements,

16  Blogspot images.

17          THE COURT:  Back up for a second.

18          MS. HERRICK:  Sure.

19          THE COURT:  You are going to be asking me to look at

20  some of these printouts from these screens, but what -- this is

21  discovery that Google obtained from Perfect 10?

22          MS. HERRICK:  This is a production that Perfect 10

23  gave to Google, correct.

24          This is part of -- these are print screens from a

25  hard drive that Perfect 10 produced that Mr. Zeda put together.

1          He put together a hard drive and served it on Google

2    that was a collection of these print screens that he surfs and

3    finds and produces in discovery.  So as you can see, he has a

4    folder here entitled "Blogspot Images August 1."

5          Now, the save date is April 14th, 2006, so we can

6    only presume that August 1 is a reference to 2005.  But my

7    point for showing you this is that as early as early 2006,

8    Perfect 10 was collecting infringements on Blogspot websites as

9    a separate known thing in folders.

10          And you can see the next page is another screen shot.

11   In this folder, the head folder is entitled "Key Sites Google."

12   And under that large folder, you see another sub folder

13   entitled "blogspot.com" about six lines down, not

14   so-and-so.blogspot.com, but Perfect 10 in early 2006 is

15   collecting alleged blogger infringements and Blogspot

16   infringements in specific folders.

17          Now, when you click on that folder -- turn the page,

18   please, to Page 3 -- this is what you see.  You see a number of

19   PDF's, a handful or so of alleged different Blogspot website

20   infringements.

21          And if you click on the fifth one down, which is

22   fotzo.blogspot.com -- and then there is an ellipses.  I can't

23   see the rest in this screen shot.  If you click on that entry,

24   which as you see was saved on January 1st, 2006, the next page

25   gives you a PDF of the alleged infringements that Mr. Zeda or

1  someone within Perfect 10's business association found on

2  fotzo.blogspot.com on January 1st, two-thousand -- January 4th,

3  2006.

4       THE COURT:  Well, the page -- oh, because it's on

5  November 22nd of 2005.

6       MS. HERRICK:  Exactly.  It's quite possible that it

7  was in 2005 that Perfect 10 gathered this document, but the PDF

8  save date happens to be January 4th of 2006.  So at the very

9  latest --

10       THE COURT:  Is this a Perfect 10 model?

11       MS. HERRICK:  Yes, it is.  I believe Marcata is her

12  name, but these are images that --

13       THE COURT:  All of the ensuing pages are what you

14  would get by clicking on that?

15       MS. HERRICK:  Yes.  When you click on the PDF,

16  http_fotzo.blogspot.com_2, and then there is an ellipses, you

17  get the following excerpt of pages, which, if you look at the

18  bottom of the page, have a URL print date of January 5th, 2006,

19  4 a.m.

20       THE COURT:  Okay.  So you're basically saying that as

21  you argue it or construe it, this series of pages puts the lie

22  to --

23       MS. HERRICK:  No later than January of 2006 in terms

24  of Perfect 10's awareness of the operative facts of alleged

25  infringements of full-size images on Blogspot websites.

1          So that's the first of the two prongs of Your Honor's

2     test for whether they knew or should have known of blogger

3     infringements and, therefore, whether their proposed amendments

4     are timely.

5          So on Prong One, we've got documents going back to

6     literally two weeks after this case was filed through roughly

7     January --

8          THE COURT:  Well, that doesn't mean they -- that's

9     stretching it.  The documents may go back to then.  It doesn't

10    mean there was any basis for them to be known or, in fact,

11    knowledge about them that early on in the case.

12         MS. HERRICK:  Well, I disagree, Your Honor.  Perfect

13    10, in addition to the single Exhibit 4 document that I showed

14    you of the black tie scarf full-sized alleged infringement on a

15    Blogger website that was printed roughly late 2004, early 2005,

16    Perfect 10 also makes the very important point in Mr. Zeda's

17    declaration at Paragraph 8 --

18         THE COURT:  Dr. Zeda.

19         MS. HERRICK:  Sorry.  Dr. Zeda -- that -- and I am

20    looking specifically at Page 4 of Dr. Zeda's declaration at

21    Lines 11 through 13 where Dr. Zeda states, quote, "In its 2005

22    exhibits in support of its motion for preliminary injunction,

23    Perfect 10 submitted 20 images that were part of infringing

24    websites hosted by Google," and then string-sites a list of

25    them.

1          We're not talking about one or two documents lost in

2     the mass of gigabytes that Perfect 10 has produced.  We are

3     talking about live exhibits to Perfect 10's preliminary

4     injunction motion which it submitted under Rule 11 in penalty

5     of perjury to Your Honor back in mid to late 2005.

6          So it cannot be disputed that Perfect 10 had

7     knowledge, not just constructive, but actual knowledge of the

8     operative facts; i.e., full-size images posted on a Blogger

9     website.

10          THE COURT:  Okay.  We are beginning to run out of

11     time.  In fact, we began a long time ago.

12          Do you want to respond to these series of pages?

13          MR. MAUSNER:  Well, I'm not sure how that shows any

14     different dates than what are set forth in Dr. Zeda's

15     declaration.

16          THE COURT:  Look, if she's right that this was what

17     your client produced and we know that Dr. Zeda is personally

18     involved in the collection of material and the production of

19     material, and an inference can be drawn that he was involved in

20     the search on the web of Blogspot that led to the ensuing

21     pages, then it does seem inconsistent with his reply

22     declaration.  So what's your response?

23          MR. MAUSNER:  Well, he may have -- he or someone else

24     at Perfect 10 may have downloaded these pictures in

25     January 2006, but he didn't -- and I certainly didn't -- know

1  of any connection between Blogspot and Google at that time.

2          THE COURT:  Well, it was publicly known since 2003

3  that Google had acquired Blogger.

4          MR. MAUSNER:  Well, I didn't know that.

5          THE COURT:  Okay.  Anything else, Ms. Herrick?

6          MS. HERRICK:  Yes, Your Honor.

7          Just addressing your second point of constructive

8  knowledge, you're indeed correct that it has been public

9  knowledge since February 15th of 2003 that Google owns Blogger.

10         THE COURT:  Okay.  But get to something that's not in

11 your papers --

12         MS. HERRICK:  Absolutely.

13         THE COURT:  -- that's materially incorrect about this

14 analysis.

15         MS. HERRICK:  So going back to Page 7 where you talk

16 about -- where the Court talks about when Perfect 10 can be

17 charged with constructive knowledge that Google owns Blogger,

18 the Court again points to a date of May 2006.

19         And I believe there are some additional dates that

20 are relevant beyond what's in the papers, specifically, in

21 April of 2005.  Aside from the fact that it's public knowledge

22 and it's a public company and you can go to Blogger.com and see

23 copyright Google, in April of 2005, Google produced documents

24 to Perfect 10 that I've included at I believe Exhibit R to the

25 Herrick declaration that show to the extent that Perfect 10 was

1  not obliged to go out and run a search on the internet to see

2  who owned Blogger.  Google produced documents that showed that

3  Google owned Blogger in April of 2005.

4         And, of course, Your Honor has already seen in the

5  papers that in March of '06, Perfect 10 itself --

6         THE COURT:  Exhibit R was the Proposed Second Amended

7  Complaint, so you don't mean Exhibit R.

8         MS. HERRICK:  Exhibit M, I believe -- sorry -- to the

9  Herrick declaration.

10        Yes, it's Exhibit M.  This document was produced --

11        THE COURT:  Yes.  I cited that in the order.

12        MS. HERRICK:  Okay.  So in April of 2005 to the

13  extent Perfect 10 didn't know already, Google produced

14  documents showing its association with and ownership of

15  Blogger.  And, of course, Perfect 10's own document production

16  also includes printouts of --

17        THE COURT:  Okay.  So let me just ask you this.

18        Apart from having to provide additional discovery

19  which may be very sprawling and extensive relating to Blogger,

20  along the lines of what you've already been doing in response

21  to web search and image search, apart from that, what other

22  prejudice can you point to?

23        MS. HERRICK:  The other prejudice -- and there is

24  sort of an overlap between prejudice and bad faith arguments

25  here.  As we briefed -- as we touched upon in the opposition

1    papers, the parties have gone around the wheel and back, to the

2    Ninth Circuit and back, litigating these issues.

3          The Ninth Circuit has spoken.  Had Perfect 10 raised

4    these issues back in 2004, 2005, when it became aware of

5    them --

6          THE COURT:  Which issues?

7          MS. HERRICK:  The alleged Blogger infringements.

8          -- the Court could have passed muster on that,

9    including what the Court alluded to earlier, which is in my

10   opinion a very clear preemption under the Communications

11   Decency Act of all the Blogger claims --

12         THE COURT:  That's an issue that isn't clear from the

13   Second Amended Complaint.  They have tried to plead around it,

14   and I have some doubts about whether they will get away with

15   it.  But what I said in this order, Ms. Herrick, you can't

16   really refute it.  Why would Perfect 10 play games --

17         MS. HERRICK:  I'll tell you why.

18         THE COURT:  -- given especially the Ninth Circuit's

19   adoption of my server test?

20         MS. HERRICK:  First of all, I'd like to just sort of

21   set the stage which is that Google does not have to show that

22   Perfect 10 was playing games.

23         We don't have to show that Perfect 10 was

24   intentionally manipulating anything.  All we have to show is

25   undue delay that resulted in our prejudice.

1           THE COURT:  You just started to put your remarks in

2   the rubric of bad faith, so tell me why they would have been

3   prone to display bad faith.  That's also an element.

4           MS. HERRICK:  But bad faith, though, does not have to

5   be maliciousness.  It can simply be an inadvertent intentional

6   reckless failure to bring something to the Court's attention in

7   a timely fashion.

8           And here's why.  At the preliminary injunction stage,

9   as Your Honor I'm sure recalls, Perfect 10 was advocating the

10  display or the incorporation test that any sort of display

11  sponsored by Google in a frame or otherwise would constitute an

12  infringement.

13          Now, obviously, that is a home run argument for

14  Perfect 10.  Had Perfect 10 succeeded on that argument, it

15  would argue that any in-line linking, any framing, any anything

16  is an infringement.

17          THE COURT:  Wait a minute.  I didn't buy that

18  argument.

19          MS. HERRICK:  So it wasn't that Perfect 10 had to

20  intentionally conceal the Blogger infringements.  It's that it

21  wasn't relevant to Perfect 10's home run theory.

22          Having lost the home run theory as confirmed by the

23  Ninth Circuit on December 3rd, 2007, Perfect 10 brought

24  additional evidence in that it knew about a long time ago to

25  supplement and address the Court's unfavorable ruling on the

1  incorporation test or the display test to submit additional

2  evidence that it believes is met by the server test.

3  　　　　We don't have to show that there was malice or evil

4  intent.  The fact that Perfect 10 knew about it, didn't bring

5  it, we were prejudiced by it.  And there are facts, as Your

6  Honor noted in your tentative, that would absolutely have been

7  relevant to the Ninth Circuit's consideration.  That's

8  sufficient.

9  　　　　THE COURT:  If those facts had been provided to the

10  Ninth Circuit, they wouldn't have helped Google.

11  　　　　MS. HERRICK:  That's not true, Your Honor, because

12  Google would have argued, briefed and raised the fair use and

13  CDA preemption defenses, and the fact that there were no DMCA

14  notices provided for the vast majority of these alleged

15  infringements.  There are many affirmative defenses that Google

16  would have briefed and may very well have succeeded on with

17  the --

18  　　　　THE COURT:  You can still brief, right?

19  　　　　MS. HERRICK:  I'm sorry?

20  　　　　THE COURT:  You can still brief, right?

21  　　　　MS. HERRICK:  You mean if we decide to --

22  　　　　THE COURT:  If the claim is allowed to proceed.

23  　　　　MS. HERRICK:  Well, of course we can still brief

24  them, but whether or not the Rule 15 has been met here, whether

25  or not there has been a three-and-half- to five-year delay in

1    bringing these claims is absolutely an argument that Google is

2    entitled to have passed upon now.

3           And to the extent these claims are futile, I submit

4    that the Forsyth v Humana case, which is Ninth Circuit 1997, is

5    something -- is Ninth Circuit binding precedent that holds that

6    where federal preemption would defeat a proposed amended state

7    claim, the amendment can't be allowed.  And I can get Your

8    Honor a cite for Forsyth.

9           THE COURT:  Okay.  But I --

10          MS. HERRICK:  114 F.3d 1467.

11          THE COURT:  Okay.  I don't think that that's a strong

12   argument for you.

13          If the claims can be preempted, once it's clear how

14   Blogger functions and to what extent Google falls on either

15   side of the divide that's in the roommate's case, you can bring

16   a motion to dismiss or a motion for summary judgment, and you

17   may have a winner.

18          MS. HERRICK:  And I was just going to say, although

19   we believe very strongly that these claims are futile, if Your

20   Honor would rather have them heard in a 12(b)(6) or a 12(c)

21   motion, we are happy to bring it that way.

22          THE COURT:  And I think as to that narrow part of

23   this complex of issues, that would be the procedurally

24   preferred way.

25          MS. HERRICK:  Okay.

1          THE COURT:  All right.  I'm going to take this matter

2    under submission.  Thank you, counsel.

3         (Proceedings concluded.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25