1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

4                      - - - -

5

6   PERFECT 10, INC., A CALIFORNIA     )
    CORPORATION,                       )
7                         PLAINTIFF,   )
                                       )
8            vs.                       ) No. CV04-09484-AHM(SHx)
                                       )
9   GOOGLE, INC., ET AL.,              )
                          DEFENDANTS.  )
10  _____)
                                       )
11  PERFECT 10, INC., A CALIFORNIA     )
    CORPORATION,                       )
12                        PLAINTIFF,   )
                                       )
13           vs.                       ) No. CV05-04753-AHM(SHx)
                                       )
14  AMAZON, ET AL.,                    )
                          DEFENDANTS.  )
15  _____)

16

17         REPORTER'S TRANSCRIPT OF PROCEEDINGS

18             LOS ANGELES, CALIFORNIA

19            MONDAY, AUGUST 18, 2008

20

21

22      _____

23         CINDY L. NIRENBERG, CSR #5059
           U.S. Official Court Reporter
24         312 North Spring Street, #438
           Los Angeles, California 90012
25         www.cindynirenberg.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Dockets.Justia.com

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:
                       MAUSNER IP LAW
4                      BY: JEFFREY N. MAUSNER, ATTORNEY AT LAW
                       21800 OXNARD STREET
5                      SUITE 910
                       WOODLAND HILLS, CA 91367
6                      310-617-8100

7

8    FOR THE DEFENDANT GOOGLE:
                       QUINN EMANUEL URQUHART OLIVER & HEDGES
9                      BY: MICHAEL T. ZELLER, ATTORNEY AT LAW
                           RACHEL M. HERRICK, ATTORNEY AT LAW
10                     555 TWIN DOLPHIN DRIVE
                       SUITE 560
11                     REDWOOD SHORES, CA 94065
                       650-801-5000

12

13

     FOR THE DEFENDANTS AMAZON.COM, A9.COM AND ALEXA INTERNET:
14                     TOWNSEND & TOWNSEND & CREW
                       BY: ANTHONY J. MALUTTA, ATTORNEY AT LAW
15                     TWO EMBARCADERO CENTER
                       8TH FLOOR
16                     SAN FRANCISCO, CA 94111
                       415-576-0200

17

18

     PRESENT TELEPHONICALLY:
19                     STEPHEN J. HILLMAN, U.S. DISTRICT
                       COURT MAGISTRATE JUDGE

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 18, 2008

 2                          2:28 P.M.

 3                          -  -  -  -  -

 4          THE CLERK:  Calling Item Number 3, CV04-9484, Perfect

 5   10, Inc. versus Google, Inc., et al. and related case,

 6   CV05-4753, Perfect 10, Inc. versus Amazon, et al.

 7          Counsel, state your appearances, please.

 8          MR. MAUSNER:  Good afternoon, Your Honor.  Jeff

 9   Mausner for the plaintiff, Perfect 10.

10          THE COURT:  Good afternoon.

11          MR. ZELLER:  Good afternoon, Your Honor.  Mike Zeller

12   and Rachel Herrick for Google.

13          THE COURT:  Good afternoon.

14          MR. MALUTTA:  Good afternoon, Your Honor.  Anthony

15   Malutta for Amazon.com, A9.com and Alexa Internet.

16          THE COURT:  Can you spell your last name, please?

17          MR. MALUTTA:  Malutta.  M-A-L-U-T-T-A.

18          THE COURT:  Okay.  Judge Hillman, are you patched in?

19          JUDGE HILLMAN:  Yes.

20          THE COURT:  All right.  I'm not sure if the clerk

21   told you that I've arranged, happily, to have Judge Hillman

22   participate in this 16(b) scheduling conference hearing.

23          I'm going to give you a sense of where things may

24   lead, although I have made no final decision, and I reserve the

25   right to discuss the matter further with Judge Hillman, but
```

1  depending on what I learn in this conference -- and part of it

2  will be about the status of the Microsoft case -- there is a

3  good likelihood that I'm going to require the parties to meet

4  and confer and recommend two different independent individuals

5  as to whom or from whom the Court would appoint one to serve as

6  a discovery master in this case in lieu of Judge Hillman.  Not

7  just in this case, meaning Google and Amazon, but possibly in

8  Microsoft.

9        Now, the status of Microsoft could affect that, and I

10 have some views which I'll explore with the lawyers about the

11 costs and the like, but the overriding concern I have and the

12 overview I have from reading these lengthy scheduling

13 conference papers is that the level of acrimony is

14 unacceptable, the conceptual, practical and apparently personal

15 differences are profound, that the course of further

16 proceedings leading up to trial in any or all of these actions

17 are going to be unmistakenly and unavoidably acrimonious and

18 complicated, and it would be beyond the capacity of the Court,

19 both Judge Hillman and myself, to administer justice properly

20 under those circumstances, and outside assistance under the

21 federal rules is probably perfectly appropriate and even

22 compelled in this case.  That's my overview.

23       Now, I'm going to ask you some questions about the

24 Microsoft case.  I'm ordering the parties to jointly -- and

25 that means splitting the cost three ways -- obtain a transcript

1    of today's proceeding.

2            And I'm ordering you, Mr. Mausner, to notify counsel

3    for Microsoft today that I asked certain questions about the

4    status of the Microsoft case.  They're not patched in because

5    this was a decision I made only a short while ago, but I want

6    you to send a copy of the transcript to them or make it

7    available to them promptly as soon as it's available.

8            Now, in the Microsoft case, I had a scheduling

9    conference, and I set a trial date of June 23rd.  I don't have

10   a very reliable recollection of all that transpired.  I've

11   looked at some notes that were compiled, and I noticed that

12   when we had that conference, which resulted in a precise

13   schedule leading up to a June 23rd, 2009 trial date -- and that

14   conference was held on February 11th, I guess some six or seven

15   months ago -- there was a dispute between the parties, meaning

16   Perfect 10 and Microsoft, relating to the format of electronic

17   discovery.  And that's the same dispute that is pending now.

18           Microsoft is using TIFF, an acronym that stands

19   undoubtedly for something.

20           Perfect 10 was using Adobe or JPEG.  So I don't

21   recall if that was a matter that was supposed to be resolved by

22   Judge Hillman if the parties couldn't agree, but where does it

23   stand on the Microsoft case, because that seems to be the

24   present dispute here?

25           And by asking you where it stands, I mean have the

1  parties worked out some kind of agreement on how to exchange

2  and in what format to make available electronic discovery?

3         MR. MAUSNER:  There is no discovery dispute regarding

4  the form of the documents to be produced and which have been

5  produced.  That has gone away.

6         THE COURT:  Well, what is the agreement then?

7         MR. MAUSNER:  There is no agreement.  We produced

8  documents to them in Adobe and other formats.  They produced

9  documents to us in TIFF, and there is no dispute about that.

10         THE COURT:  Why should there be a dispute here, then?

11  If that's a combination that has been working in Microsoft, why

12  can't it work here?

13         MR. MAUSNER:  I see no reason why it couldn't work

14  here.  The only dispute -- and this is in all three of the

15  cases -- is whether we have to do a compilation of the

16  documents that have been produced.  The compilation that all of

17  the parties want -- you know, it's a chart that sets out

18  certain information.

19         THE COURT:  This is the chart that you claim would

20  take a hundred years?

21         MR. MAUSNER:  Over a hundred years.

22         THE COURT:  You know, Mr. Mausner, tell me how you

23  got to that figure.

24         MR. MAUSNER:  Well, there are over a million

25  infringements.  The chart has -- different charts have from

1  six, I think, to --

2       THE COURT:  Tell me what some of your assumptions

3  were.  How many people would be working on it, how much time

4  per person, and how many hours per week, and with what other

5  factors that would result in three generations of human beings

6  or a hundred years being necessary?

7       MR. MAUSNER:  We actually do have that.  I don't have

8  it with me, but for -- you know, you are talking about at least

9  6 million entries.  And we worked it out and we did it with 40

10 hours per week, and it would take one person more than a

11 hundred years to do it.

12      THE COURT:  I don't believe that, personally.  I am

13 not trying to tell you that your math is all wrong.

14      MR. MAUSNER:  For a million entries -- a million rows

15 with at least 6 columns in it, you're talking about 6 to

16 10 million entries.  That is going to take -- and I think

17 that's a very conservative estimate of how long it's going to

18 take.

19      THE COURT:  I think on its face it lacks all

20 credibility.  The only reason I am tarrying at this point to

21 point that out is that it's an example, although regrettably

22 not the only example, of real hyperbole.

23      MR. MAUSNER:  It --

24      THE COURT:  Mr. Mausner, don't interrupt me.  Okay?

25      There could be all kinds of reasons why it's

1  inconceivable that something like that would take a hundred

2  years, including the likelihood that between now and year 10,

3  and between year 10 and year 20, and between now and the next

4  century, there would be continuing advances in all kinds of

5  matters involving software, computers, calculations and

6  everything else.

7          But I'm not going to debate the point with you

8  because, it may be burdensome, but no way close to a hundred

9  years.

10          The more important point is that it tells me

11  something about what is going on in these cases, and that's not

12  necessarily just a slap on your wrist, because if there is some

13  level of frustration that results in such extreme positions

14  being asserted repeatedly that on their face lack all

15  credibility, it may be because there's been a persistent

16  campaign of provocation, which wouldn't surprise me either.  So

17  I'm not finding fault with just one side.  But don't in the

18  future come to any judge or any special master whom I wind up

19  appointing with such outrageous claims of a hundred years.

20          A hundred years ago, nobody could imagine what life

21  is like today, August 18th, and I don't think you can imagine

22  what life will be like for the next hundred years either.

23          Now, getting more directly to the issues in the

24  Microsoft case that may have a bearing on what I do here, the

25  recurring dispute that's present before me this afternoon is as

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to the defendants' request that lots of depositions, far more

2    than the ten that the rules presumptively allot, 30 in the case

3    of Google, are necessary and fair.

4            How many depositions is Microsoft going to be

5    permitted to take of Perfect 10?

6            MR. MAUSNER:  There was not any variation of the

7    rules in Microsoft.  It was ten.

8            THE COURT:  Have the parties reached an agreement in

9    Microsoft that it would be the rules and no exceptions?

10           MR. MAUSNER:  Well, that's what was decided at the

11   scheduling conference.

12           THE COURT:  And the parties are sticking to that?

13           MR. MAUSNER:  Yes.

14           THE COURT:  Okay.  Now, did the parties enter into a

15   Protective Order in Microsoft that affects such things as the

16   right of in-house counsel to review claimed confidential

17   material of Perfect 10, the right of Zada to review claimed

18   confidential material of Microsoft, and other comparable

19   disputes that are surfacing today between your client on the

20   one hand and Google and Amazon on the other?

21           MR. MAUSNER:  Yes.

22           THE COURT:  No issues relating there?

23           MR. MAUSNER:  No.

24           THE COURT:  Okay.  So what is the deal?  What is the

25   nature of the agreement?

1          MR. MAUSNER:  Dr. Zada can see all of the documents

2     produced by Microsoft.  Their in-house counsel can see all of

3     the documents produced by Perfect 10.

4          THE COURT:  Well, let me ask you a different

5     question, and it's kind of working from a different

6     perspective.  What disputes have surfaced in Microsoft between

7     the time we had that scheduling conference in February and now?

8          MR. MAUSNER:  There is just the discovery dispute

9     involving the charts that they want us to compile, and then

10    there are also some requests for admissions that they want us

11    to modify our responses to.

12         THE COURT:  And are those disputes the subject of a

13    motion that's pending before Judge Hillman?

14         MR. MAUSNER:  It's not pending yet.  We're working on

15    the joint stipulation.

16         THE COURT:  Have the parties lined up a mediator?

17         MR. MAUSNER:  No.

18         THE COURT:  Have they discussed a mediator?

19         MR. MAUSNER:  No.

20         THE COURT:  Speaking just for yourself, I realize you

21    can't purport to speak for Microsoft, but why do you think

22    things are proceeding more smoothly in the Microsoft case, if

23    they are -- as appears to be the case -- than in these cases?

24         MR. MAUSNER:  Well, I think, you know, Google's

25    counsel is trying to make things difficult for us.

```
1              THE COURT:  What about Amazon?

2              MR. MAUSNER:  There haven't been many disputes in the

3    Amazon case.  There's this one motion that's pending and that's

4    it.

5              THE COURT:  Which motion are you referring to?

6              MR. MAUSNER:  It's the same motion involving the

7    charts that they want us to compile, the discovery motion.

8              THE COURT:  And is that pending before Judge Hillman?

9              MR. MAUSNER:  That is.  That's set for September 8th.

10             THE COURT:  And also on September 8th is Google's

11   motion to compel answers to Interrogatories 3 and 11?

12             MR. MAUSNER:  Yes, that's also going to be heard on

13   the 8th.

14             THE COURT:  And is there a motion pending before

15   Judge Hillman relating to Zada and his access to information?

16             MR. MAUSNER:  Yes, in the Google case.

17             THE COURT:  And when is that noticed for?

18             MR. MAUSNER:  We had a telephone hearing on that.

19             Judge Hillman determined that Google had not

20   established that the information that they wanted to prevent

21   Dr. Zada from seeing was not publicly available or that it was

22   crown-jewels type of information, and he asked Google to submit

23   another declaration on that issue.

24             THE COURT:  Is there a hearing date set before Judge

25   Hillman on that?
```

1          MR. MAUSNER:  No.  They're going to submit their

2    declaration and then it would proceed from there.

3          THE COURT:  Okay.  Now, with the date that I set for

4    the Microsoft trial of June 23rd, what prompted you to propose

5    April 14th for a trial date in Google?

6          MR. MAUSNER:  Well, we wanted to proceed with the

7    Google case prior to the Microsoft case.  That case has been

8    pending since 2004, and, you know, we wanted to have it

9    sometime before the Microsoft case, several months, and that

10   was the date that we thought we could manage.

11         THE COURT:  Why did you want to have it before

12   Microsoft?

13         MR. MAUSNER:  To get all of these cases over.  You

14   know, I --

15         THE COURT:  Well, have you discussed with the lawyers

16   in any one of these three different cases the possibility of

17   having one case serve not as the conclusive case -- or

18   preclusive, necessarily, but as the equivalent of a test case,

19   and depending on findings -- and there could be very precise

20   findings with quite detailed, special findings for the jury to

21   return -- to have the benefit to the administration of justice

22   of collateral estoppel?

23         MR. MAUSNER:  We have not discussed that.  We have

24   discussed having the trials together all at once and --

25         THE COURT:  Well, I'll tell you now that I am very

1   disinclined to pack Amazon and Google together at trial.  The

2   differences are far too great, the risk of confusion far too

3   great, the overlap far too little to warrant having a single

4   trial.  But that doesn't mean that if there are multiple

5   trials, there would have to be a reinvention of the same wheel

6   all over again.

7         I can think of various ways to ease the burden on

8   Perfect 10 at the second trial, but you shouldn't seriously

9   pursue the notion that there's going to be a joint trial of the

10   Google and Amazon cases.  That's just not going to happen.

11         Now, having set the dates in Microsoft, and believing

12   that with a June 23rd date -- that's something that I intend to

13   stick to -- I've got to tell you, with all of the difficulties

14   and issues that have to be resolved on the Google case, your

15   proposed trial of April 14th is utterly unrealistic and

16   impractical.

17         The presumptive schedule I'm setting for very simple

18   cases doesn't even -- on today's scheduling conferences doesn't

19   trigger such an early trial date, and this case is not

20   presumptively simple.  There are too many issues that have to

21   be resolved.

22         So maybe you should begin to consider how you want to

23   wage battle -- and you have a right to wage battle, and I

24   admire in many respects the way you have been waging battle

25   against these behemoths -- in light of the fact that you are

1    going to go first almost certainly in Microsoft.

2              So maybe you should put on a thinking cap and figure

3    out how you want to structure that trial in a way that think is

4    both advantageous to your client vis-a-vis the upcoming trials,

5    because they are going to be sitting in on the trial and

6    watching.

7              And one of the benefits of having a discovery master

8    who looks at these three cases as a whole, different as they

9    are and separate as they may have to be handled in certain

10   respects, one of the benefits is that there are various

11   measures, stipulations, preclusive orders, legal consequences

12   of findings in one matter that could bind the parties in the

13   other.

14             It's a little bit harder for your client than it is

15   for the defendants if they're not parties to all three cases,

16   but that just may be the way it is, Mr. Mausner, because you've

17   taken on all these behemoths, and you have a right to, but that

18   doesn't mean you can avoid the impact of adverse findings even

19   though you may not be able to benefit from the impact of

20   positive findings.  And I want you to keep that in mind because

21   it's something that I intend to keep right before me.  So I

22   won't say more on that point.

23             Now, turning to the status of Google, we're going to

24   go through that 16(b) report first.

25             There is some questions I'm going to ask about that.

1          Why don't you have a seat, please, Mr. Mausner, and I

2     want to hear from you, Mr. Zeller, so go to the lectern,

3     please.

4          First of all, without getting into detail -- I won't

5     subject you to that -- you tell me whether at any point since

6     February, when I had had the scheduling conference in the

7     Microsoft case and today, you have been in touch with

8     Microsoft's counsel about the status of that case that Perfect

9     10 brought.

10          MR. ZELLER:  I personally have not, Your Honor.

11          THE COURT:  People from your firm?

12          MR. ZELLER:  Yes.  I believe that there have been

13     some communications that we have had.  I think they have been

14     somewhat limited.  They were basically geared toward trying to

15     understand whether cases were consolidated, to what degree

16     there had been a request for consolidation and the schedule.

17          I know that the conversations we've had so far, Your

18     Honor, have not drilled down into some of the details with the

19     disputes -- or the issues, I should say, that the Court was

20     inquiring about today.

21          THE COURT:  All right.  But in light of the answers

22     that you heard Mr. Mausner give me, let's look at some of the

23     areas of contention that currently exist here.

24          I'm directing your attention, Mr. Zeller, to Page 14,

25     for example, and there's a dispute about how many depositions

1    Google should be permitted to take.  You want to have 30.

2    Mr. Mausner wants to limit you to ten.  He tells us that there

3    is no such dispute in the Microsoft case.

4            Why the problem here?

5            MR. ZELLER:  Well, my own surmise, based on hearing

6    what Mr. Mausner is saying today, is is that our case does have

7    additional claims that have been asserted against Google.  I

8    don't believe -- and certainly someone can correct me if I'm

9    wrong, but I don't believe that there are publicity claims

10   based on these nine, ten models, for example.

11           THE COURT:  Hold on just a second.  Are there?

12           MR. MAUSNER:  No, there are not.

13           THE COURT:  Keep going, Mr. Zeller.

14           MR. ZELLER:  So that means that there are additional

15   witnesses for that reason alone.

16           Also -- and this is somewhat a result of the more

17   recent developments with the most recent amended complaint, but

18   I understand that there are additional works that have at least

19   been asserted against us so far.  Maybe they will or have

20   already been asserted against Microsoft or maybe they are going

21   to be shortly asserted, but they are assignees -- or rather

22   assignors of copyrights who we would propose to potentially

23   depose as well.

24           THE COURT:  Well, if you had the documents that

25   comprise the assignments -- and these are assignments to

1  Perfect 10; is that correct?

2      MR. ZELLER:  I know that they are assignments to

3  Perfect 10.  To what degree we have the underlying documents

4  today, I don't know that answer.

5      THE COURT:  But why would you need to depose the

6  assignors?

7      MR. ZELLER:  Well, I think for a number of potential

8  reasons, Your Honor, Number 1 which would be to find out what

9  licenses were granted by these assignors.

10      THE COURT:  Wouldn't that be reflected in the

11  documents?

12      MR. ZELLER:  Not necessarily.

13      I mean, we don't know what documents Perfect 10 has,

14  to what degree they have taken over the files, what kinds of,

15  you know, discussions.

16      I've actually had very similar cases like this where

17  people take the rights -- and often with, say, photographs or

18  musical works or musical compositions, and it's not necessarily

19  a straightforward matter as to who have they licensed, who have

20  they provided rights to.  There may be prior assignments that

21  these people have entered into.  Sometimes you are dealing with

22  heirs, purported heirs, who, in fact, don't have the rights.

23  So I mean there can be many, many different --

24      THE COURT:  Did you say heirs, H-E-I-R-S?

25      MR. ZELLER:  Yes.  H-E-I-R-S.

1          So, in other words, they may have themselves been

2    some sort of assignee or a subsequent acquirer of the rights.

3          So, I mean, there can be many permutations on these

4    claims.  Today, because some of these are very newly asserted

5    works, we don't know those details, and that's part of what we

6    will have to find out in the coming days and weeks.

7          THE COURT:  Okay.  Look at the bottom of Page 15 and

8    the top of Page 16 of the 16(b) report because this is where

9    the issue of TIFF production versus the alternative, which I

10   take it is some kind of combination of Adobe and something else

11   that Perfect 10 uses.

12         You heard Mr. Mausner say P-10 is prepared to proceed

13   in this case the way it has in Microsoft.  You do it your way,

14   P-10 does it its way.  What's the problem with that?

15         MR. ZELLER:  Well, I think the problem -- it really

16   boils down to this, Your Honor.  When files are produced in

17   their native format -- say, they are PDF files.  Many of those

18   are not text searchable.

19         If they are produced in TIFF, which I will represent

20   to the Court is the standard today in litigation in how people

21   produce electronic files, that problem is overcome because you

22   can basically put these things into databases, these documents,

23   these materials, and they can be fully text searchable, which

24   is obviously very, very important.  It creates enormous

25   efficiencies.

1          And so when we are producing things in TIFF, these

2     files in TIFF, Perfect 10 can load into a database and do word

3     searches.  All of that comes up.  We don't get that advantage

4     if the files that Perfect 10 is producing are, say, for

5     example, in PDF.

6          And also, of course, in some instances, if

7     something -- if a rule --

8          THE COURT:  But if Google is litigating against the

9     world, Mr. Zeller, not just against P-10, Google routinely

10    provides discovery in TIFF format, right?

11         MR. ZELLER:  That's correct.

12         THE COURT:  Okay.  Does Google ever litigate against

13    other adversaries who don't use TIFF format?

14         MR. ZELLER:  That, I don't know.  I can say that in

15    the cases --

16         THE COURT:  Do you have a right to have the adversary

17    use TIFF format?

18         MR. ZELLER:  I wouldn't characterize it as a right,

19    Your Honor.  I would say that for efficiency purposes --

20         THE COURT:  But, you know, Google is a creative

21    enterprise, obviously.  So is Microsoft.  Older, but still out

22    there.  Microsoft seems to be, if Mr. Mausner is correct in his

23    characterization, capable of litigating, I take it, full bore

24    against Perfect 10, even though Perfect 10 doesn't make its

25    information available in TIFF.

1          Why should Google have such difficulty?

2          MR. ZELLER:  Difficulty I don't think is the right

3     word, Your Honor.

4          What I would say is this, is that when things are

5     produced in native files -- if Google were to do that -- and,

6     by the way, so the Court is aware of this, in order to put

7     something into TIFF, it has to be converted.

8          So if Google were to start producing things in native

9     format, it would multiply disputes.  There's no question.

10    People would come and say I can't read this.  We are going to

11    have the same issue with Perfect 10.

12         If they produce something, whatever file format it

13    is -- sometimes these can be very exotic.  Sometimes they may

14    be in Apple format.  And that imposes tremendous costs on the

15    party to try and, Number 1, figure out what the file is;

16    Number 2, to decipher it.

17         So, I mean, I would suggest, Your Honor, that really

18    a fair playing field in this circumstance would be that

19    everyone produces in a common format.  Information can be

20    shared.

21         Also when the day comes for a trial in this sort of

22    situation, and -- I mean, I think the Court, if it inquired of

23    other litigants in other cases that have been tried before Your

24    Honor in recent weeks or months, would find that there is often

25    an enormous benefit to be gained by the parties of having a

1  common format, because once trial comes, you don't necessarily

2  have to have, you know, very, very different formats.

3          Parties find it very difficult to talk to one

4  another.  The technicians find it very difficult to talk with

5  one another, and this is a technical case.  I mean, there is

6  going to be presumably a lot of exhibits, a lot of documents, a

7  lot of information in computer format, and kind of a Tower of

8  Babel.

9          THE COURT:  How much does it cost to convert whatever

10  discovery in the format Perfect 10 currently has been employing

11  to TIFF format?

12          MR. ZELLER:  Well, part of that -- well, right now,

13  Your Honor, we have not been able to do all of that.  I don't

14  even have the cost because a large part of this, we can't read.

15          We have very large disks, disks full of data that

16  have been turned over to us.  This is partly what we have

17  raised in the course of our discovery issues.  We've received

18  very sizable hard drives filled with undifferentiated data.  We

19  don't know why it's there.  There are no control numbers.  We

20  can't tell what it is.

21          I mean, you know, we can go to vendors and get

22  estimates for them to try and decipher these things, but

23  ultimately, Your Honor, it takes however much time it takes

24  them.  They have to go through these things file by file by

25  file to open them up, to potentially convert them to something

1  else.

2  So I would submit, Your Honor, that -- I mean, we are

3  looking at so far, what Perfect 10 has submitted, something in

4  the neighborhood of 600 gigabytes of electronic information in

5  this native file format.  I mean, it literally requires a file

6  by file kind of --

7  THE COURT:  So we have been talking about this

8  technical gap or dispute, but right now Google has made no

9  motion to require production in TIFF format, right?

10  MR. ZELLER:  I understand we're meeting and

11  conferring on that.

12  THE COURT:  And that's your understanding,

13  Mr. Mausner?

14  MR. MAUSNER:  I don't think -- yeah, I think we have

15  mentioned it to each other, but I don't think we're meeting and

16  conferring.

17  Your Honor, I've looked at these documents, and they

18  open.  If you open them in Outlook, Outlook automatically

19  chooses whatever they're in.  If it's a PDF, it will open a

20  PDF.  If it's in some other format, it automatically opens it

21  in that format, but it's not -- it's not hard to open it.

22  THE COURT:  Okay.  I'm not asking for enough

23  information now to make some kind of ruling.  There's no motion

24  pending, and I don't know if there will be one or how it will

25  be resolved.

1          Right now I'm trying to get a sense of what is really

2    going on here to decide who will resolve it, so let's move on.

3          The depositions that Perfect 10 has taken that are

4    referred to at the top of Page 17, have those been completed,

5    Mr. Mausner?

6          MR. MAUSNER:  We've taken four depositions that have

7    been completed.  I think four.  Is there another one that

8    you're --

9          THE COURT:  No, that's what it says here.

10          MR. MAUSNER:  Okay.  Yes.

11          THE COURT:  But I wanted to know if any have been

12    completed.

13          MR. MAUSNER:  Yes.

14          THE COURT:  Have you noticed any others?

15          MR. MAUSNER:  Yes.  We have noticed a Rule 30(b)(6)

16    deposition for a technical person regarding what information

17    they need to locate an infringing image in their system.

18          THE COURT:  And when is that supposed to be?

19          MR. MAUSNER:  I believe it's going to be

20    September 10th.

21          They wanted to place certain conditions on our taking

22    that.  You know, that they would have, I think, five days of

23    30(b)(6) deposition of Perfect 10, and we don't agree to that

24    many days, but the day we've set is September 10th.  And I

25    don't know if we need to resolve all of those --

1          THE COURT:  Given the nature of that deposition,

2   although it's a 30(b)(6) deposition, it's kind of about

3   something involving expertise, so tell me -- that's kind of a

4   segue to this question.  On Page 15 of this 16(b) report, there

5   is a surprisingly cryptic entry about expert discovery.  It

6   says, "Perfect 10 has yet to designate any experts, but when it

7   does, Google will take discovery regarding same."

8          What are the areas of expertise?  What is the nature

9   of expert testimony that Perfect 10 contemplates being part of

10  this case and necessary for trial?

11         MR. MAUSNER:  Okay.  And a lot of this actually may

12  be done by Dr. Zada rather than an outside expert, but I think

13  Google is going to raise the issue of whether they could locate

14  the infringing images based on the URL that Perfect 10 provided

15  to them.

16         We think that that's actually a pretty simple answer,

17  that you can locate it with those URLs, but we think that they

18  are going to raise that.

19         There will be --

20         THE COURT:  So somebody, and it might be Dr. Zada,

21  will demonstrate to the jury how easy it is, right?

22         MR. MAUSNER:  Correct.

23         THE COURT:  With equipment that would be available

24  here in the Court, right?

25         MR. MAUSNER:  We could do it that way, yes, Your

1   Honor.

2           There will be issues regarding damages.  You know,

3   we've been thinking about damage theories in the case.  The one

4   that I like the best is to take -- to try to figure out the

5   number of potential customers that Perfect 10 lost because its

6   images were available for free through Google.

7           What I'm thinking is, you know, you start with the

8   number of searches.

9           THE COURT:  Don't go too far down the road.

10          MR. MAUSNER:  Okay.

11          THE COURT:  Because I don't really want to hear about

12  the different theories of damage analysis or testimony.  But

13  damages would be an area of expertise.  What else would be?

14          MR. MAUSNER:  That's really the main one that I can

15  think of.

16          THE COURT:  How about you, Mr. Zeller?  What are the

17  areas of expert testimony that will be applicable here?

18          MR. ZELLER:  Well, I would certainly say that,

19  broadly stated, there would be categories of technical experts,

20  matters of --

21          THE COURT:  Into what areas of technicality or

22  technology?

23          MR. ZELLER:  Yes, sir.  What I would say is is that

24  how it is that Google's search engine operates, such as the

25  automated processes by which it collects information, how it is

 1    that users interact with the Google site, where are -- where's

 2    the information, the data that is at issue here, stored, how is

 3    it retrieved, how is it displayed --

 4          THE COURT:  Don't you think a lot of this would be so

 5    incontestably clear that it could be easily incorporated into

 6    user-friendly, meaning, jury-friendly, stipulations?

 7          MR. ZELLER:  I would expect so.

 8          In fact, Your Honor, what I would expect is that on

 9    some of these issues, that they will be so clear that the Court

10    can determine them as a matter of law on summary judgment.

11          I mean, many of these issues would from our

12    perspective go to, say, fair use, and why it is that we

13    ultimately believe that many of the claims that are being

14    asserted here would be matters of fair use.

15          So I absolutely do think, Your Honor, that those

16    would be entirely suitable areas for stipulation or admitted

17    facts or somehow a simplified, and, as the Court somehow put

18    it, a jury-friendly way of putting this across.  Absolutely.

19          I would also say that we would likely have survey

20    experts, experts, because, for example, we have trademark and

21    dilution claims here.

22          We would expect that should those claims go forward,

23    that we would want to have some sort of empirical evidence

24    relating to issues such as protectability.  Is the term even

25    recognized by anyone, is it famous for any purpose, as has been

1   asserted in this case, and does it have secondary meaning?

2          We would also potentially have

3   likelihood-of-confusion type experts to discuss those issues as

4   well.

5          I would think that also -- I mean, the counter to

6   what Mr. Mausner has raised is we certainly -- I think another

7   area of technical expertise would involve really the

8   reasonableness and the notice that has been provided under the

9   DMCA.

10         Mr. Zada apparently has a view that it's easy to

11  discern what the infringing sites are, the accused sites are,

12  based upon the information provided.

13         I can certainly tell the Court that Google has a very

14  different view about the adequacy of that information.  Maybe

15  that will be resolved on summary judgment, maybe it will have

16  to go to trial, but that would certainly be another area as

17  well.

18         THE COURT:  Okay.  Now, in this Google report -- and

19  don't go to sleep on me, Mr. Malutta, because I want you to

20  listen carefully to all that's been said.  I'll give you an

21  opportunity to give me your take on some of these same issues

22  very shortly.

23         But on Page 13 of this Google report, the parties

24  remind me that I previously ordered them to meet and confer and

25  submit a stipulation and proposed order addressing the scope of

1    the copyrights, and they tell me that there's been an exchange.

2         Where do things stand on that, on that stipulation?

3         MR. MAUSNER:  We have exchanged our language.  What

4    we decided to do was wait to see when the Google trial was

5    going to be scheduled because the date -- the cutoff date for

6    new copyright registrations could depend on the trial date or

7    we could do it some other way, but we decided to see what the

8    trial date was going to be, and then --

9         THE COURT:  But do you have an agreement in

10   principle, once you know what the trial date is, as to what the

11   cutoff will be?

12        MR. MAUSNER:  No, we don't because there is different

13   ways of doing it.  You know, one would be six months from

14   today.  One could be, you know, six months from the trial date.

15   So we wanted to see what the trial date was going to be and

16   then try to work that out.

17        THE COURT:  Did you propose that kind of approach to

18   counsel for Amazon, Mr. Malutta, or -- what firm are you with?

19   Townsend?

20        MR. MALUTTA:  Townsend & Townsend.

21        MR. MAUSNER:  No, we haven't gotten to Amazon and

22   Microsoft.  We're going to request the same agreement with the

23   other parties as well.

24        THE COURT:  Well, you probably don't have to request

25   it because once I decide what it is -- and I'm going to set a

1    date for that to be determined.  And right now I'm telling you

2    that the stipulation has to be lodged one week after I send out

3    a scheduling order on the Google case.  One week.

4            And that will be the same basis for imposing that

5    requirement on Perfect 10 in the other two cases.  We don't

6    have to have motion practice and meet and confers and

7    arguments.

8            If you want to wait and see what the trial date will

9    be, I can sort of understand that.  I'll work with you on that.

10           But within a week of that, I want Google and Perfect

11   10 to file the stipulation as to the cutoff date for copyrights

12   that are going to be the subject of the case thereafter,

13   including up to trial.  And whatever the concept is that you

14   agree to will be the concept in both Microsoft and Amazon.

15           Now, you're here today, Mr. Malutta, so you will have

16   a chance to squawk about that if you want.

17           MR. MALUTTA:  All right.

18           THE COURT:  Microsoft isn't, but Microsoft is going

19   to get a copy of the transcript.  And if they seek to be heard

20   about something, they will have the right to take the

21   appropriate steps.

22           Since I mentioned you already, do you have a problem

23   with what I just said?

24           MR. MALUTTA:  Our concern, Your Honor, is that --

25           THE COURT:  I'm talking just about the issue of a

1    cutoff date for the copyrights that are going to be the subject

2    of the dispute against your clients.

3            MR. MALUTTA:  No, Your Honor, we don't.

4            THE COURT:  Okay.  The other parts of what I have

5    been exploring, I'll give you a chance to be heard on.

6            Now, the next question I want to ask is this letter

7    of request to a British court that I said Judge Hillman will

8    have to determine, and he was good enough to agree to handle,

9    is that resulting from the claims relating to FoneStarz?

10           MR. MAUSNER:  Yes.

11           THE COURT:  Does that issue apply in either of the

12   other two cases?

13           MR. MAUSNER:  Yes.

14           THE COURT:  Which ones?

15           MR. MAUSNER:  I think both.

16           THE COURT:  And where do things stand in terms of a

17   letter of request in those cases?

18           MR. MAUSNER:  We haven't actually discussed it.  It's

19   the defendants who want to take the deposition.

20           Our position would be that one deposition should be

21   taken of FoneStarz for all three cases, and we would like to

22   participate in the deposition by video conference so we don't

23   have to go over there.

24           THE COURT:  What's so bad about traveling to London?

25           MR. MAUSNER:  I would love to do it, but, as you

might imagine, I don't have the time to do anything, Your

Honor.

THE COURT:  Well, I sympathize with you, but I really

wonder whether you're -- well, we'll see about that.  I'm just

going to hold off on what I have to say.  But that makes sense

to me.

And it makes sense to me further to have a single

deposition of Zada in all three cases with ample opportunity --

enough, but not more than enough -- for each of the three sets

of defendants to question him, but with an agreement that would

require all three defendants to meet and confer with each other

and determine who will take the lead and who will be actually

posing the questions about issues and topics and claims and

defenses that are common to all three defendants.  Okay?

So what I am saying, Mr. Malutta and Mr. Zeller --

and this is going to have to be the case with whoever is

representing Microsoft -- that's the Winston & Strong firm,

right?

MR. MAUSNER:  Yes.

THE COURT:  Okay.  Zada is going to be subject to

several days of deposition, but in one fell swoop in a schedule

that all four sets of parties are going to have to agree to,

and the defendants are going to have to coordinate their

questions so that he doesn't get gang raped in the sense of

having the same question about the same claims or counterclaims

1     or the same technology or the same manner of practice for

2     Perfect 10 or the same issues of damages, or whatever it is

3     that's common to all three cases.  Insofar as Perfect 10 is

4     concerned, he gets asked by one lawyer.

5              Now, if there is something that that one lawyer

6     doesn't ask or chooses not to ask that is about the same

7     general issue and a different lawyer wishes to ask, that would

8     be okay because maybe somebody forgets something, maybe

9     somebody doesn't think it's important.  But anything that's

10    common to all of them gets asked just once.

11             Now, you are all to meet and confer and schedule that

12    deposition.

13             I am contemplating that the entirety of the

14    deposition would take -- for all three cases would take not

15    more than six days.

16             And that's the limit I'm authorizing and setting.  If

17    there is a need to modify that based on some factor that I'm

18    failing to contemplate, then you can come back to ask me.  But

19    that's 42 hours of deposition in all three cases max.

20             And you might as well tell Dr. Zada to get ready

21    because I'm not going to shave that to a smaller allotment.

22    And I may increase it, depending just on what is involved, but

23    I hope I don't have to.

24             MR. MAUSNER:  Your Honor, may I inquire?

25             They will also be wanting to take 30(b)(6)

1   depositions which most likely will be Dr. Zada also. Can we

2   say that the six days includes everything that's going to cover

3   Dr. Zada?

4           THE COURT: I don't want to make that in the

5   abstract. I will want to discuss that, among other things,

6   with Judge Hillman.

7           I don't know to what extent the 30(b)(6) would

8   involve a different kind of testimony or examination and maybe

9   less percipient. It depends on what the 30(b)(6) is about.

10           If you want to act wisely, and people aren't

11   inclined -- or, I should say, intent on flexing their muscles

12   or drawing the last ounce of blood, they will see what happens

13   during that initial allotment before they take a 30(b)(6)

14   deposition.

15           And it may be that there is no need or very little

16   need for additional questions in the guise of a 30(b)(6), so I

17   am not going to grant your request offhand.

18           But I'm telling you I am trying to be fair minded. I

19   don't know who has more of a claim that the other guy is acting

20   in bad faith here. I really can't figure that out. But I want

21   to put an end to it, and so does Judge Hillman.

22           And if somebody plays games with any of the

23   arrangements that I'm throwing out -- and a lot of this is just

24   me sitting here thinking about what makes common sense. I

25   don't have a script, and I haven't thought this through. I

1    haven't even looked at this until a couple of hours ago -- then

2    whoever plays games is going to be subject to a potential

3    degree of sanctions ranging from -- or, let me put it this way,

4    within the whole array of sanctions available under the federal

5    rules.

6            I'm not contemplating there will be games playing,

7    but there better not be from either side, because Judge Hillman

8    and I are fed up with the failure of the parties to figure out

9    sensible ways to accommodate each other and get this case

10   ready -- or these cases ready for settlement, because I think

11   settlement is where it's heading no matter what.  But we'll get

12   back to that later.

13           All right.  The next point I want to make is that the

14   letter of request to the British court, if it's something that

15   is going to be applicable in all three cases, then you have the

16   burden -- and I'm imposing it on you, Mr. Mausner -- to meet

17   and confer with the lawyers in the Microsoft and the Amazon

18   cases, and patch in somebody from Quinn Emanuel and have a

19   single request encompassing all three cases, either proposed

20   and agreed to or at least a single request that would be the

21   subject of a single ruling by whoever handles discovery

22   disputes.  Right now, that happens to be Judge Hillman.  It's

23   not to be done in three different cases in much the same way.

24           So that's the next order that is necessary.

25           Yes, Mr. Zeller?

1          MR. ZELLER:  If I may be heard briefly on that

2   particular issue just to raise to the Court a complicating

3   factor which is that -- and I think what the Court is saying

4   about a single letter of request makes perfect sense from the

5   U.S. court perspective and particularly for Judge Hillman.  My

6   concern is, however, that the British courts, if there is going

7   to be a dispute over this particular letter of request -- I

8   mean, they have very particular requirements of what they

9   expect these to look like, so there would potentially be motion

10  practice in the British courts over these particular requests.

11          We spent a lot of time, and it took quite some time

12  to narrowly tailor this.

13          Now, obviously, this could be completely obviated if

14  Perfect 10 could prevail upon FoneStarz to agree to sit for the

15  deposition.

16          I understand that the individual with knowledge of

17  this is someone who's the head of their -- he's apparently

18  identifiable and known, and he was the person who submitted

19  information, a declaration, in connection with the motion for

20  preliminary injunction.

21          But I just wanted to raise that potentially

22  complicating feature because if we send a request that has, I

23  don't know, just X number -- you know, too many of these

24  requests all kind of bundled together, even though -- because

25  it's looking for different information for each defendant, the

1   British courts may blanch at it, and so I just wanted to alert

2   the Court to that.

3         THE COURT:  All right.  Well, thank you for alerting

4   me.  I'm not sure I fully understand what you are saying, but

5   it's premature to assume that that is what is going to happen.

6   It could happen.  I'm not saying you are making something up,

7   but work something out with the lawyers.

8         And what efforts have you made to see to it that

9   FoneStarz is consensually available to be deposed?

10         MR. MAUSNER:  We haven't because we're not in contact

11   with them anymore.  We don't oppose this at all, as long as we

12   get to participate by video.

13         THE COURT:  What do you mean not in contact?  Is

14   there no business arrangement?

15         MR. MAUSNER:  There currently is not.  It's -- you

16   know, it dried up.  There wasn't anything left.  You can get

17   these cell phone downloads for free off of the --

18         THE COURT:  I know that is what was alleged, and I'm

19   aware of that.

20         MR. MAUSNER:  Actually, it's my understanding that

21   Google approached FoneStarz with some kind of business

22   proposal, so -- but we don't oppose this at all.  Let me put it

23   that way.  And I don't think there should be --

24         THE COURT:  Mr. Mausner, why did you feel compelled

25   to add that little footnote about Google contacting FoneStarz?

1   What relevance is that --

2          MR. MAUSNER:  I think they have had more recent

3   contact than we have.  That's all I'm saying.  You asked me

4   if we had any contact or not.

5          THE COURT:  Well, you must have found out about it

6   from FoneStarz, right?

7          MR. MAUSNER:  I actually don't know.  I mean, I just

8   heard that, and I don't know --

9          THE COURT:  Okay.  It doesn't matter to me, but the

10  point that I'm jumping on you for is to keep the clutter out of

11  this.  I don't want gamesmanship and gotcha thinking to

12  permeate this lawsuit or these lawsuits.  Cut it out.  No more.

13  Both sides.  All sides.

14         Now, the next question again arising out of the

15  Google 16(b) report is triggered by something on Page 19.

16         I'm told -- and, of course, this is Perfect 10's

17  lawyer speaking -- that Google, quote, "unreasonably wants

18  Perfect 10 to put a confidentiality designation on each page."

19         Okay.  With respect to this discovery dispute about

20  confidentiality on various pages, where do things stand?  Is

21  there a motion pending before anybody?

22         MR. MAUSNER:  There's not currently a motion pending,

23  no.

24         THE COURT:  Are you planning to seek a Protective

25  Order or is Google planning to seek an order compelling this

1   designation?  Where do things stand?  Ms. Herrick?

2          MS. HERRICK:  Absolutely, Your Honor.  If necessary,

3   we do intend to pursue motion practice because obviously

4   something that's very important in this case, as in all cases,

5   is that the parties strictly abide by the Protective Order.

6          And the large hard drives that Mr. Zeller was

7   referring to earlier have been produced with a sticker on them

8   that just says "Confidential," and inside, there is a mix of

9   confidential and clearly public information.  And we don't want

10  to run afoul of the Protective Order by accidentally producing

11  or maybe filing something that Perfect 10 meant to designate as

12  confidential but didn't specifically identify or label.

13         THE COURT:  But if you're correct that some stuff is

14  obviously public, then you are not at risk if whatever is

15  obviously public is something that makes its way into some

16  filing of yours, right?

17         MS. HERRICK:  I'm sorry?  Say that one more time.

18         THE COURT:  You're not at risk of violating a

19  Protective Order if something that's obviously public is

20  something that you incorporate into something that you filed,

21  right?

22         MS. HERRICK:  Technically, if we were to file

23  something not under seal that Mr. Mausner has designated as

24  confidential, we would be violating the Protective Order, and

25  we certainly don't want to in any way, shape or form risk that.

1          THE COURT:  Okay.  But let's see if we can have a

2    deal here.

3          So if something is obviously public, it's been given

4    this blanket, random, sweeping, as Google would have it,

5    designation of confidentiality because you put some little

6    sticker on a hard drive, and they incorporate it into something

7    they say or do or file, even though it was part of this hard

8    drive with the confidential blanket stamp, are you going to

9    fuss?

10         MR. MAUSNER:  No.  And we would also, you know, be

11   happy to tell them if they want to ask about something.

12         It's just going to be very difficult to take all of

13   these millions of documents and, you know, put actual

14   confidential designations on each one.

15         THE COURT:  Okay.  Well, I'm not making a ruling

16   about this dispute and neither is Judge Hillman, who has been

17   patient enough to -- are you still there, Judge Hillman?

18         JUDGE HILLMAN:  I am.

19         THE COURT:  Okay.  Neither of us has to issue some

20   kind of advisory ruling because maybe it won't come to light.

21         But it seems to me, Ms. Herrick, that when push comes

22   to shove, and you are really in the process of needing to make

23   use of whatever is on these documents, if there is a genuine

24   ambiguity or doubt, then you run it by the people at Perfect 10

25   or Mr. Mausner.

 1          And I'm going to hold Mr. Mausner to his word because

 2   I am going to hold you to your word.

 3          If something is obviously public, use it.  Don't

 4   waste your client's money or your time getting permission.  And

 5   he is not going to be given any credence if he claims that you

 6   made a violation of the Protective Order by using it, because

 7   if it was obviously public, you had a right to do it.

 8          MS. HERRICK:  Your Honor, just one further thing.

 9          Some things might appear to be obviously public to

10   us, but Perfect 10 has nevertheless insisted that it's

11   confidential.

12          For instance, screenshots of alleged infringements,

13   Perfect 10 has taken the position that the screenshots that

14   identify where an infringing image can be found is

15   confidential.  So that is something that I might want to file

16   because it appears to be just a screenshot, but Perfect 10, I

17   think, would be upset by that and would argue that that would

18   be a violation of a Protective Order because they have

19   designated those sorts of material as confidential.

20          We believe improperly so, but that is just one

21   example of how I think there will be --

22          THE COURT:  But my point is if there is something

23   that's really making you think that you are at risk of

24   inadvertently, unintentionally violating a Protective Order,

25   bring it up.

1        You got a problem with screenshots?

2        MR. MAUSNER:  Not with the shot itself, but the

3   location of the infringing website allows anybody to find the

4   infringements, basically.

5        And we don't have a problem with those being filed in

6   court.  What we do have a problem with is Google publishing the

7   location of the infringing websites on the internet, which is

8   something that it's done in the past.

9        It's actually published Perfect 10's DMCA notices

10  that have the URL where the infringing images are located.

11       THE COURT:  So why don't you modify the Protective

12  Order.  Make it clear what you do think they shouldn't do.

13       MR. MAUSNER:  But --

14       THE COURT:  Look, I'm not going to spend more time on

15  this one because I've got too many other things to do, but it

16  seems to me that this is an example of what I'm afraid has been

17  going on here which is that both sides are just pointing the

18  finger and failing to talk to each other.

19       If there is some clarity that can be agreed to that

20  will limit the need to fuss and make motions about the

21  Protective Order and the snapping of confidentiality, then

22  change your God damn Protective Order, file it, and proceed on

23  that basis.

24       Now, let's move on.

25       MR. MAUSNER:  Your Honor, I think they do, too, but

1  we definitely want to avoid motions.  We just don't have time

2  for that.

3        THE COURT:  Well, you can avoid motions by

4  considering in good faith reasonable proposals of Google.

5        MR. MAUSNER:  And we will.

6        THE COURT:  It isn't just you who would have to make

7  a motion because the other guy is being unreasonable.  Maybe

8  Google would have to make a motion because you're being

9  unreasonable.

10        MR. MAUSNER:  We will try, Your Honor.  I'll tell you

11  that.

12        THE COURT:  Okay.  Now, please be seated,

13  Mr. Mausner.

14        And would you go to the lectern, Mr. Malutta, because

15  now I want to talk about -- and it won't take as much time --

16  the issues in the Amazon case.

17        MR. MALUTTA:  Thank you, Your Honor.

18        THE COURT:  Before I ask you specific questions or

19  touch on specific things in the 16(b) report that I have before

20  me on that case, do you wish to be heard about anything that's

21  been said or any ruling I've made or any observation I've made

22  thus far?

23        MR. MALUTTA:  Not really, Your Honor.  You once

24  referred to us as sort of the tail of the dog here, and I feel

25  like that again.  Google has amply presented their arguments on

1　the various issues you've addressed.

2　　　　THE COURT:  Well, but I'm giving you your opportunity

3　to present your client's take, if you have anything distinctive

4　that you want me to know about.

5　　　　MR. MALUTTA:  No, Your Honor.

6　　　　I'm sorry.  The one distinctive thing I should

7　address which sort of changes the outlook here is that Alexa

8　Internet, another one of the Amazon defendants, was just added

9　in this case, so that really changes the case posture.  A9 and

10　Amazon have been in this case obviously since 2005.

11　　　　THE COURT:  But you represent all three?

12　　　　MR. MALUTTA:  We represent all three.

13　　　　THE COURT:  Okay.  So tell me whether there are

14　tactical or analytical differences that you expect -- not

15　necessarily factual differences arising from some different way

16　they function, but are there going to be -- I assume there are

17　not going to be any tactical or analytical differences since

18　you are representing all three, right?

19　　　　MR. MALUTTA:  I would disagree.  I would say there

20　are certainly some analytical legal issues.

21　　　　I mean, you alluded that they do function

22　differently, that A9 and Alexa function very differently, and

23　they bring together totally different affirmative defenses,

24　different claims --

25　　　　THE COURT:  I haven't had chance to look at their --

1   well, first of all, has Alexa filed its answer?

2           MR. MALUTTA:  It has filed an answer.

3           THE COURT:  What is distinctive about its affirmative

4   defenses?

5           MR. MALUTTA:  Alexa operates very differently from

6   A9.  A9 is more of a search portal.  They amalgamate search

7   results from different search engines.  Originally, it was

8   Google, then it transitioned to other providers.  Alexa for a

9   time was more -- is more of a traditional search engine, sort

10  of crawling the indexing.

11          THE COURT:  You say for a time.  What about now?

12          MR. MALUTTA:  They have ceased doing image search.

13  They are still doing web search, the textual links.

14          THE COURT:  So Alexa is just a Google competitor?

15  It's a Yahoo, it's an Ask.com?

16          MR. MALUTTA:  It's the poor step-cousin, yes.

17          THE COURT:  Pardon me?

18          MR. MALUTTA:  It's the poor step-cousin to the

19  Googles of the world.

20          THE COURT:  And what has changed about the way A9

21  does business?

22          MR. MALUTTA:  A9 barely functions anymore.

23          A9 is -- the function is still the same.  It hasn't

24  provided image search, which was the subject of the original

25  complaint, since 2006.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1        THE COURT:  Well, are you telling me that because

2   Alexa is the new kid on the block that the way these cases are

3   coordinated for discovery -- and that's what I've already made

4   clear is going to happen and has been happening and will

5   happen, but not for trial.  I don't intend to consolidate them

6   for trial -- but that the way that they would be coordinated

7   for discovery along the broad outlines that I have been

8   discussing here today is unfair to Alexa?

9        MR. MALUTTA:  No, I have no objection to the

10  coordinated discovery.

11       THE COURT:  So on Page 14 of your 16(b) report, I'm

12  told that your view is that I should -- the Court should defer

13  discovery on the --

14       MR. MALUTTA:  On contributory damages as to A9.

15       THE COURT:  And that A9 intends to file a motion

16  within the next ten days.  This was filed on August 12th -- so

17  we don't have ten days -- for hearing and decision.  What kind

18  of motion is that?

19       MR. MALUTTA:  It's a motion for summary adjudication

20  as to A9's defense under the DMCA, Section 512(a).

21       THE COURT:  And you are going to be filing that

22  motion by August 22nd?

23       MR. MALUTTA:  We are, Your Honor.

24       THE COURT:  And so your view is if it's a meritorious

25  motion and found to be meritorious, then no discovery would be

1    permissible?

2            MR. MALUTTA:  Correct.

3            THE COURT:  And what discovery are you trying to

4    stay?

5            MR. MALUTTA:  Discovery as to contributory -- on

6    damages.  We feel we don't need to get into damages.  If we've

7    got a defense as to the DMCA, damages are precluded.

8            THE COURT:  Okay.  So if the motion is soon to hit

9    me, Mr. Mausner, what's your response as to whether or not we

10   should hold off on discovery as to that aspect of the case?

11           MR. MAUSNER:  As to damages regarding A9?

12           THE COURT:  Yes, and as to contributory infringement.

13           MR. MAUSNER:  While the summary judgment motion is

14   pending, I think that's agreeable.

15           THE COURT:  Okay.  So there we have it.  You don't

16   have to make a motion to stay discovery or burden any court.

17   That's the way we'll proceed.

18           MR. MAUSNER:  Now, there may be some discovery that

19   relates to the summary judgment motion depending what is

20   raised.

21           THE COURT:  Well, then you'd make a 56(f) motion.

22           MR. MAUSNER:  Right.  And, Your Honor, we'd like more

23   than a week, of course, to respond to their motion.

24           THE COURT:  Yeah, you'll have two weeks.

25           All summary judgment motions will be on stages of

1    two-week intervals.  Two weeks to the opposition, two weeks

2    after the opposition for the reply, and two weeks after the

3    reply for the hearing date.

4         That's going to be the rule on all summary

5    adjudication and all summary judgment motions on all three

6    cases.

7         I may have deviated from that in the scheduling order

8    on the Microsoft case, but the lawyers and you can adjust

9    things accordingly.

10         MR. MAUSNER:  Okay.  There may be some summary

11    judgment motions that we would need more than two weeks.  I'm

12    not sure if we would here, but there may be some that are more

13    complicated than this one.

14         THE COURT:  Okay.  Well, keep in mind that this may

15    be the first motion for resolution, at least on some of the

16    merits of your various claims, so I assume that Google and

17    Microsoft will be watching for what positions you take and what

18    rulings I issue.

19         And that leads to this point.  I forgot to mention

20    this when I was talking about the Google case.  Google has got

21    a whole pack of summary judgment motions they want to make, and

22    I don't know when you are planning to make them.  It doesn't

23    seem like it's timely now.  But here's the guidance I'm going

24    to give you.  Okay?

25         They seem to be discrete motions.  They seem to be

1  addressing different claims and defenses. And if you were to

2  file all of them at the same time, I would grant relief to

3  Perfect 10 both on the time to oppose and the like, so don't

4  even bother doing that. Don't dump the ball in the court or on

5  Mr. Mausner at the same time.

6          You've got -- one, two, three, four, five, six,

7  seven -- you've got eight motions that you specify on Page 21

8  of the Google 16(b) report.

9          Now, what you should do, and what I'm ordering you to

10  do, Mr. Zeller -- and I don't have a view on how it would shake

11  out -- is determine which of these motions, if it's meritorious

12  or possibly if it's lacking in merit, would preclude the need

13  for any later motion to be filed.

14          In other words, figure out and work with Mr. Mausner.

15  And I want you to stipulate to a sequence. And we can figure

16  out the timing, because if there is some motions which, if I

17  find them to be meritorious, would moot the need for later

18  motions, then the later motions don't get made, your firm loses

19  a little bit of money, and Google pays a little bit less in

20  attorneys' fees, and the Court doesn't have to waste time.

21          So I'm not going to be setting dates on these two

22  cases today anyway. I'm going to be speaking to Judge Hillman,

23  but that's going to be the requirement.

24          And that will apply to your case as well, Mr.

25  Muletta -- Malutta. I apologize. How do you correctly

1    pronounce your name?

2              MR. MALUTTA:  Malutta.

3              THE COURT:  Forgive me.  I couldn't remember.

4              I don't know if you've told me in your 16(b) report

5    about all the different motions.  Did you say that in yours --

6    that you plan to file?  Is that in your report?

7              MR. MALUTTA:  Just the one that we plan to file next

8    Monday.

9              THE COURT:  But if there are going to be others at a

10   later time, depending on what happens --

11             MR. MALUTTA:  We're happy to pace them apart.

12             THE COURT:  Yeah, you've got to be practical about

13   this and look for a way to handle things with common sense and

14   efficiency.

15             All right.  Now, I already, I think, issued a

16   ruling -- and you said you didn't have a problem with it --

17   about when the cutoff date will be for copyrights which are

18   subject to these claims a week after I issue the scheduling

19   order.

20             MR. MALUTTA:  I do want to raise the one issue we do

21   have with that is we object, as Amazon -- and I'll talk about

22   all three together -- is the adding of the different -- you

23   know, the sort of serial amending the complaint and adding

24   different registrations that keep coming to light.  Just that

25   amendment, we would like some sort of --

```
 1          THE COURT:  Once the cutoff date is present, I'll
 2   give Perfect 10 an opportunity to amend the complaint one last
 3   time, and that's it.
 4          MR. MALUTTA:  Okay.  Agreed.
 5          THE COURT:  Then everything is in the final
 6   complaint.
 7          And I think for the sake of clarity so that there's
 8   no confusion -- you know, I'll probably go through five
 9   generations of law clerks on these cases.  And so some
10   successor to my very talented law clerk doesn't get confused, I
11   will require the defendants to file responsive pleadings to the
12   final amended complaint so that our files are clear.
13          So if it's going to be the Third Amended Complaint in
14   the Google case, for example, there will have to be an answer
15   and affirmative defenses to the Third Amended Complaint.
16          I don't know what number complaint we're up to in
17   Amazon, but you get the point.
18          MR. MALUTTA:  I do.
19          THE COURT:  And that will be it.  No more copyrights
20   that will be subject to this ongoing litigation.
21          So what's the basis for your contention, Mr. Malutta,
22   that -- I think it's a point that you make more than once in
23   the 16(b) report -- that Alexa is very different from Amazon
24   and A9, and that some differences are necessary for purposes of
25   reaching a sensible order relating to scheduling?
```

```
 1              If I got what you told me before, Alexa is basically
 2      a search engine.
 3              MR. MALUTTA:  We believe so, Your Honor.  I mean,
 4      they were just added as a party, so we are doing our own
 5      internal investigation as well.
 6              THE COURT:  But why can't I set dates that apply to
 7      all three of your clients?
 8              MR. MALUTTA:  We have no objection to that, Your
 9      Honor.  We've asked for all three dates for our clients, just
10      so long as they are sufficiently out to allow us to have the
11      full discovery for Alexa.
12              THE COURT:  And what's your view about this issue I
13      raised with the Google lawyers concerning the format of
14      electronic reduction?
15              MR. MALUTTA:  Our view point is the same as theirs.
16      We have -- and I'll also represent to this Court that the TIFF
17      format is the standard litigation format.
18              All of the litigation databases out there, all the
19      vendors, everybody uses TIFF.
20              And that's what -- that makes it easy to identify
21      documents, to search documents.  It makes it easy to put
22      control numbers on them so we know what we are referring to
23      when it comes down to trial or deposition or something.  That's
24      what makes it very easy to investigate what's in this massive
25      production.  600 gigabytes is enormous.  We have had quotes
```

1  from vendors, and it's near a million dollars to convert their

2  native files into something that's usable in a standard

3  litigation database.

4         THE COURT:  Well, do you think that producing it in

5  standard database format, whatever that is, is a display of

6  gamesmanship and bad faith on the part of Perfect 10?

7         MR. MALUTTA:  I have no idea what the motivation is

8  for Perfect 10 to produce it in the format -- and it's a format

9  that's been created for this litigation.

10        They are creating documents for this litigation, and

11 why they've chosen one format over the standard format, I don't

12 know.

13        THE COURT:  Well, if there's going to be some motion

14 practice -- and if I am keeping things straight in my mind, we

15 simply passed over the resolution of that dispute earlier this

16 afternoon -- then my guess is whoever decides that motion would

17 find it potentially relevant to know whether it's just games

18 playing.  So I'll leave it at that.

19        No, you sit down, Mr. Mausner.  I don't want a

20 response right now.

21        Now, in your 16(b) report, I don't think there is

22 anything mentioned about the mechanism in that case, in the

23 Amazon cases -- case, to comply with the Local Rule 16-15

24 requiring good faith efforts for mediation.

25        Judge Lynch was the mediator in the Google case

1  apparently.  You don't have any objection to Judge Lynch being

2  the mediator in this case, do you?

3          MR. MALUTTA:  I'm going to reserve objection.  I have

4  no idea what Judge Lynch may or may not have done in that case,

5  and I don't know whether it would --

6          THE COURT:  Well, he didn't pull off a miracle.  I

7  can tell you that.

8          MR. MALUTTA:  Apparently not.

9          THE COURT:  But it makes sense to have an experienced

10  and skillful mediator, and he is certainly both, and especially

11  to have one who's already learned a lot about these claims.

12          So I propose to have Judge Lynch designated the

13  outside mediator under the Local Rule.  And, in fact, that's

14  what I'm now ordering.

15          If you've got a problem with that, you'll have to

16  come back and make me change my mind.

17          Who is the mediator in the Microsoft case?

18          MR. MAUSNER:  We haven't had mediation.

19          THE COURT:  But did you select anybody?

20          MR. MAUSNER:  No, we hadn't.

21          THE COURT:  Well, it's going to be Judge Lynch.

22          And, again, this transcript will reflect that so that

23  Microsoft, if it wants to, can weigh in on that.

24          Now, maybe Judge Lynch has a conflict.  I don't know.

25  Maybe he owns stock in one of these companies.  Maybe there is

1  some other reason, in which event, it can't be him.  But,

2  otherwise, if he is willing to take it -- and I'm not ordering

3  him to take it.  That would, of course, be ludicrous -- then I

4  would like him to serve as the mediator.

5       Okay.  Is there anything else you wanted to add, Mr.

6  Malutta?

7       MR. MALUTTA:  That's it, Your Honor.

8       THE COURT:  Okay.  Judge Hillman, is there anything

9  you wish to say?

10       JUDGE HILLMAN:  No, but I have to say that it's

11  difficult to hear much of the details of your conversations,

12  but I have nothing to add at this point.

13       THE COURT:  You couldn't hear what was being said?

14       JUDGE HILLMAN:  No, not in great detail, but I have

15  the gist of everything that was discussed.

16       THE COURT:  Oh, I wish you had spoken up because it

17  was important to me that you --

18       JUDGE HILLMAN:  Well, I can get a transcript, too,

19  but -- and whoever orders it, if you would get me a copy of it,

20  I would appreciate it.

21       THE COURT:  Okay.  Well, the order will be placed

22  after I leave the bench.

23       I'm going to call you in your chambers momentarily,

24  Judge Hillman, and we will see where things go.  But if there

25  is something that you think that you didn't hear correctly that

1    would kind of be important, tell us now.

2              JUDGE HILLMAN:  No, I don't.

3              I'm unclear -- and I guess after we talk, I'll have a

4    better understanding of where your thoughts are on a special

5    master.

6              THE COURT:  Okay.  Well, that's, of course, what I

7    want to talk about with you.  And that reminds me.  I don't

8    think I actually allowed the lawyers to weigh in on that.

9              JUDGE HILLMAN:  Well, (unintelligible) address that.

10             THE COURT:  Do you want to be heard about that

11   possibility, Mr. Mausner?

12             MR. MAUSNER:  What does Your Honor contemplate as to

13   how the cost would be handled on that?

14             THE COURT:  The cost would be handled either in

15   thirds or in fourths, and here's what I mean.  I don't want to

16   subject you -- and Microsoft, for that matter -- to the cost

17   and the difficulty of functioning under the initial auspices of

18   a special master for discovery disputes when you don't have

19   any.

20             So I am assuming it wouldn't apply to the Microsoft

21   case.  I'm just assuming that.

22             Then it leaves these cases.  And I would

23   presumptively imagine that Amazon and Google and Perfect 10

24   would split the cost equally a third each.

25             MR. MAUSNER:  Our only concern on that would be the

1   cost.  Other than that, we would obviously agree to have that.

2           THE COURT:  Well, the cost will be the cost.  But you

3   know something, you're the plaintiff, and you want an early

4   trial, and I can see why, and that's fine.  And you have no

5   shot at as early a trial as you're wanting, except in the

6   Microsoft case, under the way it's currently looking.

7           There is much too much contentiousness, confusion,

8   failure on all sides to explore practical ways to overcome

9   their differences.  And so there is a lot of reasons why a

10  special master can cut through it all and do it on a much

11  faster level than Judge Hillman.

12          Judge Hillman is dealing not only with this case and

13  tons of other cases, but with additional responsibilities as

14  Chief Magistrate Judge, so it's quite a burden.

15          And if it takes Judge Hillman longer than it might a

16  mediator -- and I think it would take him longer, particularly

17  if we set dates that would be applicable to the mediator after

18  the mediator has had a chance to get up to speed -- I don't

19  mean mediator.  I mean the special master.  In the last few

20  statements I have used mediator, but I mean the special master.

21          The special master would not be Judge Lynch.  It will

22  be a different person, and he would be dealing only with issues

23  of discovery, so I think having a special master could have

24  some salutary effect.  And on a tactical level, it might be

25  pretty good for Perfect 10, but that's not why I would do it.

1          Anything else, counsel, that you wish to add?

2          You want to be heard about the special master?

3          MR. ZELLER:  Your Honor, not at this juncture.

4          I mean, this is something that we haven't discussed

5    with Google.  I think on its face what the Court is saying

6    makes a lot of sense.  I would obviously want any input from

7    the client, but I don't have anything at this juncture.

8          THE COURT:  And you, Mr. Malutta?

9          MR. MALUTTA:  Nothing at this time.

10          THE COURT:  All right.  Anything further before I

11   close this down?

12          MR. MAUSNER:  May I respond regarding the way we've

13   produced the documents, Your Honor?

14          THE COURT:  Two sentences.

15          MR. MAUSNER:  We have produced the documents in the

16   manner in which they are maintained at Perfect 10.  We have

17   given them hard drives that are an exact duplication of Perfect

18   10's computer with files and subfiles and so on.  We haven't

19   been playing any games with that.

20          THE COURT:  Okay.  Well, that's three sentences, but

21   I have given you a chance to be heard.  Right now I don't have

22   to make a finding.

23          All right.  Thank you.  We're adjourned.

24      (Proceedings concluded.)

25                        -oOo-