1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE A. HOWARD MATZ, U.S. DISTRICT JUDGE

4                          - - -

5


6
PERFECT 10, INC., A CALIFORNIA      )
7  CORPORATION,                       )
                                     )
8                     PLAINTIFF,      )
                                     )
9          vs.                        ) No. CV05-4753-AHM(SHx)
                                     )
10  AMAZON.COM, INC., ET AL.,          )
                                     )
11                    DEFENDANTS.      )
   _____)

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             LOS ANGELES, CALIFORNIA

16            MONDAY, OCTOBER 27, 2008

17

18

19

20

21

22        _____

23              CINDY L. NIRENBERG, CSR 5059
               U.S. Official Court Reporter
24             312 North Spring Street, #438
               Los Angeles, California 90012
25                 *www.cindynirenberg.com*


UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Dockets.Justia.com

1   APPEARANCES OF COUNSEL:

2   FOR THE PLAINTIFF:

                        LAW OFFICES OF JEFFREY N. MAUSNER

3                      BY: JEFFREY N. MAUSNER, ATTORNEY AT LAW

                          MELANIE POBLETE, PARALEGAL

4                      21800 OXNARD STREET

                      SUITE 910

5                      WOODLAND HILLS, CA 91356

                      310-617-8100

6

7

8   FOR THE AMAZON.COM, A9.COM AND ALEXA INTERNET DEFENDANTS:

                      TOWNSEND & TOWNSEND & CREW

9                      BY: MARK T. JANSEN, ATTORNEY AT LAW

                      TWO EMBARCADERO CENTER

10                   8TH FLOOR

                      SAN FRANCISCO, CA 94111

11                   415-576-0200

12

13

   ALSO PRESENT FOR THE GOOGLE DEFENDANTS:

14                   QUINN EMANUEL URQUHART OLIVER & HEDGES

                      BY: MICHAEL T. ZELLER, ATTORNEY AT LAW

15                 865 S. FIGUEROA STREET

                      10TH FLOOR

16                 LOS ANGELES, CA 90017

                      213-443-3000

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

E X H I B I T S

| COURT EXHIBITS | MARKED | ADMITTED |
|---|---|---|
| A | 18 | |
| B | 19 | |

1    LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 27, 2008

2                    11:13 A.M.

3                    – – – – –

4    THE CLERK:  Calling Item Number 1, Perfect 10, Inc.

5    versus Amazon.com, Inc., et al.

6    Counsel, state your appearances, please.

7    MR. MAUSNER:  Good morning, Your Honor.  Jeff Mausner

8    for P10.  With me is Melanie Poblete, who is a paralegal.

9    THE COURT:  Good morning to you both.

10    MR. JANSEN:  Good morning, Your Honor.  Mark Jansen

11    representing defendant A9.com.

12    THE COURT:  Okay.

13    MR. ZELLER:  Good morning, Your Honor.  Mike Zeller

14    for Google.

15    THE COURT:  Google is not a party to this case, is

16    it?

17    MR. ZELLER:  It is because the cases are

18    consolidated.  I mean --

19    THE COURT:  Well, you're welcome to be here, but I

20    don't think I need to hear from you.

21    MR. ZELLER:  I agree, Your Honor.  It's not my

22    intention to speak unless spoken to.

23    THE COURT:  All right.  Please be seated.

24    Mr. Mausner, approach the lectern.

25    I will rule on the objections that came in over the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  weekend to your client, Mr. Zada's, declaration, and I rebuke

2  you for going beyond the scope of the authorized responses from

3  the previous questionnaire that I circulated.  You filed

4  something in the nature of a sur-reply, and I don't think that

5  was warranted, and I don't want you to do it again.

6           Now, turn to the questions that are dated October

7  27th.  The previous pages on this several-page questionnaire,

8  there are Pages 1 through 5 which simply incorporated in a

9  pithy fashion the responses that I got to the previous

10  questionnaire.  And if somebody thinks that there is a material

11  omission or mischaracterization in the responses, then I'll

12  give you a very brief opportunity to tell me how we flubbed it,

13  otherwise, I want to focus on the questions that are on the

14  unnumbered page, which we will call Page 6, the page that has

15  the date of October 27th.

16           MR. MAUSNER:  Thank you, Your Honor.

17           There is one correction.  On Page 2, the first

18  question there regarding the Zada declaration, Paragraph 16,

19  our response to that is yes where it says, "Did not answer.

20  (Probably 'no.')"

21           THE COURT:  Where did you answer yes?

22           MR. MAUSNER:  Page 2, Lines 2 through 5.

23           THE COURT:  Page 2 of what?

24           MR. MAUSNER:  Page 2 of the Perfect 10 Supplemental

25  Brief.

1          THE COURT:  Well, I must have left that in my study.

2          MR. MAUSNER:  I have a copy here, Your Honor.  Would

3    you like me to --

4          THE COURT:  I'll look at it later.

5          MR. MAUSNER:  On Page 2, Lines 2 through 5, we

6    stated -- and this is a listing of the infringements.  We've

7    listed eight different forms of infringement.  It says, "A9 has

8    provided web search links and cache links to infringing

9    websites, like the Irina Garenskih example mentioned by the

10   Court."

11         And we said, "This is infringement of display and

12   distribution rights by third party websites' reproduction right

13   by A9 users."

14         THE COURT:  All right.  I'll look at it.

15         Look at Page 6, please, Mr. Mausner.

16         MR. MAUSNER:  Yes, sir.

17         THE COURT:  Actually, I meant to do something else

18   before I heard from you, so why don't you be seated for a

19   minute.

20         There are certain parts of the pending motion that

21   I'm in a position to rule on.  I'm going to rule orally, and

22   there's one chunk that I'll take under submission.

23         I grant summary adjudication to A9 on the direct

24   infringement claims that have been brought against it.  The

25   server test is still the test.  It will be up to the Ninth

1   Circuit to revise the test, limit it, refine it, and I can see

2   that it might.

3           There could be a distinction that would be drawn

4   between an ISP or a search engine on the one hand and a direct

5   infringer on the other, but nothing in the current state of the

6   law warrants a disregard.  And P10 does not dispute and could

7   not dispute that A9.com never did and has not stored any of the

8   images on its own servers.

9           That's in the Statement of Undisputed Facts,

10  Paragraph 13 in the SGI response.  That's true for the

11  thumbnails or the actual size.

12          Although A9 provides a "see full-size image" option,

13  the Ninth Circuit did not address this, and I don't think that

14  the conclusion it would draw would be any different.

15          What the Court in Germany ruled may be interesting,

16  but it's only part of the developing jurisprudence, and I'm

17  going to stick with the server test and grant summary

18  adjudication against Perfect 10 and in favor of A9 on the

19  direct infringement claims.

20          I'm also going to grant summary adjudication on the

21  vicarious infringement claims.  There is clearly no legal right

22  that A9 has to stop the infringing conduct, and it doesn't have

23  the practical ability to do so.

24          I don't have to get into issues of whether there was

25  a direct financial benefit.  That was part of the Grokster

1    formulation because really the only issue here is control.

2              And the opinion of the Ninth Circuit in this case

3    when it went up on appeal, 508 F.3d at 1173 through 74, and

4    later on 74 and 75, deal in sequence with this issue of a legal

5    right to stop it or a practical ability to stop it.  I find

6    that the language, the analysis and the conclusion that is set

7    forth by the Ninth Circuit in that case precludes Perfect 10

8    from establishing vicarious infringement liability in this

9    case.

10             A9 never had and still doesn't have a contractual or

11   other right to control the content on any third party websites.

12   That's reflected in Paragraph 14 of the Statement of Undisputed

13   Facts.

14             P10 attempts to dispute those, but the dispute that

15   it sets forth in the SGI Paragraph 14 goes to contributory

16   liability, not vicarious liability.

17             And I don't find that any ability that A9 may have to

18   control its own index comes close to meeting the Ninth Circuit

19   standard for having the practical ability to shut down the

20   infringing sites or remove the infringing content from those

21   sites.

22             The ability to stop or limit that kind of conduct

23   doesn't mean the ability -- or isn't synonymous with the

24   ability to detect it.  It means to shut it down, and there is

25   no evidence that would permit a jury to find that A9 had that

1    ability here.

2            So those are my rulings on the direct infringement

3    and vicarious infringement parts of this motion.

4            And you can file a very pithy order confirming that

5    those were my rulings, Mr. Jansen, and that will go out in

6    writing, but I'm not going to be supplementing these oral

7    findings with any opinion.

8            So let's turn to the crux of this case and of the

9    other consolidated cases which are the claims for contributory

10   liability.  And on the contributory liability prong, I see the

11   possibility of there being two genuine factual -- and to some

12   extent mixed factual and legal issues that probably -- but I'm

13   not making a conclusive ruling -- warrant denying the summary

14   adjudication motion.

15           The first has to do with whether or not the threshold

16   question for invoking 512(a), which is the premise of the

17   summary adjudication motion, the Safe Harbor, in 512(a),

18   whether the threshold requirement of complying with 512(i), the

19   repeat infringer policy, has been established.

20           The focus there -- and that will be the focus of this

21   very limited hearing.  I have seven or eight matters on my

22   afternoon calendar, and I intend to break not a minute later

23   than 12:00, if we go that far.  The focus will be on

24   Clickriver, and there are some questions that I will address

25   when we get to that.

1          And as to 512(a) itself, if you turn to that and get

2     past the 512(i) threshold, there are two aspects of statutory

3     requirements that seem to be at play here in the sense that I'm

4     not satisfied that A9 has made the necessary irrefutable

5     showing, and that is whether or not they retained the material

6     longer than necessary and whether it modified the content.

7          So those are the overviews that may place in context

8     some of the questions and some of the colloquy that we are

9     about to have, counsel.

10          Please return to the lectern, Mr. Mausner.

11          MR. MAUSNER:  Yes, sir.

12          THE COURT:  Okay.  Now, start out with Question 14,

13     please.

14          MR. MAUSNER:  It's our position that an entity either

15     is or is not a 512(a) service provider.  If they modify some of

16     their content on some searches, then they are not a Section

17     512(a) service provider.

18          THE COURT:  What authority is there for that

19     proposition?  Let's assume, for the sake of your answering that

20     question, that there were a hundred searches, and they modified

21     the content on one and did not on 99.

22          MR. MAUSNER:  They had the ability to do so.  They

23     make the choice.

24          THE COURT:  I -- go ahead.  I'm sorry to interrupt

25     you.  Keep going.  What else?

1          MR. MAUSNER:  They make the choice of whether or not

2     to modify the content.  There may only be some that content

3     needs to be modified.  But once they do that and once they have

4     that ability, then they are a 512(a) service provider, period.

5          THE COURT:  Well, why do you say period?  Can you

6     tell me what supports that conclusion?

7          MR. MAUSNER:  Well, I think it will be --

8          THE COURT:  Again, assuming, Mr. Mausner, that there

9     are a hundred searches and 99 are not modified.

10          MR. MAUSNER:  Okay.  First of all, that's not what

11     we're being faced with here.  A9 has submitted no evidence that

12     there are search results that they didn't modify.

13          The only evidence that has been submitted is what

14     Perfect 10 submitted which shows that for searches on Perfect

15     10 models, these search results are modified.

16          This is their motion for summary judgment, and they

17     clearly have not met their burden of showing that there are any

18     search results where there is no modification.

19          But even apart from that, I think this will be -- or

20     this could be a case, if Your Honor wants to reach that, that

21     issue, that determines it, but Your Honor doesn't have to reach

22     that issue because there's no evidence at all that's been

23     submitted that there are any search results that weren't

24     modified.

25          THE COURT:  So putting aside the question-of-proof

1  burdens -- and one should never put those aside.  You gave a

2  perfectly responsible answer -- you think that the law is such

3  that if a provider has the capacity to modify and it sometimes

4  chooses to do so, it's precluded from that safe harbor?  Is

5  that your position?

6       MR. MAUSNER:  Yes, Your Honor.

7       THE COURT:  Do you have any statutory or case

8  authority support for that proposition and conclusion?

9       MR. MAUSNER:  No, Your Honor.

10      But the reason for Section 512(a), which does not

11 have a notice and take-down provision in it, is for those very

12 kind of service providers who cannot do -- cannot take down

13 material, cannot modify it.

14      It's for companies like cable companies and phone

15 companies that actually provide the transmission, and they do

16 not have the ability to do that.

17      If a service provider has the ability, and they

18 exercise that ability in some cases, then they are no longer a

19 512(a) provider -- or I should say they never were a 512(a)

20 provider.

21      THE COURT:  What can you tell me about the degree to

22 which the evidence that Dr. Zada attached and the searches he

23 chose to address are representative?

24      MR. MAUSNER:  Well, they're searches on Perfect 10

25 models only.  As to Perfect 10 models, you know, they are

1    representative of all searches.

2              All of the evidence shows that A9 never got a link

3    from Alexa.  What they got is the URL, and then A9 created the

4    link by putting in the code.  We submitted a -- there's only

5    one --

6              THE COURT:  Why did you refer to Alexa in your answer

7    and not to Google?

8              MR. MAUSNER:  That's another point, Your Honor.  The

9    only evidence that A9 submitted of what it got from the search

10   provider was that one -- it's Page 7 of Exhibit 1 to the

11   Amacker supplemental declaration.

12             They never submitted what they got from Google, and

13   they never submitted what they got from Microsoft.  And, again,

14   Your Honor, this is their burden of proof to show what they

15   received from their search provider.  And if they had done

16   that, we could have shown for those cases as well what it was

17   that A9 added.  We did that for the Alexa case.  They provided

18   us that one page, and we submitted the actual source code that

19   A9 created.

20             THE COURT:  You know, you just cross-referred to the

21   Alexa case, and I want to tell you that to the extent that you

22   expected me to take into account in your opposition to this

23   motion the notices that you apparently incorporate in something

24   you filed in your own separate summary judgment motion against

25   Alexa is a baffling notion.  I don't do that.  I will not do

1   that.

2           I'm not incorporating into my analysis anything that

3   you asked me to consider by reference.  Different motion,

4   different defendant.  And you've got to understand that we

5   can't go searching around for tidbits of information even in

6   related cases, even when we are pouring a lot of effort into

7   those cases that aren't presented before us.

8           We have as much work as you do, Mr. Mausner, at

9   least.  So I'm not going to let you cure that in any

10  supplemental thing.  I don't want any more papers on this

11  motion.  Zero.

12          MR. MAUSNER:  Your Honor, we don't think it's

13  necessary.

14          THE COURT:  Well, don't do that again.

15          MR. MAUSNER:  We submitted a sample, but we didn't

16  want to burden the Court with, you know, many, many DMCA

17  notices.

18          THE COURT:  Okay.  In any event, keep going.  You

19  were saying that you were really responding only to the

20  evidence that A9 incorporated, and that was on Page 7 of

21  Exhibit 1.

22          MR. MAUSNER:  Yes, Your Honor.  That is one instance

23  that A9 provided any evidence of what they got from their

24  search provider.

25          And then this is what A9 got from its search

1    provider, Your Honor (indicating).  Do you have a --

2           THE COURT:  I don't have the screen on.

3           Move the easel, Steve, so I can see the monitor,

4    please.

5           MR. MAUSNER:  We have a blow-up also.  This is

6    Exhibit 1, Page 9, of the Amacker supplemental declaration.

7           THE COURT:  Page 9 or Page 7?

8           MR. MAUSNER:  Page 9.  And I have an extra copy, Your

9    Honor, if you'd like.

10          THE COURT:  Just put it up on the easel.  And give

11   your extra copy to your paralegal, and I'll take it.

12          MR. MAUSNER:  Okay.

13          THE COURT:  Go ahead.

14          MR. MAUSNER:  As you can see, Your Honor, what A9

15   received from Alexa is very little.  There is no link at all in

16   here.  The only thing that is contained in what it received

17   from Alexa is the URL and the snippet of text.

18          THE COURT:  What part of this document do you refer

19   to as the snippet of text?  Is it the context?

20          MR. MAUSNER:  The snippet of text is "US CATS

21   Tournaments."

22          THE COURT:  Okay.  Go ahead.

23          MR. MAUSNER:  This is what Alexa did with this.

24          Melanie, can you give a copy of this to Judge Matz,

25   please.

1    And this is Exhibit 37 to the Zada supplemental

2  declaration.  Okay.  So Exhibit 37 to the Zada declaration

3  shows what A9 did with the URL and the text snippet that it

4  got.

5    A9 wrote all of this code here (indicating), and in

6  particular it put in the code for the link which is this href

7  command.  And it wrote other code regarding where the link is

8  going to appear and what the link and the web page itself is

9  going to look like.

10    THE COURT:  All right.  I get the point.  We don't

11  have to tarry on it.

12    Answer 15(a), please.

13    MR. MAUSNER:  As a matter of fact, Your Honor, we do.

14    What happened is they submitted a motion to strike

15  Dr. Zada's supplemental declaration, which I believe was filed

16  on Saturday.

17    At Page 9, Lines 5 to 14 of the motion to strike, A9

18  claims that sponsored links on amazon.com for the massive

19  infringing pay sites Giganews and NewsRazor are not coming from

20  A9.  And then A9 quotes from a statement on Amazon's website

21  that says, "The amazon.com sponsored links are provided by

22  Clickriver ads and other third party networks."

23    Now, we had cited this for the proposition that it's

24  coming from A9.  They claim now that those ads are coming from

25  third party networks, and they rely on Gil Sheinfeld's

1 declaration where he says that, "Clickriver did not provide

2 those ads. They were provided by Google or some other third

3 party provider." He doesn't say who those third party

4 providers are.

5       Now -- so over the weekend, we took a look at this,

6 and --

7       THE COURT: Wait a minute. You are now introducing

8 new evidence?

9       MR. MAUSNER: Yes, Your Honor, in response to their

10 motion to strike.

11       THE COURT: Which I haven't even looked at.

12       MR. MAUSNER: That's correct -- oh, you haven't

13 looked at their motion to strike?

14       THE COURT: No.

15       MR. MAUSNER: Well, this is directly responsive to

16 this question anyway as to whether we have any evidence that

17 infringers it has identified are Clickriver subscribers.

18       Now, this --

19       THE COURT: The evidence you are about to show me is

20 something that you've given to Mr. Jansen?

21       MR. MAUSNER: Yes, Your Honor.

22       THE COURT: Tell me what it is.

23       MR. MAUSNER: The first page -- this one here

24 (indicating) -- is part of a search that was done on amazon.com

25 for Usenet. And as a result of that search, there were some

1   sponsored links that came up which are shown close to the

2   middle of the page, a little bit down.  There are sponsored

3   links for Giganews, NewsRazor, and Easynews.

4          MR. JANSEN:  I'm sorry.  Excuse me, Your Honor.

5          I'm not sure I did get what you are showing to the

6   Court right now, unless this was an exhibit that was in your

7   prior --

8          MR. MAUSNER:  No.  I gave it to you this morning.

9          MR. JANSEN:  You gave me this which is a printout of

10  some kind (indicating).

11         MR. MAUSNER:  And I gave you the other one.

12         MR. JANSEN:  No, I never got that.

13         THE COURT:  Hand it to Mr. Jansen, please.

14         By the way, what's the difference, if any, between a

15  Clickriver ad and a sponsored link?

16         MR. MAUSNER:  They are synonymous.  Ad and sponsored

17  link are the same.  Basically, it's an advertisement that also

18  has a link in it.

19         THE COURT:  So what does this document that you've

20  handed -- let's call it Exhibit A to this hearing.  What does

21  this show me?

22    *(Court Exhibit A was marked for identification.)*

23         MR. MAUSNER:  This shows sponsored links on

24  amazon.com, and it shows the sponsored links are Giganews,

25  NewsRazor and Easynews.

1      Now, when you put your curser over the Giganews

2 sponsored link, you get the link that appears at the very

3 bottom of the page, which is RD.A9.com and then a bunch of

4 other letters and symbols.

5      And notice just above that link, it says "Search

6 powered by A9."  That's highlighted in yellow just above the

7 link at the bottom.

8      Now, when you do a View Source for these three

9 sponsored links, this is what you get, the other sheet that was

10 handed up.

11      It shows that these sponsored links are coming from

12 A9.com.  There's no mention in this code of Google or any other

13 third party network.  The sponsored link is coming from A9.

14      So it does not appear that what A9 stated in its

15 motion to strike or in Mr. Sheinfeld's declaration is correct.

16      THE COURT:  All right.  I will give A9 a chance to

17 answer that.  But I don't -- we'll mark the second page, which

18 has various portions highlighted in yellow, most of them

19 references to A9, as Exhibit B.

20      *(Court Exhibit B was marked for identification.)*

21      THE COURT:  Now, I don't follow what all of this is

22 supposed to tell me about these materials establishing that the

23 infringers are Clickriver subscribers.  I don't see where it

24 links to Clickriver, Exhibit A and B.

25      MR. MAUSNER:  Well, Amazon has stated that the

1   sponsored links come from A9 through Clickriver or from third

2   parties.  They have stated that the links for these infringing

3   websites, Giganews and NewsRazor, are not coming from A9, they

4   are coming from some third party provider, which could have

5   been Google or someone else.

6           The current links that are -- sponsored links that

7   are on Amazon's website for Giganews and NewsRazor, this

8   exhibit, the second one, is the source code for those links.

9           The only mention of any entity in that code is A9.

10  There's no mention of Google or any other third party which

11  shows that the link is coming from A9.

12          THE COURT:  Okay.  Please be seated.

13          Mr. Jansen, please go to the lectern, and start out

14  by telling me whether you think any of the answers I

15  incorporated into the previous outline, which I listed

16  questions only, need correction or amplification.

17          MR. JANSEN:  Your Honor, I don't think so except with

18  the issue of modification, which I think is a critical question

19  the Court's posed in a number of questions that were handed out

20  today as well.

21          THE COURT:  Yeah, well, we'll get to that.  I'm going

22  to give you a chance to respond to what Mr. Mausner just told

23  me.  But in terms of the questions 1 through 13, no changes?

24          MR. JANSEN:  No changes.  Our answer is the same.  We

25  don't believe we modify the search results as the code should

1　be interpreted.

2　　　　　THE COURT:  All right.  Well, now, the concerns that

3　I have with your motion -- to give you a chance to respond in

4　context to what Mr. Mausner told us -- include the following --

5　and this is going to be a little hard for you to address

6　piece-by-piece, so do your best to do it kind of generally or

7　generically.  The items in Question 7 -- this is before you get

8　to this page -- is this issue of modification.  It resulted

9　from various exhibits that were attached to the initial Zada

10　declaration, Exhibits 2, 7 and 8, which were addressed in

11　Paragraphs 13, 18 and 19 of his declaration.

12　　　　　It appeared that A9 recommended search results based

13　on the user search history and added certain text and links to

14　the search results page.  This is with reference to Toolbar.

15　Now, I know that Toolbar had only a certain life span, and we

16　will get back to that later.

17　　　　　Paragraph 16 of that declaration, the previous one

18　from Zada, pointed out that A9 had more search results than

19　search results in the underlying search engine, had changed the

20　order of the search results sometimes, and sometimes there

21　appeared to be filtering in what results were returned.

22　　　　　So if that's what you were alluding to when you first

23　responded a moment ago, my question to you now is why do those

24　not constitute modifications that would preclude application of

25　512(a)?

1    MR. JANSEN: Well, let me just try to clarify what I

2  think we tried to point out in our papers, which is that we

3  concede that if you do a search on Google, that is, if you had

4  done a search on Google in 2005 and up through 2006 when A9

5  changed to MSN, and if you did a search on Alexa today, which

6  now provides the web search results, you might get a different

7  listing of result sets, but it's not because of anything that

8  A9.com does.  It's because of the -- because A9.com is -- I

9  think Amacker said repeatedly -- takes exactly the URLs, the

10  search results that are provided by the search provider, and

11  relays those to the user.

12        There is some reformatting in the sense that they

13  have to be made readable by the user's computer screen so that

14  they display and can be read, because the XML format that's

15  delivered by the supplier's search engine is just data.  It's

16  not readable.  It has to be formatted so it can be displayed by

17  the user's web browser when the user is sitting at his computer

18  screen.

19        So Google, for example -- and Dr. Zada had examples

20  of this I think at Exhibits 5 through 6 of his declaration --

21  did provide different search results to the users that visited

22  Google.

23        And if the user visited A9.com at that time, the

24  search result would go to Google, and Google selected a

25  different set of responses to send back to A9.  That's the

1    reason that the results look different to the user who searched

2    on A9.com as opposed to Google.

3            THE COURT:  But I'm talking about Toolbar for the

4    last series of questions and references that I made before, and

5    Toolbar was something that A9 created.  It went out of

6    operation I guess in 2006 or so.

7            MR. JANSEN:  Toolbar.  I will address Toolbar, right.

8            Toolbar, as I understand it, Number 1 has never been

9    put at issue in this case, but I will try to explain my

10   understanding.

11           THE COURT:  Well, I don't know how you can say it's

12   never been put in issue.  I mean, I flagged it as a concern

13   back in early October.

14           MR. JANSEN:  It was put in issue for the very first

15   time in the opposition to the summary judgment motion but never

16   in responses to interrogatories or the complaint.

17           But let me explain how Toolbar does not -- and the

18   Toolbar functionality -- doesn't constitute a modification of

19   the results.

20           THE COURT:  Please do.

21           MR. JANSEN:  Okay.  Toolbar users would visit A9.com.

22   They were the only account holders or subscribers that ever

23   existed with the A9 functionality.  And as to them, there was

24   clear policy in their agreement that they would be subject to

25   termination if they engaged in any kind of copyright violation.

1        As part of that program, their search history was

2   stored on an A9.com search history server, as I understand.

3   And I haven't got all of the details on this, but that's my

4   understanding.

5        So as Matt Amacker explains in his declaration, when

6   a user who is a Toolbar subscriber sent in a query, they would

7   receive automatically the results from the provider, Google, as

8   search results.

9        And on the exhibit that Matt Amacker attaches to his

10  declaration -- I don't have the number offhand.  It may be

11  Number 3 to his supplemental declaration -- the left-hand

12  column has got the search results coming back immediately from

13  Google, unmodified except to the extent that there is

14  formatting so that the viewer can see it and click on the

15  links, which is what the whole purpose of a search engine is.

16       On the right-hand side, there is a column showing the

17  Toolbar subscriber's prior use history that relates to that

18  search.  So if that person had done a search for Mt. Everest

19  previously, there would be -- or child safety seats I think is

20  the example in Matt Amacker Exhibit 3 -- there would be a

21  listing on the right side that would show that user's prior

22  search history on Mt. Everest or child safety seats.

23       THE COURT:  Why does that not constitute a

24  modification?

25       MR. JANSEN:  The material that is being forwarded at

1    the request of the user is material from Google in a search

2    request.  There is additional information that's being given,

3    but it's not a modification of the URLs that are provided by

4    Google.  There is additional information that's being given to

5    the user, but it's not modification of the material that is the

6    issue of this lawsuit, i.e., the material claimed to be --

7              THE COURT:  You mean the content of the photos -- the

8    photos?

9              MR. JANSEN:  The photos, or I think Mr. Mausner is

10   also concerned about simply a link to a website that might have

11   a lot of text and maybe photographs in it somewhere.  I think

12   he's gone beyond image search and photos, but, yes.

13             Those cached -- if you want to say that the

14   history -- the Toolbar history information that's being given

15   is not the instantaneous search result that is being provided

16   back to the user.

17             The user submits the request to A9.  A9.com

18   immediately brings back instantaneously, without storage on its

19   facilities, to the user.  And it does store the history of --

20   if that user went to a particular website, then, I think, as I

21   understand it, it was stored, the information that they

22   visited, that URL.  The photograph is not stored.  The image,

23   if there was an image visited, is not stored on that, just the

24   URL address that corresponds to the site that was visited.

25             That's what I know about that generally right now.

1          THE COURT:  Okay.  Mr. Jansen, given the limited

2    time, turn now, please, to the evidence that Mr. Mausner

3    proffered here in court this morning in response to Question

4    15(a), and give me your take on what he claims it shows.

5          MR. JANSEN:  Well, I want to, first of all, say

6    that -- this is Exhibit B?

7          THE COURT:  Yeah.

8          MR. JANSEN:  Or is it Exhibit A?  His Exhibit A is a

9    search that was done on amazon.com.  It was not done on A9.com,

10   Number 1.  That's important I think for the Court to recognize.

11         And I don't believe this is a new issue at all

12   because -- I believe if you looked at Exhibit 29 to Dr. Zada's

13   previous declaration, he has a very similar printout of a

14   search for Usenet on amazon.com.

15         And I want to point out right now that Exhibit 29 to

16   his declaration --

17         THE COURT:  Look, the simple question I would like

18   you to clarify, please, is whether there is now in the content

19   of Exhibit A and B, as I defined those, evidence that Giganews

20   and NewsRazor and Usenet, certain other Usenets, have been

21   Clickriver subscribers.  Yes or no?

22         MR. JANSEN:  I believe that's not true, Your Honor,

23   but I have no way of -- having just gotten this Exhibit B and

24   not being able to really tell how or whether it's related, and

25   not being a code expert myself, I can't possibly comment on

1  what this even means.

2            THE COURT:  Can you comment on --

3            MR. JANSEN:  I can't comment -- yes?

4            THE COURT:  Can you comment on what your client's

5  contention is in answer to 15(b)?

6            MR. JANSEN:  My client's contention in response to

7  15(b) is, Number 1, as I understand it -- and this is in the

8  declaration of Gil Sheinfeld.  I asked specifically about this

9  when we put together our supplemental response -- or, actually,

10  we put this together as part of the motion to strike when we

11  got the first -- the opposition brief -- is that Clickriver

12  does not have any contractual arrangement with any of those

13  Usenets.  And the understanding that I have -- and it was put

14  in the declaration -- was that those are provided on

15  amazon.com.  Sponsored links come from other sources besides

16  simply Clickriver, including Google and others.

17            And the understanding I had -- and this was put in

18  Mr. Sheinfeld's declaration -- is that Clickriver would not

19  have referred links to those entities because it did not -- and

20  it doesn't now and it never had a contractual relationship with

21  those Usenets.

22            So I don't believe there is any evidence that

23  plaintiff has submitted -- and plaintiff has had three years to

24  take discovery of a relationship -- a contractual relationship

25  between any alleged infringer and Clickriver.  And to hand this

1   up on the day of the hearing after three years of discovery,

2   and then make this claim that is really -- just really a lot of

3   innuendo, as far as I can tell, just like the rest of Mr.

4   Zada's declaration, I believe is completely improper and should

5   be ignored.

6           But to get to the other points in Question 15,

7   Clickriver, again, does not -- it does not put sponsored links

8   on the A9.com system.  It provides sponsored links, and now

9   it's limited to only service providers, such as, for example,

10  refrigerator repairmen or TV installers on amazon.com in

11  connection with advertisement for particular products.

12          Like, for example, televisions on amazon.com, if you

13  were in the Los Angeles area, you would also get a sponsored

14  link for, you know, installers who would install home theater

15  systems.

16          Clickriver does have -- and this I think is one of

17  the questions on your sheet -- it does have a repeat infringer

18  policy that complies with what's expected in the Ninth Circuit;

19  that is, it has a very clear provision to subscribers.  And

20  this is Exhibit 13 to Zada's declaration.

21          And I'm holding that up right now, Your Honor

22  (indicating).

23          I don't know if this can be seen, but it says that

24  Clickriver adds content guidelines, and this is Exhibit 13 to

25  Zada's declaration.  It says very clearly at the very

1   beginning, "We reserve the right at any time to refuse or

2   suspend any ad;" and, "Intellectual property violation:  Ads

3   are not permitted for products that violate intellectual

4   property rights," Page 1.

5         It goes through, and there is a notice provision at

6   the bottom for trademark issues in particular.

7         And to answer the other question you had about -- the

8   last page provides very clearly that communications or

9   trademark complaints, for example, would go to A9.com.

10         And to answer the other question, I believe that if

11   there was a violation of some copyright -- or perceived

12   violation of some copyright on amazon.com, which is what

13   Counsel is referring to with this so-called evidence, this new

14   evidence, the proper place to send the notice is to amazon.com

15   because amazon.com is the entity that would obviously have that

16   sponsored link.  But certainly if a notice was sent to A9.com,

17   then that would be dealt with.

18         The problem is in this case -- and I think in your

19   last two questions on your sheet, the issue of notice is not

20   relevant to this motion because 512(a), if A9.com qualifies --

21   and I think it certainly does with respect to at least the vast

22   majority of searches.  I can see questions from the judge about

23   possibly searches that involve responses to the Toolbar

24   subscribers, but as to all the other searches, there was no

25   modification of the content without doubt.

1          Certainly, as to all the post-Toolbar period, there

2     is no doubt that we're a 512(a).  And if we qualify as 512(a),

3     we are not required to respond to a notice and take-down

4     directed to the 512(a) activity.

5          Now, I think if there was a Clickriver-sponsored link

6     problem that really existed, then probably a notice to A9.com

7     would -- A9.com would look at that notice and deal with it

8     appropriately.  But we've never gotten a notice.

9          And that's another issue that will be an issue later

10    in this case should the Court deny the summary judgment motion,

11    is that Perfect 10 never sent A9.com a notice as required under

12    the DMCA.  The notice was supposed to go to A9.com's legal

13    department in Palo Alto.  And that's very clear in --

14          THE COURT:  Yeah, let's not get into that right now.

15    I agree with you.

16          MR. JANSEN:  Okay.

17          THE COURT:  How do you answer Number 17 on this list

18    of questions for today?  Dr. Zada fished around and came up

19    with something.

20          MR. JANSEN:  Well, this is interesting.  Number 1, A9

21    never got the January 21, 2005 notice.  It went to amazon.com.

22    At that time amazon.com did have an A9 search function.

23          Amazon.com told Mr. Zada -- that was Karen Rusmyer

24    told Mr. -- Dr. Zada that A9 had no way of removing the links

25    technically because of the nature of how they received the data

1    automatically from Google.  And that notice was sent to Google

2    with the understanding that Google would take care of that

3    issue.

4          THE COURT:  What evidence is there that the notice

5    was sent to Google?

6          MR. JANSEN:  Oh, it's undisputed, I think.  But I

7    haven't submitted it with this paper because, again, notice is

8    not an issue, you know, in this motion.  But it is an

9    undisputed fact that that notice was forwarded to Google.

10          As far as the statement that this particular link was

11    not taken down, I can't tell by looking at -- I haven't

12    analyzed it enough to know whether or not what Dr. Zada says in

13    his supplemental declaration is true, and we'd move to strike

14    it for that reason.  I haven't investigated whether it's true

15    or not, but I can, I think, tell you that A9.com hasn't because

16    it can't, Number 1, technically, on a reasonable basis; and,

17    Number 2, because it has no duty to do so.  A9.com itself has

18    not made any effort to remove that link.

19          THE COURT:  Okay.  And the last question is Number

20    16.

21          MR. JANSEN:  I think the answer for that is yes.

22          I think I tried to answer that in one of my last

23    answers that I think, certainly, if there is an issue with

24    Clickriver, if there were -- and this is purely hypothetical --

25    an issue with Clickriver providing sponsored links onto A9.com,

1  which Gil Sheinfeld says it does not, then a notice should go

2  to A9.com to be dealt with, because I pointed out, to the

3  extent that Clickriver had some problematic sponsored link that

4  went to amazon.com and was visible on the amazon.com website,

5  the notice should go to amazon.com complaining about a

6  Clickriver-sponsored link there because amazon.com is the

7  entity that is actually supplying that content to the user, if

8  there is a problem with it.

9       But the notices would definitely get dealt with if

10  they're specific enough.  And the problem again was that A9.com

11  never got a notice -- especially one relating to Clickriver --

12  ever from plaintiff.

13       THE COURT:  Is it your contention that the repeat

14  infringer policy that A9 had for A9.com is applicable to and

15  sufficient to the extent that the conduct of Clickriver is at

16  issue?

17       MR. JANSEN:  Yes, I believe it is.  I don't believe

18  the conduct of Clickriver is at issue because I don't think

19  Clickriver ever put sponsored links onto A9.com, and there's

20  been no showing by plaintiff that it ever did so.  All the

21  evidence that plaintiff has submitted has been alleged

22  sponsored links on the amazon.com website.  And, again, the

23  notice, if there was one, should go there.

24       THE COURT:  Okay.  That will be the segue for the

25  only question that I will permit Mr. Mausner to answer and that

1   is -- thank you, Mr. Jansen.  You may be seated -- is the last

2   thing that Mr. Jansen said.

3      Do you have any evidence in the record to refute what

4   he just said; that all of the sponsored links went to Amazon

5   and not to A9?

6      MR. MAUSNER:  I believe there was evidence in the

7   record that at one time sponsored links were on A9 itself.

8      THE COURT:  What is that evidence?

9      MR. MAUSNER:  One second, Your Honor.

10    *(Counsel confers with Dr. Zada off the record.)*

11     MR. MAUSNER:  This is Dr. Zada.

12     THE COURT:  I know that.

13     MR. MAUSNER:  He forgot his jacket this morning.  I

14  apologize.

15     THE COURT:  That's all right.

16     MR. MAUSNER:  Okay.  Exhibit 11 to the original

17  declaration of Dr. Zada -- would you like me to put it up on

18  the Elmo, Your Honor?

19     THE COURT:  I think I have it.

20     Okay.  It's an A9 search.  The search was Usenet,

21  November 13th, 2005?

22     MR. MAUSNER:  Correct, Your Honor.  And near the top,

23  it shows sponsored links for giganews and guba.net.  On the

24  second page, it shows sponsored links for usenetbinaries and

25  powerusenet.com.  Third page shows sponsored links for

1    powerusenet.com and thundernews.com, and the fourth page shows

2    newsdemon, and so on.

3            There are quite a few sponsored links on A9.

4            THE COURT:  Okay.  Thank you, Mr. Mausner.

5            Did you see that material just now?

6            MR. JANSEN:  Yes, I did.  I want to respond to it

7    right now, Your Honor.

8            THE COURT:  Go ahead.

9            MR. JANSEN:  This is completely another example of

10   plaintiff taking things totally out of context.  If you take a

11   look at that, yes, there was sponsored links provided by Google

12   automatically as part of the search results when A9.com had a

13   contract with Google.  And the date of this at the bottom is

14   11/13, November 13th, 2005.

15           THE COURT:  Right.

16           MR. JANSEN:  If you look at Gil Sheinfeld's

17   declaration, it says very clearly that Clickriver programs did

18   not start --

19           THE REPORTER:  I'm sorry, Counsel.

20           MR. JANSEN:  I'm sorry.

21           If you look at the declaration of Gil Sheinfeld that

22   we submitted --

23           THE COURT:  I'll look at it.  You don't have to

24   display it.

25           MR. JANSEN:  Yeah, I won't.

1          Paragraph 3, it began running on a very limited alpha

2     basis starting April 2006.  This cannot be from Clickriver.

3     This was a feed -- again, an automatic response from Google in

4     response to a user search query.  And that's the evidence they

5     have, and they are constantly trying to make things into things

6     they are not.

7          THE COURT:  All right.  I'll take this motion under

8     submission.  Thank you, counsel.

9          MR. MAUSNER:  Thank you, Your Honor.

10          MR. JANSEN:  Thank you, Your Honor.

11      *(Proceedings concluded.)*

12                         --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25