QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   Michael T. Zeller (Bar No. 196417)
   michaelzeller@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
   Charles K. Verhoeven (Bar No. 170151)
   charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
   Rachel Herrick Kassabian (Bar No. 191060)
   rachelkassabian@quinnemanuel.com
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065

Attorneys for Defendant GOOGLE INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERFECT 10, INC., a California corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>GOOGLE INC., a corporation; and DOES 1 through 100, inclusive,<br><br>        Defendants. | CASE NO. CV 04-9484 AHM (SHx) [Consolidated with Case No. CV 05-4753 AHM (SHx)]<br><br>**DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512(d) FOR WEB AND IMAGE SEARCH**<br><br>[Separate Statement, Declarations of Rachel Herrick Kassabian, Sibrina Khan, Bill Brougher, Shantal Rands Poovala and Paul Haahr filed concurrently herewith] |
| AND COUNTERCLAIM | Hon. A. Howard Matz |
| PERFECT 10, INC., a California corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>AMAZON.COM, INC., a corporation; A9.COM, INC., a corporation; and DOES 1 through 100, inclusive,<br><br>        Defendants. | Date: August 17, 2009<br>Time: 10:00 a.m.<br>Crtrm.: 14<br><br>Discovery Cut-off: None Set<br>Pretrial Conference Date: None Set<br>Trial Date: None Set<br><br>**PUBLIC REDACTED** |

01980.51320/2993889.1

1       TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on August 17, 2009, in the courtroom of the

3 Honorable A. Howard Matz, located at 312 North Spring Street, Los Angeles,

4 California 90012, Courtroom 14, Defendant Google Inc. ("Google") shall and hereby

5 does move this Court for summary judgment pursuant to the safe harbor provisions of

6 the Digital Millennium Copyright Act, 17 U.S.C. § 512 ("DMCA") with respect to

7 plaintiff Perfect 10, Inc.'s ("P10") claims of copyright infringement directed to

8 Google Web and Image Search.[1] This motion for summary judgment is made on the

9 grounds that Google satisfies each of the statutory requirements for safe harbor under

10 the governing DMCA provision, 17 U.S.C. § 512(d).

11       This motion is based on this Notice of Motion and Motion, the concurrently-

12 filed Memorandum of Points and Authorities and Separate Statement, the supporting

13 Declarations of Rachel Herrick Kassabian, Sibrina Khan, Bill Brougher, Shantal

14 Rands Poovala and Paul Haahr, the pleadings and other papers on file in this action,

15 and such additional evidence as may be presented at or before the hearing.

16       **Statement of Local Rule 7-3 Compliance**

17       Google's counsel engaged in the Local Rule 7-3 pre-filing conference with

18 P10's counsel on November 7, 2008 as well as times thereafter.

19

---

20   [1] Under separate covers, Google is filing motions for summary judgment of
entitlement to DMCA safe harbor under Sections 512(b) regarding Google's caching

21 feature ("Caching Motion") and 512(c) regarding Google's Blogger service ("Blogger

22 Motion"). Google respectfully suggests that the Court consider the instant motion
regarding Section 512(d) first, as it includes a recitation of the facts common to all

23 the three motions, and is incorporated by reference in Google's Caching and Blogger

24 motions.

25   Additionally, to the extent Google's Blogger service and Web Search caching
feature function as information location tools under 17 U.S.C. § 512(d), by linking

26 users to content hosted on third-party websites, Google moves for summary judgment

27 on P10's copyright infringement claims regarding those services and features under
Section 512(d) as well.

28

01980.51320/2993889.1            -1-

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

DATED: July 2, 2009

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP

By ⟨Rachel Herrick Kassabian⟩
Michael Zeller
Rachel Herrick Kassabian
Attorneys for Defendant GOOGLE INC.

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................1

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS .........................................................................................1

I.     THE PARTIES .............................................................................................1

       A.     P10..................................................................................................1

       B.     Google ............................................................................................2

II.    P10'S RELEVANT ALLEGATIONS AGAINST GOOGLE ............................3

III.   THE DMCA .................................................................................................3

IV.    GOOGLE'S DMCA POLICIES.....................................................................5

       A.     Google's DMCA Policy And Process For Web Search............................5

       B.     Google's DMCA Policy And Process For Image Search .........................6

V.     GOOGLE'S REPEAT INFRINGER POLICY ....................................................6

VI.    P10'S DEFECTIVE NOTICES......................................................................7

       A.     Group A: The 2001 Notices .............................................................8

       B.     Group B: The Spreadsheet Notices ..................................................8

       C.     Group C: The DVD And Hard Drive Notices......................................9

VII.   GOOGLE'S REQUESTS FOR DMCA-COMPLIANT NOTICES ................11

VIII.  GOOGLE'S PROCESSING OF P10'S DEFECTIVE NOTICES....................12

       A.     Google's General Approach To The P10 Notices ..................................12

       B.     Google's Processing Of The Group B Notices .......................................14

       C.     Google's Processing Of The Group C Notices .......................................15

       D.     Google's Enforcement Of Its Repeat Infringer Policies.........................15

ARGUMENT.........................................................................................................17

I.     GOOGLE MEETS THE DMCA'S THRESHOLD REQUIREMENTS ..........17

       A.     Google Is A Service Provider .............................................................17

       B.     Google Has An Appropriate Repeat Infringer Policy.............................17

-i-

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

C.    Google Does Not Interfere With Standard Technical Measures ............ 18

II.   GOOGLE IS ENTITLED TO SAFE HARBOR UNDER SECTION 512(D) ........................................................................................................ 19

    A.    P10's Defective Notices Failed To Confer Any Knowledge ................ 20

        1.    **The Group A Notices Are Irrelevant** ........................................ 20

        2.    **The Group B Notices Did Not Confer Knowledge** .................. 20

        3.    **The Group C Notices Did Not Confer Knowledge** ................. 22

    B.    Google Expeditiously Processed P10's Defective Notices ................... 23

III.  GOOGLE DOES NOT HAVE THE RIGHT AND ABILITY TO CONTROL THE ALLEGED INFRINGING CONDUCT, NOR DOES IT RECEIVE A FINANCIAL BENEFIT ATTRIBUTABLE THERETO. ...... 24

    A.    Google Does Not Have The Right And Ability To Control The Alleged Infringing Activity ................................................................. 24

    B.    Google Does Not Receive A Financial Benefit Directly Attributable To The Alleged Infringing Activity ................................. 25

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## Cases

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)...............................................................16

Arista Records, Inc. v. Mp3Board, Inc.,
2002 WL 1997918 (S.D.N.Y. 2002) ....................................20

Corbis Corp. v. Amazon.com, Inc.,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) ....................17, 24

Cusano v. Klein,
280 F. Supp. 2d 1035 (C.D. Cal. 2003)...............................16

Ellison v. Robertson,
357 F.3d 1072 (9th Cir. 2004) .................................................4

Field v. Google,
412 F. Supp. 2d 1106 (D. Nev. 2006)...............................9, 17

Hendrickson v. EBay, Inc.,
165 F. Supp. 2d 1082 (C.D. Cal. 2001) .............................4, 24

Io Group, Inc. v. Veoh Networks, Inc.,
586 F. Supp. 2d 1132 (N.D. Cal. 2008)............................24, 25

Lenz v. Universal Music Corp.,
572 F. Supp. 2d 1150 (N.D. Cal. 2008)...................................5

Perfect 10, Inc. v. Amazon.com, Inc.,
508 F.3d 1146 (9th Cir. 2007) ...........................................2, 24

Perfect 10, Inc. v. CCBill LLC,
488 F.3d 1102 (9th Cir. 2007) .......................................passim

Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,
494 F.3d 788 (9th Cir. 2007) ............................................24, 25

Rivera v. Anaya,
726 F.2d 564 (9th Cir. 1984) .................................................16

UMG Recordings, Inc. v. Veoh Networks,
___ F. Supp. 2d ___, 2008 WL 5423841 (C.D. Cal. 2008)....................22

## Statutes

17 U.S.C. § 507..........................................................................20

17 U.S.C. § 512 .....................................................................passim

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

## **Rules**

Fed. R. Civ. P. 56(b) .................................................................................. 16


## **Other Authorities**

144 Cong. Rec. 108 (1998) ..................................................................... 3, 4

144 Cong. Rec. 61 (1998) ........................................................................... 3

H.R. Rep. No. 105-551(II) ................................................................... 23, 25

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

# MEMORANDUM OF POINTS AND AUTHORITIES

## Preliminary Statement

Congress enacted the Digital Millennium Copyright Act ("DMCA") to protect and promote free enterprise and free speech on the Internet. Concerned about the impact of service provider liability on Internet access and free speech, Congress established the safe harbor provisions of the DMCA to shield service providers from claims of infringement based on providing information location and content hosting services, among other activities. The DMCA's notice requirements establish that service providers are not expected to police the Internet for claimed copyright infringement, but are expected to respond to proper notices by copyright owners. The notice requirements are indispensable to the statute's protection of technological development, commerce and free speech.

There are no material facts for trial regarding whether Google qualifies for safe harbor under Section 512(d) of the DMCA. It does. Perfect 10, Inc. ("P10") delivered to Google burdensome, abusive, repetitive and incomplete notices that were hopelessly defective under the DMCA, and worse, appeared to be designed to advance a strategic litigation objective rather than secure actual DMCA takedowns. Although the notices were inadequate and thus failed to impose any obligation on Google under the DMCA, Google nevertheless went beyond what the law requires in a good faith effort to process them. Accordingly, Google is entitled to DMCA safe harbor, and should be granted summary judgment on P10's copyright infringement claims regarding Web and Image Search.

## Statement of Facts

## I.  THE PARTIES

### A.  P10

P10 alleges that it creates, licenses and sells copyrighted adult entertainment products, including photographs, magazines and a website. Second Amended Complaint ¶¶ 8-10. P10 has pursued litigation against a wide variety of parties, but

1  has focused its litigation efforts on companies such as Google, Amazon, Microsoft
2  and CCBill, rather than the parties who have actually made copies of P10 images
3  available on their websites. In one of those cases, the court has addressed the
4  inadequacies of P10's notices. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102,
5  1113 (9th Cir. 2007).

6          **B.    Google**

7          Google operates the world's most popular Internet search engine. Declaration
8  of Bill Brougher ("Brougher Dec."), ¶ 2. Google has indexed billions of web pages
9  on the Internet. *Id.* ¶ 3. As the Ninth Circuit has recognized, Google offers a
10 valuable information location service to the public for free. *See Perfect 10, Inc. v.*
11 *Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007).

12         Google uses an automated software program, known as a web crawler or the
13 "Googlebot," to obtain copies of publicly-available web pages for use in its search
14 index. Brougher Dec. ¶ 4. For Image Search, Google's search engine compiles an
15 index of the text associated with each image crawled, which is in turn associated with
16 a particular "thumbnail" image. *Id.* When a user enters a query, the search engine
17 searches the relevant index and delivers the links (for Web Search) or thumbnails (for
18 Image Search) that aid the user in identifying and locating the third-party content
19 most relevant to the search. *Id.* ¶ 5. Although Google crawls and indexes billions of
20 web pages, it does not crawl or index all web pages. For instance, web pages hosted
21 on servers with a robot exclusion .txt file, which instructs robots not to crawl or index
22 those web pages, are not crawled and indexed by Google. *Id.* ¶ 4. Google also does
23 not crawl or index websites that are accessible only by password. Declaration of Paul
24 Haahr ("Haahr Dec.") ¶ 14. Not all websites in the Google index will appear in the
25 search results. Haahr Dec. ¶¶ 4, 11. Google regularly blocks links to content
26 (including thumbnails) from search results for policy and legal reasons, including a
27 valid DMCA notice. *Id.* ¶¶ 4, 11.

28

## II.  P10'S RELEVANT ALLEGATIONS AGAINST GOOGLE

P10's main claims are directed to Web and Image Search.  P10 contends that Google directly infringes P10's copyrights by making thumbnail copies of images that are available on third-party Internet sites and displaying those thumbnails in Image Search results.  Second Amended Complaint ¶ 26(a), (b).  P10 also alleges that Google is secondarily liable for copyright infringement for (1) allowing users to see full-size images of P10's copyrighted works hosted or displayed by third parties (*id.* ¶ 26(c)); (2) linking users to allegedly infringing copies of P10's images hosted or displayed by third parties (*id.* ¶ 26(d)); and (3) linking to third-party sites with names or passwords allegedly permitting access to perfect10.com (*Id.* ¶ 26(e)).

## III.  THE DMCA

The DMCA reflects Congress' careful balance between the rights of copyright holders and the rights of citizen-consumers on the Internet.  *See* 144 Cong. Rec. 108, H7092 (1998)) (statement of Rep. Coble) (attached to the Declaration of Rachel Herrick Kassabian ("Kassabian Dec.") as Ex. D).  Congress enacted the DMCA to "updat[e] the copyright laws for the digital age and prepar[e] a sizable portion of our economy for the next century."  144 Cong. Rec. 61, S4887 (1998) (statement of Sen. Lott) (attached to the Kassabian Dec. as Ex. C ).  Congress sought to address the expansion of secondary liability for copyright infringement, which threatened the very "infrastructure of the Internet."  *Id.* at S4888 (statement of Sen. Ashcroft).

Two recurring concerns were emphasized during the congressional debate. The first was that "if America's service providers are subject to litigation for the acts of third parties at the drop of a hat, they will lack the incentive to provide quick and sufficient access to the Internet."  144 Cong. Rec. 108, H7095 (1998) (statement of Rep. Goodlatte) (Kassabian Dec., Ex. D).  Congress noted the potentially disastrous consequences for consumers if search engines become subject to civil liability because they "categoriz[e] [web pages] for a directory" or develop other "true consumer-oriented products."  *Id.* at S4889 (statement of Sen. Ashcroft) Kassabian

1  Dec., Ex. C. Congress considered the protection of such web infrastructure "critical
2  to unlock the potential for the Internet." *Id.* at S4888.

3      The second concern was to safeguard Internet service providers from copyright
4  liability that could threaten free speech on the Internet. Congress correctly predicted
5  that the Internet would become the forum for individual expression in the 21st
6  Century, and that "an increasingly high percentage of what we say to each other will
7  be electronically transmitted." 144 Cong. Rec. 108, H7092 (statement of Rep. Frank)
8  (Kassabian Dec., Ex. D). Unless carefully managed, secondary copyright liability
9  had the potential "to diminish the freedom [ISPs] felt in presenting things." *Id.* Thus,
10  the DMCA was structured to avoid "either an incentive or an excuse to censor" on the
11  part of service providers. *Id.*

12      To address these concerns, Congress created four "safe harbors" that shield
13  certain activities from liability or damages under the Copyright Act. 17 U.S.C. § 512.
14  The goal was to encourage and "facilitate the robust development and worldwide
15  expansion of electronic commerce, communications, research, development, and
16  education," by "protect[ing] qualifying Internet service providers from liability for all
17  monetary relief for direct, vicarious and contributory infringement." *Hendrickson v.*
18  *EBay, Inc.*, 165 F. Supp. 2d 1082, 1088 (C.D. Cal. 2001) (quoting S. Rep. No. 105-
19  190, at 20); *see also CCBill*, 488 F.3d at 1111; *Ellison v. Robertson*, 357 F. 3d 1072,
20  1076 (9th Cir. 2004).

21      Congress made clear that "a service provider need not monitor its service or
22  affirmatively seek facts indicating infringing activity . . . in order to claim [the
23  DMCA's] limitation on liability." H.R. Rep. No. 105-511 (II), at 53 (1998) (attached
24  to the Kassabian Dec. as Ex. E); *see* 17 U.S.C. § 512(m) (codifying same). The Ninth
25  Circuit has echoed this important precept. *CCBill*, 488 F.3d at 1111 ("a service
26  provider need not affirmatively police its users for evidence of repeat infringement
27  .... Were we to require service providers to terminate users under circumstances
28  other than those specified in § 512(c), § 512(c)'s grant of immunity would be

meaningless."). The DMCA places the burden squarely on the copyright holder to provide proper notice to service providers. *CCBill*, 488 F.3d at 1113. This means that copyright owners must review each alleged infringement, make a good faith determination regarding whether it is infringing (including considering the possibility of fair use), and submit a DMCA-compliant notice. *See id.*; *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150, 1155-56 (N.D. Cal. 2008). Absent proper notice or actual knowledge of infringement, service providers are under no obligation to respond in any fashion. *See CCBill*, 488 F.3d at 1113.

## IV. GOOGLE'S DMCA POLICIES

### A. Google's DMCA Policy And Process For Web Search

Google publishes information required for DMCA complaints relating to Web Search at http://www.google.com/dmca.html. Declaration of Shantal Rands Poovala ("Poovala Dec."), Ex. B. For a Web Search DMCA complaint, Google directs complainants to identify the copyrighted work infringed by providing a brief description of it and the complete URL (web address) or other location where the work can be found. *Id.* ¶ 7. Google also directs complainants to provide the complete URL at which the infringing material is located and the Web Search query that directly links to that web page. *Id.* ¶ 8. Google needs this information in order to verify the complaint and prevent abuses of the DMCA removal procedure. *Id.* ¶ 7-8. Without proper notice, Google has no way of knowing which uses a copyright owner regards to be infringing, in contrast to those uses that are licensed, a fair use, or otherwise acceptable to the owner. *Id.* ¶ 15. If a URL is incomplete or contains ellipses or misspellings, it hinders Google's ability to locate the materials in question. *Id.* ¶ 9, Haahr Dec. ¶ 4.

Google expeditiously processes DMCA notices using a team of employees charged with processing removal requests. Poovala Dec. ¶¶ 11-20. On receipt, notices are entered into an electronic "queue" for tracking purposes, and reviewed to confirm that they contain the required information. *Id.* ¶¶ 11, 13. If they do not,

-5-

1  Google asks for more information. *Id.* ¶ 13. If they are complete, the ███ team
2  then compares the copyrighted work to the infringing material. *Id.* ¶ 14. If there is a
3  match, the team forwards the URL in question to an engineering team responsible for
4  DMCA removals, which then blocks that URL from appearing in Google search
5  results. *Id.*; Haahr Dec. ¶¶ 5-6. Google then notifies the complainant of the removal.
6  Poovala Dec. ¶ 14. Google also notifies the complainant of any counter-notifications
7  received. *Id.* ¶ 18. If there is a counter-notification, and if the complainant informs
8  Google within ten days that it has filed a lawsuit, the URL will remain blocked. *Id.*
9  Otherwise, the URL will again be able to appear in search results. *Id.*

10       **B.    Google's DMCA Policy And Process For Image Search**

11       Google's DMCA policy for Image Search removals is published at
12  http://www.google.com/images_dmca.html, and is similar to its policy for Web
13  Search. Poovala Dec. ¶ 22.[2] Google directs complainants to provide the complete
14  URL at which the infringing material is located, but for Image Search, this requires
15  an image URL. *Id.* ¶¶ 22-23, Ex. E; Haahr Dec. ¶ 10. Google's policy for Image
16  Search explains how copyright holders can locate the image URL of an infringing
17  image. Poovala Dec. ¶ 23 & Ex. E. The same image may be displayed on the page
18  actually hosting the image on its servers, as well as on one or more web pages using a
19  hyperlink to the hosted image. Haahr Dec. ¶ 10. Again, Google has no way of
20  knowing which uses of an image the copyright owner regards to be infringing, so the
21  owner must identify each infringing web page URL and/or image URL. Poovala
22  Dec. ¶ 15.

23  **V.    GOOGLE'S REPEAT INFRINGER POLICY**

24       Google's Web and Image Search services have no subscribers or account
25  holders. Haahr Dec. ¶ 17. Webmasters do not "sign up" to have their websites listed

26

27       [2] Google's handling of Image Search DMCA notices is similar to the process for
    Web Search. Poovala Dec. ¶ 25; *see supra* Part IV.A.
28

in Google's organic search results—websites appear in Google search results if they
are crawled by the Googlebot and are relevant to users' queries. *Id.* Thus, there are
no subscriptions or accounts to terminate pursuant to a repeat infringer policy with
respect to Web and Image Search. Of course, Google has repeat infringer policies for
its products and services with account holders, such as AdSense or Blogger.[3]
Pursuant to those policies, Google will terminate account holders following receipt of
███ verified DMCA notices.[4] Even though not required by the DMCA, Google also
makes a good faith attempt to enforce its repeat infringer policies even where the
notice in question is defective or not otherwise directed to those products or services.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

## VI.  P10'S DEFECTIVE NOTICES

P10 purports to have sent Google 83 DMCA notices.[7]  Kassabian Dec., Ex. L;
Poovala Dec., Exs. L & N.  In spite of the fact that P10 has been advised by the

---

[3]  Beyond the fact that Google has such policies, Google does not concede that
the enforcement of these policies is relevant to the Section 512(d) analysis, where the
information location service itself does not have account holders or subscribers.

[4] ████████████████████████████████████
████████████████████████████████████████

[5]  An AdSense account holder, or "publisher," places certain code on its web pages
in order to signal to Google's servers that Google-provided ads should be delivered to
that page.  *See* https://www.google.com/adsense/login/en_US/?sourceid=aso&subid
=na-en-ha-bk&utm_medium=ha&utm_term=adsense.

[6] ████████████████████████████████████
████████████████████████████████████████

[7]  For ease of reference, Google refers to P10's DMCA communications as
"notices."  However, Google does not concede that these communications constituted
valid notices of copyright infringement pursuant to the DMCA.  Nor does Google
concede that the URLs identified by P10 as "infringing URLs" in its claimed notices
were actually infringing.

1 courts, and by various service providers including Google, regarding the important

2 notice requirements of the DMCA, P10's notices consistently failed to meet those

3 requirements. As the summary table at Exhibit A of the Kassabian Declaration

4 demonstrates, P10's notices failed to include at least two—and in some cases as many

5 as five—of the seven required components set forth in the DMCA. Moreover, P10's

6 obvious strategy has been to impose an impossible burden on Google in the hope that

7 Google is not able to remove the content at issue, and that P10 can then sue Google.

8 The format and content of P10's defective notices evolved over time, and are grouped

9 here by their shared characteristics. *See generally* Kassabian Dec., Ex. L; Poovala

10 Dec., Exs. L & N.

11        **A.**    **Group A: The 2001 Notices**

12      During discovery, P10 produced seventeen notices from 2001 (collectively, the

13 "Group A Notices"). Kassabian Dec., Ex. L.[8] P10 has conceded that its suit is not

14 based on these alleged notices, so they are irrelevant here. *Id.*, Ex B.[9]

15        **B.**    **Group B: The Spreadsheet Notices**

16      P10 sent Google a series of notices in spreadsheet format (hereinafter, the

17 "Group B Notices"). Each comprised a cover letter or email and a three-column

18 spreadsheet. Poovala Dec. ¶ 42, Ex. L.[10] The first column listed infringing URLs,

19 the second listed the corresponding search terms used, and the third listed the

20 copyrighted work at issue. *Id.* ¶ 42.[11] Some of the same URLs were listed multiple

---

22    [8] *See* Kassabian Dec. ¶ 13 (listing the dates of the 17 Group A Notices).

23    [9] Even had P10 not waived any claims based on the Group A Notices, they suffer
24 from a myriad of defects, including failing to identify the copyrighted works at issue,
or the URLs of the infringing material. *See* Kassabian Dec., Exs. A & L. Moreover,
25 any such claims would be time-barred. *See* 17 U.S.C. § 507.

26    [10] *See* Poovala Dec. ¶ 41 (listing the dates of the 48 Group B Notices). The May
31, and June 1, 4, and 16, 2004 notices did not include a spreadsheet. *Id.* ¶ 43.

27    [11] Google does not concede that any of the works identified in P10's notices
28 actually belong to P10. Google has yet to receive complete discovery establishing
    (footnote continued)

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

1 times in various Group B Notices. *Id.* ¶ 45, Ex. L. Numerous fields in the
2 spreadsheets were left blank. *Id.* ¶ 44, Ex. L.

3    The Group B Notices consistently failed to identify P10's copyrighted work at
4 issue. *Id.*, Ex. L. In many instances, the Group B Notices made no attempt to
5 identify any work at all. Poovala Dec. ¶ 44, Ex. L. In other instances, they listed
6 various media containing dozens, hundreds, or even thousands of images—without
7 specifying which of the many images was at issue—such as (1) entire websites like
8 perfect10.com, amyweber.net and ambersmith.net, (2) multiple pages from P10
9 Magazine, (3) an unidentified "Perfect10 DVD," and (4) an unspecified "Perfect 10
10 Model Boxing DVD." *Id.*

11    The Group B Notices also failed to properly identify the location of the
12 infringing material. The vast majority of the URLs listed were web page URLs, but
13 the Group B notices largely failed to include the image URLs that would allow
14 Google to block the hosted image to which other pages had linked. Poovala Dec. ¶
15 46, Ex. L. At many of those web page URLs, multiple images were displayed. *Id.*
16 Ex. M. Additionally, many of the URLs were incomplete. *Id.* ¶ 45.

17        ### C. **Group C: The DVD And Hard Drive Notices**

18    In December 2005, and from spring 2007 onward, P10 provided notices with a
19 cover letter, a spreadsheet, and a several-hundred gigabyte hard drive or DVDs
20 containing electronic files ("Group C Notices"). Poovala Dec., ¶ 48, Ex. N.[12] The
21 cover letters represented that the accompanying hard drive or DVDs contained
22 infringing copies of P10 images in various folders. *Id.* ¶ 49, Ex. N. For at least eight
23 of the eighteen notices, the cover letters acknowledged that P10 located the infringing
24 images not on Google, but on password-protected "Usenet" sites with which P10

25 _____

26 P10's copyright ownership, including all registration, deposit and chain of title
27 documents. Kassabian Dec. ¶ 14.
   [12] *See* Poovala Dec. ¶ 48 (listing the dates of the 18 Group C Notices).

28

1  apparently established accounts. *Id.* As noted above, Google's search services do not
2  crawl, index or link to the content on password-protected sites. Haahr Dec. ¶¶ 14-15.
3  In addition, many of the cover letters directed Google to search for the P10 works at
4  issue amongst P10's entire 15,000+ image collection contained on a hard drive it sent
5  on June 28, 2007. Poovala Dec. ¶ 50, Ex. N.

6      The spreadsheets failed to properly identify the location of the infringing
7  materials. The first column listed the top-level URL for various websites without
8  specifying the location within that site of an infringing image. Poovala Dec. ¶ 51,
9  Ex. N. The second and/or third columns listed only the electronic folder in which the
10 files containing infringing material were saved on the accompanying drive or DVDs.
11 *Id.* [13] The spreadsheets likewise did not identify the corresponding P10 images
12 infringed. Instead, the cover letters directed that if Google wished to see and
13 compare the P10 images corresponding to each alleged infringement, it had to search
14 for them amongst P10's entire 15,000+ image collection from perfect10.com,
15 contained on a hard drive P10 had sent on June 28, 2007. *Id.* ¶ 50, Ex. N

16     The hard drive and DVDs contained a myriad of nested electronic folders in
17 the form of (1) raw image files such as JPEG files, and (2) screen shots of Google
18 search results. Poovala Dec. ¶¶ 52-53, Ex. O. None of the raw image files displayed
19 a web page or image URL. *Id* ¶ 54, Ex. P. [14] Some of the screen shots failed to
20 include a complete URL of the page depicted. *Id.* ¶ 55. Other screen shots appear to

21 ──────────────────────

22 [13] Seven of the Group C Notices did not even include a spreadsheet to guide
23 Google's review of the accompanying DVD, but were otherwise the same as the other
   Group C Notices. Poovala Dec. ¶ 48, n. 4, Exs. N1, N2, N13, N16, N17 & N18. The
24 March 20, 2007 DVD also included three large folders of extraneous materials which
25 P10 does not even claim are alleged infringements of P10 works. For example,
   Folder 4 contains alleged infringements of songs and movies, none of which P10
26 claims to own. Poovala Dec., Ex. N2.

27 [14] Many raw image files displayed other companies' copyright notices (such as
   Playboy), and may not have even belonged to P10. Poovala Dec., ¶ 54, Ex. N3.
28

1  have been manipulated such that the image depicted could not be found at the URL
2  depicted. *Id.*, Ex. R. In total, these folders contained over 70,000 distinct files.
3  Declaration of Sibrina Khan ("Khan Dec."), ¶ 6. Many individual folders contained
4  tens of thousands of pages of screen shots of infringing material. *Id.* ¶¶ 12-17.

5      The hard drive and DVDs were incomprehensible, failing to direct Google to
6  the specific works or infringements claimed. For example, just one of the hundreds
7  of electronic folders on the hard drive provided with the June 28, 2007 notice, entitled
8  "z other infringing websites," contains 46,187 pages of screen shots. Khan Dec. ¶ 19.
9  This folder includes a subfolder named "ALL LARGE ARE P10" which contains 107
10 of its own subfolders that in turn contain 24,870 pages of screen shots. Poovala Dec.,
11 Ex. N3; Khan Dec. ¶ 19. For 108 of the 246 top-level URLs listed in the June 28
12 notice, P10 referred to the entire "ALL LARGE ARE P10" subfolder as the location
13 of the infringing material without specifying which of the images contained within
14 those 24,870 pages was infringing. Poovala Dec., Ex. N3. Likewise, one of the
15 DVDs sent with the December 13, 2007 notice contains several layers of folders and
16 subfolders comprising 28,672 pages of screen shots of infringing material. Poovala
17 Dec., Ex. N8; Khan Dec. ¶ 16.

18     In total, Google received one hard drive and 21 DVDs with the Group C
19 Notices, all in the format described above. Poovala Dec. ¶ 48.

20 **VII.  GOOGLE'S REQUESTS FOR DMCA-COMPLIANT NOTICES**

21     Google repeatedly advised P10 of the various defects that hindered or
22 precluded Google from completely processing its notices. Poovala Dec. ¶¶ 56-73,
23 Exs. S-EE. In particular, Google advised P10 to: (1) follow Google's DMCA
24 guidelines (which comply with the statute's requirements); (2) provide complete
25 URLs; (3) submit notices in electronic soft copy, given the large number of URLs
26 involved; (4) identify the infringed works at issue, and (5) identify the URLs at which
27 Google could find the infringing material. *Id.* Google also explained that it could do
28

1  nothing with raw image files, nor could it do anything about material located on
2  password-protected sites not crawled or indexed by Google. *Id.*

3       At no time did P10 respond to Google's letters by resubmitting its notices in an
4  intelligible and DMCA-compliant format. Poovala Dec. ¶ 74. To this day, P10
5  continues to send notices in these unintelligible formats, and refuses to provide
6  Google with soft copy spreadsheets listing individual URLs. *Id.*

7  **VIII. GOOGLE'S PROCESSING OF P10'S DEFECTIVE NOTICES**

8       Google first describes its overall approach to processing P10's notices, and
9  then describes the challenges unique to processing each of Groups B and C.

10      **A.    Google's General Approach To The P10 Notices**

11      P10's notices were unlike any others Google has received, in both their volume
12  and incomprehensibility. Poovala Dec. ¶ 75. Although Google does not concede that
13  it was required to do so, Google went above and beyond the DMCA's requirements
14  in order to process P10's notices. *Id.* ¶¶ 75-77.

15
16
17                                        As noted above, the notices consistently
18  failed to specify the location of the infringing materials. In addition, P10 uniformly
19  failed, in every notice, to identify the work that Google should compare with the
20  alleged infringing material (assuming a discernable URL was listed). Nevertheless,
21  Google made a good-faith attempt to process these defective notices.
22
23
24
25
26      Though P10 sporadically sent electronic soft copies of its notices, it has refused
27  to do so since 2005, even though Google has repeatedly explained that an electronic
28  soft copy URL facilitates the speed and accuracy of processing. Poovala Dec. ¶ 84.

-12-

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

1  An electronic soft copy URL, which may be copied and pasted directly to/from the

2  browser address bar, allows Google to immediately access the specific page that

3  contains infringing material. *Id.* Without electronic soft copies, Google was forced

4  to manually type thousands of URLs, many of which were lengthy and complex.[15]

5  *Id.* Given the poor quality of many of P10's notices (including those transmitted by

6  fax), this was often an impossible task. *Id.*[16]

7  Over the past four-plus years, Google has reviewed numerous URLs ▮▮▮▮

8  ▮▮▮▮ in response to P10's DMCA notices, and has blocked many of those

9  URLs ▮▮▮▮▮▮ from appearing in Web or Image Search results, despite the

10  inadequacy of P10's notices. Poovala Dec. ¶ 91.

11  Google received numerous counter-notifications in response to P10's notices.

12  Poovala Dec. ¶ 96, Ex. MM; *see* 17 U.S.C. § 512(g). In these counter-notifications,

13  various counter-complainants swore under oath that the images displayed on their

14  sites were not owned by P10. *See* Poovala Dec. ¶ 96, Ex. MM. Some further

15  declared that P10's notices appeared to be aimed at stifling competition. *Id.*, Ex. MM

16

---

17  [15] Examples of URLs in P10's notices include: http://www.minovia.com/modules

18  /uskolaxgallery/index.php?carpeta=vibe_sorensen&foto=vibe%20sorensen01.jpg&ini

19  cio=0&PHPSESSID=1531ec14c93c0e1cef7323d013e4c51b and
    http://www.wallpapers-zone.com/original/stars_et_top_models_femmes/alena_seredo

20  va/alena_seredova_004.html.

21  [16] P10's failure to provide soft copy lists is puzzling now that Google has
    confirmed through discovery that P10 has them—but apparently chooses not to send

22  them to Google. P10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ recently filed one such soft-copy
    spreadsheet with the Court in the related *Amazon* case. *See* Kassabian Dec. ¶ 11, Exs.

24  J (email) and K (Ex. 9 to the Zada Dec. in Support of P10's MSJ Against Alexa and
    Amazon). That sheet includes much of the very information that Google has been

25  asking P10 to provide, including the web page URL where the alleged infringing

26  material is located and the image URL where the same image is hosted. *Id.* P10's

27  conduct is inconsistent with the DMCA and suggests a stronger interest in harassment
    than in facilitating the removal of links to infringing copies of its images.

28

at 1737. For example, one such counter-complainant declared: "I have no idea why I'm being named in this infringement notice. Perfect 10, Inc. owns no copyrights to any of the images posted on my sites . . . **My guess is that Perfect 10, Inc. is doing this to eliminate competition. . . .**" *Id.* (emphasis added).

These counter-complainants also asserted that P10's failure to identify in its notices the specific image claimed to be infringing deprived them of the information they needed to prepare proper counter-notifications. Poovala Dec., Ex. MM at 1737, 1757. For example, one such counter-complainant declared:

> **The notice that Perfect 10, Inc. sent you is so vague that I don't even know which image/file they are complaining about.** They just list models. You can't own a particular model. **If he would have listed an actual file I could have easily produced documentation showing that I have the rights to display it.** He probably did this because he knew that larger companies, like myself, would have counter sued his pathetic attempt to reduce the amount of competition he has to deal with.

*Id.* at 1737 (emphasis added); *see also id.* at 1757 ("I never received any additional information about this, such as which images in particular were problematic. I have done my best to resolve this issue, but without the specific information I cannot be sure that the issue has been resolved.") Though Google forwarded all of these counter-notifications to P10, P10 never responded to them. Poovala Dec. ¶ 96.

P10 also has conceded that it has sent Google DMCA notices complaining about websites that were actually licensed to display P10's images. Poovala Dec. ¶¶ 97-98, Ex. NN; *see also* Kassabian Dec., Ex. J (email from Norman Zada

████████████████████████████████████████

████████████████████████████████████████

### B.    Google's Processing Of The Group B Notices

With few exceptions, Google was able to complete its processing of the majority of the Group B Notices within one to two weeks of receipt. Poovala Dec.

-14-

1  ¶ 82. In some cases, these notices (which often contained hundreds of URLs) were
2  processed in as little as two days. *Id.* Google's efforts were hampered by the severity
3  of the notices' defects and P10's lack of cooperation. Where P10 refused to
4  cooperate by sending complete URLs, electronic soft copies of lists of URLs, and the
5  like, Google's processing efforts were delayed. *Id.* Further, P10 would often send
6  several identical or slightly revised versions of the same notice, thereby forcing
7  Google to re-review and re-process hundreds of URLs. *Id.* ¶ 83.[17]

8  ### C.  Google's Processing Of The Group C Notices

9  Given the massive volume of materials in the Group C Notices and their
10  general incomprehensibility, █████████████████████████████████
11  ███████████████████ Poovala Dec. ¶ 87. Again, though Google does not
12  concede that any of this was required under the DMCA, the team reviewed the
13  thousands of pages of screenshots page by page, and manually typed in the
14  discernable URLs. ████████████████████████████████████████████
15  ████████████████████████████████████████████████████████████
16  ████████████████████████████████ P10 is the only copyright holder that has
17  refused to provide notices in a format amenable to the standard processing done by
18  the █████ team. *Id* ████████████████████████████████████████
19  ████████████████████████████████████████████████████████████
20  ████████████████████████████████████████████████

21  ### D.  Google's Enforcement Of Its Repeat Infringer Policies

22  Google carefully reviewed P10's notices to ensure that its repeat infringer
23  policies were enforced.[18] As noted above, Web and Image Search have no such

---

[17] For example, on June 28, 2004, P10 sent a notice listing 316 allegedly
infringing URLs. Eight days later, P10 sent the same list of 316 URLs. Five days
later, P10 sent the same list yet again. Poovala Dec., Exs. L5, L6, L7.

[18] Facts specific to Google's enforcement of its Blogger repeat infringer policy
with respect to P10's notices are stated in Google's Blogger Motion.

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

1  policy because there are no account holders or subscribers, but Google did not turn a

2  blind eye to other services where it was evident that another service might be

3  implicated.[19]



12  ## Summary Judgment Standard

13  "A party against whom relief is sought may move at any time . . . for summary

14  judgment on all or part of a claim," or on an affirmative defense. Fed. R. Civ. P.

15  56(b); *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984). The moving party must

16  demonstrate the absence of a genuine issue of material fact for trial. *Anderson v.*

17  *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The opposing party "may not rest

18  upon the mere allegations or denials of the adverse party's pleadings, but the adverse

19  party's response, by affidavits or as otherwise provided ...[by Rule 56], must set

20  forth specific facts showing that there is a genuine issue for trial." *Cusano v. Klein*,

21  280 F. Supp. 2d 1035, 1038 (C.D. Cal. 2003).

---

23  [19] Google does not concede that its efforts here were required for Section 512(d) safe harbor regarding a product or service that has no account holders or subscribers (as is the case with Web and Image Search). However, Google does make a good faith attempt to enforce its repeat infringer policies wherever the information provided makes that possible.

26  [20] None of P10's notices was actually directed to a Google service with account holders or subscribers, as instructed by Google's product-specific DMCA policies. *See, e.g.*, http://www.google.com/adsense_dmca.html.

01980.51320/2993889.1

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

## I.   GOOGLE MEETS THE DMCA'S THRESHOLD REQUIREMENTS

To be eligible for any DMCA safe harbor, a party must meet three threshold conditions. First, the party must be a service provider. Second, it must have adopted and reasonably implemented a repeat infringer policy. Third, the party must not interfere with "standard technical measures" used by copyright owners to identify or protect their works. 17 U.S.C. §§ 512(k), 512(i)(1). Google meets all of these requirements.

### A.   Google Is A Service Provider

It is beyond dispute that Google is a "service provider" as defined by the DMCA. *See* 17 U.S.C. § 512(k)(1)(B) (service provider is "a provider of online services or network access, or the operator of facilities therefor"); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004) (DMCA's definition of service provider is a broad one encompassing a variety of activities). At least one other district court has already found Google to be a "service provider" in the context of a safe harbor motion. *See Field v. Google*, 412 F. Supp. 2d 1106, 1125 (D. Nev. 2006) (granting Google's motion for partial summary judgment of DMCA safe harbor under § 512(b)). Google satisfies this condition as a provider of Web and Image Search and other services.

### B.   Google Has An Appropriate Repeat Infringer Policy

Web and Image Search do not have account holders or subscribers, and thus Google need not (and cannot) have a repeat infringer policy for those services. As noted above, AdSense and Blogger are services for which Google has repeat infringer policies, since those services have account holders. The DMCA requires "a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). A policy is considered implemented if the service provider "has a working notification system, a procedure for dealing with

1  DMCA-compliant notifications, and … it does not actively prevent copyright owners
2  from collecting information needed to issue such notifications." *CCBill*, 488 F.3d at
3  1109. A policy is considered *reasonably* implemented if the service provider
4  terminates those subscribers or account holders when "appropriate." *Id.* at 1111.
5  Google's repeat infringer policy meets all of these conditions.

6      <u>First</u>, Google has a designated agent for receiving DMCA notices. Poovala
7  Dec., Ex. A; Kassabian Dec., Ex. G (P10 admitting same). Google also publishes
8  detailed instructions explaining what information Google needs to process a DMCA
9  notice, and how and where the notice should be submitted. Poovala Dec. ¶ 5 & Ex.
10  B; *see e.g.,* http://www.google.com/dmca.html. If a notice is deficient, Google
11  requests the necessary information. *Id.* ¶ 13.

12      <u>Second</u>, Google has a procedure for dealing with DMCA-compliant notices,
13  including verifying the complaints, ensuring that offending links or content are
14  removed, and tracking its processing efforts. *See* Part IV, *supra.*

15      <u>Third</u>, Google does not actively prevent copyright owners from collecting
16  information needed to issue a DMCA notice. Poovala Dec. ¶ 39. To the contrary,
17  copyright owners are free to utilize search services to locate infringing content.[21]

18      **C.**   **Google Does Not Interfere With Standard Technical Measures**
19      Google does not interfere with any known technical measures that are used by
20  copyright owners. 17 U.S.C. § 512(i)(1)(B); Haahr Dec. ¶ 18.[22]

21
22
23

---

24     [21]  Again, beyond the fact that Google has such policies, Google does not concede
25  that the enforcement of these policies is relevant to the Section 512(d) analysis, since
   Google's Web and Image Search services have no account holders to terminate.
26     [22]  The DMCA does not identify any "standard technical measures," nor does
27  Google know which such measures (if any) are considered "standard" by copyright
   owners.
28

01980.51320/2993889.1

-18-

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S
ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

# II. GOOGLE IS ENTITLED TO SAFE HARBOR UNDER SECTION 512(D)

Having satisfied the threshold requirements, the undisputed evidence demonstrates that Google is entitled to safe harbor under Section 512(d) with respect to P10's search-related infringement claims. Section 512(d) provides safe harbor for service providers linking users to an online location containing infringing material or infringing activity if the service provider:

> (1)(A) does not have actual knowledge that the material ... is infringing;
>
> (B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to the material;
>
> (2) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> (3) upon notification of claimed infringement, responds expeditiously to remove, or disable access to, the material that is claimed to be infringing ... except that, for purposes of this paragraph, the [identification of the location of the claimed infringement in the required DMCA notice] shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

17 U.S.C. § 512(d). Google meets this test.[23]

---

[23] The statutory requirements for a valid DMCA notice are attached as Exhibit F to the Kassabian Declaration.

DEFENDANT GOOGLE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. §512(d) FOR WEB AND IMAGE SEARCH

## A. **P10's Defective Notices Failed To Confer Any Knowledge**

P10 claims that Google has knowledge of infringement of P10's images via Web and Image Search by virtue of its 80+ notices. Not so. P10's notices are the epitome of non-compliance with the DMCA. Without exception, they fail to identify the "copyrighted work claimed to have been infringed" or the "material that is claimed to be infringing," and thus conferred no knowledge upon Google. *See* 17 U.S.C. § 512(c)(3)(B); *CCBill*, 488 F.3d at 1113 (defective notice does not impute knowledge of infringement). A defective notice does not trigger any obligation to remove infringing material. 17 U.S.C. § 512(c)(3)(B). Thus, because P10's notices did not confer actual or constructive knowledge of infringement, they did not trigger an obligation to remove anything. *See* 17 U.S.C. § 512(c)(3)(B)(i) and (d)(3). Each group of notices is addressed below.

### 1. **The Group A Notices Are Irrelevant**

The Group A Notices consist of 17 letters P10 allegedly sent to Google in 2001. P10 has confirmed that these notices are irrelevant to its case, and thus, it is not basing its claims on these notices. *See* Kassabian Dec., Ex. B. Indeed, such claims would be time-barred anyway. *See* 17 U.S.C. § 507. Accordingly, to the extent P10's complaint can be read to include the 2001 Group A Notices, Google is entitled to judgment in its favor on those claims.[24]

### 2. **The Group B Notices Did Not Confer Knowledge**

The Group B Notices do not comply with the DMCA's notice requirements. The Group B Notices failed to identify the works at issue in a number of ways. For many of the URLs listed, P10 did not identify *any* copyrighted works whatsoever,

---

[24] As discussed above, even had P10 not waived any claims based upon the Group A Notices, these notices are fatally defective, and Google is entitled to summary judgment on this basis as well. *See supra* at 8 fn. 9; Kassabian Dec. ¶ 13 & Exs. A and L.

1 listing only a model name. Poovala Dec., Ex. L (column for work identification left
2 blank). A bare reference to model names is insufficient under the DMCA. *See Arista*
3 *Records, Inc. v. Mp3Board, Inc.*, 2002 WL 1997918, *8-9 (S.D.N.Y. 2002) (DMCA
4 letters listing only artists' names, but no songs, held insufficient). Three of the Group
5 B Notices identified entire DVDs described as "P10 DVD" or "P10 Model Boxing
6 DVD" as the infringed work. Poovala Dec., Exs. L23, L35, L44. P10 did not
7 provide Google with these DVDs. *Id.*

8     Similarly, P10 identified entire websites or multi-page ranges of various
9 magazines as "the work" at issue, without specifying any particular images. Poovala
10 Dec. ¶ 44 & Ex. L.[25] For example, P10's February 13, 2006 notice identified the
11 entire perfect10.com website as the infringed work for *all 1,181 URLs* listed, and the
12 September 27, 2005 notice identified perfect10.com as the infringed work for *all 247*
13 *URLs* listed. *Id.*, Ex. L47. Likewise, the June 28, 2004 notice identified multiple
14 pages of Perfect 10 magazine as the work infringed at 175 of the 316 allegedly
15 infringing URLs listed, and the December 21, 2004 notice identified a 24-page
16 section of P10 magazine as the infringed work at one or more of the URLs listed. *Id.*,
17 Exs. L5, L18. P10's abusive and improper blanket citation to entire image collections
18 fails to confer sufficient notice under the DMCA. *CCBill*, 488 F.3d at 1113.

19     The Group B Notices also failed to identify the location of the infringing
20 material as required. 17 U.S.C. § 512(c)(3)(A)(iii); 17 U.S.C. § 512(d)(3). P10
21 routinely provided URLs for pages displaying multiple images—without specifying
22 which images were infringed. Poovala Dec., Ex. L. Similarly, several of the Group
23 B Notices listed incomplete URLs—i.e., they contained ellipses, misspellings, and/or
24 extra spaces. *Id.* P10's failure to provide the specific location of infringing materials
25
26

27     [25] P10 does not claim to own two of those sites: amyweber.net and
ambersmith.net.
28

1 | is fatal under the DMCA. *CCBill*, 488 F.3d at 1112-13; *see* 17 U.S.C.

2 | § 512(c)(3)(A)(iii); 17 U.S.C. § 512(d)(3).

3 | Additionally, as referenced above, P10 submitted the same Group B Notices

4 | multiple times, and largely refused to submit electronic soft-copy notices. P10's

5 | barrage of duplicative, hard-copy notices only made Google's task of processing

6 | them more burdensome. Such harassing conduct violates the letter and spirit of the

7 | DMCA. *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, ___ F. Supp. 2d ___,

8 | 2008 WL 5423841, *9 (C.D. Cal. 2008) (Matz, J.) (the "'notice and take-down'

9 | procedure is a formalization and refinement of a *cooperative* process that has been

10 | employed to deal efficiently with network-based copyright infringement.") (quoting

11 | S. Rep. 105-190, at 45) (emphasis added).

12 | ### 3. The Group C Notices Did Not Confer Knowledge

13 | The Group C Notices do not substantially comply with the DMCA's notice

14 | requirements either. 17 U.S.C. § 512(c)(3)(A)(ii) and (iii); § 512(d)(3). Worse, these

15 | notices appear to have been designed to burden Google in the hope of cultivating a

16 | lawsuit.

17 | First, the Group C Notices categorically fail to identify the specific works at

18 | issue, instead directing Google to P10's entire 15,000+ image collection from

19 | perfect10.com as the work infringed.

20 | Second, the Group C Notices also fail to identify the location of the infringing

21 | material as required. These notices referred to entire websites, screen shots of which

22 | are on the DVDs or a hard drive provided with the notices, rather than specifying

23 | URLs at which infringing content might be located. Many of the thousands of pages

24 | of electronic files on the DVDs and hard drive either failed to reflect a complete

25 | URL, or any URL at all. Poovala Dec., Ex. N. Some screen shots appeared to be

26 | altered in that the URL depicted did not result in the page reflected. The Group C

27 | Notices present an incomprehensible jumble of screenshots, files and folders that are

28 | ineffective to confer notice under the DMCA. *CCBill*, 488 F.3d at 1112-13 (service

01980.51320/2993889.1

1 providers are not required to "piece together the relevant information for each
2 instance of claimed infringement" from thousands of pages of materials).

3      The Group C Notices also referenced the home pages for password-protected
4 "Usenet" sites, which home pages did not contain any images. Indeed, P10 conceded
5 that those infringing materials could only be accessed by logging onto the Usenet
6 sites directly. P10 claims that these Usenet sites contain **93%** of the infringements at
7 issue in this case, yet—as P10 is well-aware—it is impossible for Google to remove
8 links to them from its search results, because those links do not exist in Google's
9 index in the first place. Haahr Dec. ¶¶ 14-15.

10      Thus, P10's notices conferred no knowledge of any infringements via Web or
11 Image Search. *See* 17 U.S.C. § 512(d)(3) & (c)(3) (defective notices cannot be
12 considered in determining whether a service provider has actual or apparent
13 knowledge of infringement); *CCBill*, 488 F.3d at 1113 (defective notice does not
14 impute knowledge of infringement).

15      **B.**   **Google Expeditiously Processed P10's Defective Notices**

16      Although P10's notices fell far short of the DMCA's requirements, Google
17 exceeded what the law requires to process them. As described in detail above,
18 Google (1) notified P10 of the defects and how to correct them; ████████████
19 ████████████████████████████████████████████████████ (3)
20 blocked discernable URLs from search results even when P10 had failed to identify
21 the specific work allegedly infringed at those URLs; and (4) enforced (wherever
22 possible) Google's repeat infringer policies, despite the defects in the notices. *See*
23 Part VIII, *supra*; *see also* Poovala Dec. ¶¶ 75-91. Google's processing efforts were
24 beyond reasonable in light of the numerous defects therein, and P10's repeated
25 refusals to cure them. *Id.* ¶ 85. Google processed the notices as quickly as possible,
26 sometimes in as little as two days, and routinely ███████████████ asked
27 employees to work over holidays. *Id.* ¶¶ 82, 85. By any standard, Google
28 expeditiously processed P10's notices, despite their gross defects and inadequacies.

01980.51320/2993889.1

1  *See* 17 U.S.C. § 512(c)(3); H.R. 105-551(II) at 53-54 ("Because the factual
2  circumstances and technical parameters may vary from case to case, it is not possible
3  to identify a uniform time limit for expeditious action.") (Kassabian Dec., Ex. E).
4  Thus, even if the Court were to find P10's notices sufficient (which they are not),
5  Google expeditiously responded to them.

6  **III.  GOOGLE DOES NOT HAVE THE RIGHT AND ABILITY TO**
7  **CONTROL THE ALLEGED INFRINGING CONDUCT, NOR DOES IT**
8  **RECEIVE A FINANCIAL BENEFIT ATTRIBUTABLE THERETO.**

9  Google does not have the right and ability to control the alleged infringing
10  activity, but even if it did, Google does not receive a financial benefit directly
11  attributable that activity. 17 U.S.C. § 512(c)(1)(B) & (d)(2). Both elements must be
12  met for the safe harbor to be denied. *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.
13  Supp. 2d 1132, 1150 (N.D. Cal. 2008) (quoting *Corbis*, 351 F. Supp. 2d at 1109).

14  **A.  Google Does Not Have The Right And Ability To Control The**
15  **Alleged Infringing Activity**

16  The Ninth Circuit has already ruled that "Google cannot stop any of the third-
17  party websites from reproducing, displaying, and distributing unauthorized copies of
18  P10 images because that infringing conduct takes place on third-party websites."
19  *Amazon.com*, 508 F.3d at 1174. Google's ability to remove access to materials
20  accessed through its system does *not* equate to the right and ability to control the
21  infringing activity. *Id.*; *see Corbis*, 351 F. Supp. 2d at 1110; *Hendrickson*, 165 F.
22  Supp. 2d at 1093-94. Google cannot remove these sites from the Internet, or dictate
23  what they choose to display. Haahr Dec. ¶ 16. All Google can do is to prevent third-
24  party websites from appearing in search results. The ability to do so is not enough to
25  establish a right and ability to control the allegedly infringing activity. *Perfect 10,*
26  *Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 805 (9th Cir. 2007) ("the defendant must
27  have the right and ability to *supervise* and *control* the infringement, not just affect
28  it."). Google lacks any such right or ability.

-24-

## B. Google Does Not Receive A Financial Benefit Directly Attributable To The Alleged Infringing Activity

Because Google lacks the right and ability to control the alleged infringing activity, it need not show that it does not receive a financial benefit directly attributable to it. *See Visa*, 494 F.3d at 806 (declining to address financial benefit on an appeal from dismissal because there was no right and ability to control); *Io Group*, 586 F. Supp. 2d at 1150. Nevertheless, Google receives no such benefit.

Google does not charge websites a fee to appear in its organic Web and Image Search results generated in response to user queries, nor does Google charge a fee to use Web and Image Search. Haahr Dec. ¶ 16. "In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one. In general, a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service. . ." H.R. Rep. 105-551(II), at 54 (Kassabian Dec., Ex. E). Because infringing and non-infringing websites and users pay the same—nothing—to use Web and Image Search, the direct financial benefit test is not met here.

## Conclusion

Google is entitled to safe harbor under Section 512(d) on P10's copyright infringement claims directed to Web Search and Image Search, and respectfully requests that the Court grant it summary judgment on this basis.

DATED: July 2, 2009

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By *Rachel Herrick Kassabian*

Michael Zeller
Rachel Herrick Kassabian
Attorneys for Defendant GOOGLE INC.