QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
  Rachel Herrick Kassabian (Bar No. 191060)
  rachelkassabian@quinnemanuel.com
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065

Attorneys for Defendant GOOGLE INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERFECT 10, INC., a California corporation,<br><br>     Plaintiff,<br><br>     vs.<br><br>GOOGLE INC., a corporation; and DOES 1 through 100, inclusive,<br><br>     Defendants. | CASE NO. CV 04-9484 AHM (SHx) [Consolidated with Case No. CV 05-4753 AHM (SHx)]<br><br>DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512 |
| AND COUNTERCLAIM<br><br>PERFECT 10, INC., a California corporation,<br><br>     Plaintiff,<br><br>     vs.<br><br>AMAZON.COM, INC., a corporation; A9.COM, INC., a corporation; and DOES 1 through 100, inclusive,<br><br>     Defendants. | Hon. A. Howard Matz<br><br>Date: August 17, 2009<br>Time: 10:00 a.m.<br>Ctrm: 14<br><br>Discovery Cut-off: None Set<br>Pretrial Conference Date: None Set<br>Trial Date: None Set<br><br>**PUBLIC REDACTED** |

01980.51320/2993831.1

DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

I, Shantal Rands Poovala, declare as follows:

1.    I am the head of the Consumer Products Legal Support group at Defendant Google Inc. ("Google"). I have been employed with Google since November 2002. In the middle of 2004, I began assisting with the processing of notices of alleged copyright infringement under the Digital Millennium Copyright Act ("DMCA"). This became my full-time position in 2005. I currently manage a team of personnel who respond to DMCA notices and other complaints received by Google. In the course of my duties, I have become familiar with Google's products and services, Google's DMCA policies, and the manner in which Google processes (and documents the processing of) DMCA notices.

2.    I have personal knowledge of the matters set forth herein and if called and sworn as a witness, I could and would competently testify thereto.

### Google's Designation of an Agent To Accept DMCA Notices

3.    Google has designated an agent for receiving notifications of claimed copyright infringement under the DMCA. Attached as Exhibit A is a true and correct copy of Google's current designation of agent form, on file with the Copyright Office. At no time from 2001 through the present has the Google Board of Directors served as Google's designated agent for this purpose.

4.    DMCA notices are processed by my team, ███████████████ █████████████████████ in the order received.

### Google's DMCA Policy and Procedure for Web Search

5.    Google has a DMCA policy and procedure for processing complaints received under the DMCA regarding Web Search located at http://www.google.com/dmca.html. Attached as Exhibit B is a true and correct copy of Google's published DMCA policy for Web Search. It is Google's policy to respond expeditiously to notices of copyright infringement directed to Web Search.

DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

1    6.    Google's published DMCA policy for Web Search instructs copyright

2  owners to submit DMCA notices by fax or mail to a specified address, and to include

3  various information consistent with the requirements of the DMCA.

4    7.    For example, for a Web Search complaint, Google directs complainants

5  to identify in sufficient detail the copyrighted work at issue and refer to the location

6  where Google can find the work at issue. Google needs this to verify the complaint.

7    8.    Google also directs complainants to provide the complete URL at which

8  the infringing material – that is, the material the complainant wants removed—is

9  located and the Web Search query that directly links to that web page. A web page

10  URL is a string of characters that identifies the location of that web page on the

11  World Wide Web. It is what an Internet user sees in his or her browser bar.

12    9.    If the URL contains improper ellipses or misspellings or is otherwise

13  incomplete, Google is unable to verify the complaint or block the URL from

14  appearing in the search results. Google also cannot block URLs which are not live on

15  the web, or which are already blocked, because these URLs already do not appear in

16  Web Search results.  In other words, in those circumstances there is nothing for

17  Google to block.

18    10.    Google's Web Search policy covers its caching feature as well.  When

19  Google suppresses a live web page URL from appearing in Web Search results

20  pursuant to its Web Search DMCA procedure, it automatically prevents all cached

21  links to that page from appearing in Web Search results as well.

22    11.    Google has a team of employees charged with processing DMCA

23  removal requests.  If a Web Search DMCA notice is received by fax or email, it is

24  automatically entered into the ▮▮▮▮ queue," which is a list of notices to be

25  processed.  If a notice is received by mail, it is sent via interoffice mail to the

26  ▮▮▮▮ team, at which time it is entered into the ▮▮ queue.  The ▮▮ queue is

27  organized so that the earliest-received notice is at the top of the list.

28

01980.51320/2993831.1

1    12.   In most circumstances, each notice is handled by the same team

2 member for the entirety of its processing, and will ████████████ queue until

3 processed. This ensures that notices are processed expeditiously, in the order in

4 which they are received. If a non-Web Search DMCA notice is received, a team

5 member will forward the notice to the appropriate queue for the service referenced.

6    13.   Once a notice is assigned to a member of the ██████ team, he or she

7 reviews the notice to confirm that it contains the required information. For Web

8 Search, these fields are: (1) identification of the copyrighted work allegedly

9 infringed, (2) the exact URL at which the allegedly infringing material is located, (3)

10 the complainant's contact information, (4) the sworn statements required by 17

11 U.S.C. § 512(c)(3)(A)(v) and (vi), and (5) a signature, unless the complainant has a

12 signature on file with Google. ████████████████████████████

13 ██████████████████████████

14    14.   If Google has received the required information, the ██████ team

15 member processing the notice compares the copyrighted work claimed to be infringed

16 to the allegedly infringing material, by pasting or manually typing the URL(s) into a

17 browser. If there is a match, the ██████ team scans the notice and sends it to

18 www.chillingeffects.org ("Chilling Effects"), a nonprofit organization. ████████

19 ████████████████████████████

20 ██████ Chilling Effects provides Google with a URL (the "Chilling Effects URL")

21 at which it has posted the notice in question. The ██████ team then forwards the

22 allegedly infringing URL(s) in question and the Chilling Effects URL to the

23 engineering team for further processing. Once URLs have been submitted to the

24 engineering team for removal, Google notifies the complainant that the notice is

25 being processed. The engineering team notifies the ██████ team once the URLs

26 have been prevented from appearing in Google search results in response to user

27 queries. ████████████████████████████

28 ████████████████████████. If any allegedly infringing URLs could not be

DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR
SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

1 removed because they were incomplete, were not live on the web, or were already
2 blocked (i.e. there was nothing to remove), the engineering team notifies the
3 ███████ team.

4     15. ████████████████████████████

5 ████████████████████████ Google needs the copyright owner to identify
6 each URL at which it claims infringing material is located (by web page URL),
7 because without proper notice, Google has no way of knowing which uses a
8 copyright owner regards to be infringing, in contrast to those uses that are licensed, a
9 fair use, or otherwise acceptable to the owner.

10     16. ████████████████████████████
11 ████████████████████████████████████
12 ████████████████████████████████████
13 ███████ The AdSense terms and conditions advise account holders (or "publishers")
14 that they may not display copyrighted material unless they have the right to do so,
15 and that they may be terminated for violating these policies. Attached as Exhibit C
16 is a true and correct copy of Google's terms and conditions for AdSense.

17     17. Google processes all DMCA notices expeditiously. ████████
18 ████████████████████████████████████
19 ████████████████████████████████████
20 ████████████████████████████████████
21 ██████████

22     18. ████████████████████████████
23 ████████████████████████████████████ At
24 that point, the matter is closed, unless a counter-notification is received. Google
25 notifies the original complainant of any counter-notifications received as a result of a
26 DMCA removal. If the original complainant then notifies Google within ten days
27 that it has filed a lawsuit, the URL will remain blocked. Otherwise, the URL again
28 will be free to appear in search results.

1  19. Google documents its processing of DMCA notices.

2  20. ████████████████████████████████████████

3  ████████████████████████████████████████████

4  **Google's DMCA Policy and Procedure for Image Search**

5  21. Google has developed and maintains a policy and procedure for

6  processing DMCA complaints regarding Image Search located at

7  http://www.google.com/images_dmca.html. Attached as Exhibit D is a true and

8  correct copy of Google's published DMCA policy for Image Search. It is Google's

9  policy to respond expeditiously to notices of copyright infringement directed to

10 Image Search.

11  22. Google's DMCA policy for Image Search is largely the same as its

12 policy for Web Search. Google directs complainants to provide the complete URL at

13 which the allegedly infringing material is located. For Image Search, this requires

14 the corresponding image URL. The image URL refers to the location of the image

15 file hosted by a third party. Other web pages hosted elsewhere may link to that

16 image URL and display that image. This means that complainants must provide the

17 image URL at which the allegedly infringing image is hosted if the complainant

18 wishes to prevent the image from appearing at all in search results. Google can only

19 process the URL verified by the complainant in the notice.

20  23. Google's DMCA policy for Image Search explains how copyright

21 holders can locate the image URL of an allegedly infringing image. Attached as

22 Exhibit E are sample screen shots of the steps Google's published policy directs

23 copyright holders to take to locate the image URL.

24  24. As with Web Search, providing a partial or incomplete URL prevents

25 Google from identifying the location of the complained-of image. Google also

26 cannot block from its Image Search results URLs which are already blocked, because

27 such URLs already do not appear in Image Search results, so there is nothing to

28 block.

1      25.   Google's procedure for processing notifications of copyright

2  infringement related to Image Search is the same as the procedure for processing

3  notifications relating to Web Search. The same engineering team processes the

4  Image Search URLs provided by the ████ team. The same notice and counter-

5  notification process is used. If the complaint lacks information required, Google asks

6  the complaining party for clarification.

7              **Google's DMCA Policy and Procedure for Blogger**

8      26.   Google provides users with a service, known as Blogger, that allows

9  users to create their own blogs hosted on Google servers. Google does not charge

10  users to set up Blogger accounts. Most web pages on Blogger bear the suffix

11  "blogspot.com" or "blogger.com." Users can create and post content on their blogs,

12  including images. In some cases, the images displayed on Blogger are uploaded by

13  users to Google's servers, and in other cases, the user hyperlinks to content hosted on

14  third party servers. Google does not encourage copyright infringement on its Blogger

15  system. The terms and conditions for Blogger advise account holders that they are

16  not permitted to display copyrighted material unless they have the legal right to do so,

17  and that they may be terminated for violating Google's policies. Attached as Exhibit

18  F is a true and correct copy of Google's terms and conditions and content policy for

19  Blogger.

20      27.   Google has a DMCA policy and procedure for processing DMCA

21  notices directed at Blogger content, published at

22  http://www.google.com/blogger_dmca.html. Attached as Exhibit G is a true and

23  correct copy of Google's published DMCA policy for Blogger.

24      28.   Google's published DMCA policy for Blogger instructs copyright

25  owners to submit DMCA notices by web form, fax or mail to a specified address, and

26  to include various information consistent with the requirements of the DMCA.

27      29.   For example, for a Blogger DMCA complaint, Google directs

28  complainants to identify in sufficient detail the copyrighted work allegedly infringed

01980.51320/2993831.1

1 by providing a brief description of the work and the complete URL where the work
2 can be found. Google needs this to verify the complaint.

3     30.    Additionally, Google directs complainants to identify the location of the
4 infringing material on a Blogger site so Google can locate it. To do so, the copyright
5 holder must provide either (1) the URL for the top level domain of the blog along
6 with the time and date of the blog entry at issue, or (2) the "permalink," or URL for
7 the post in question (hereinafter "post URL"), which can be found by clicking on the
8 timestamp of the posts. Attached as Exhibit H is a screen shot of a Blogger page,
9 identifying the time stamp of the post and date of the blog entry.

10     31.    It is Google's policy to respond expeditiously to notices of copyright
11 infringement directed to Blogger. DMCA notices are received by fax, mail, or, if
12 voluminous, e-mail, sent to the attention of Google's Legal Support for Blogger
13 DMCA Complaints. As of April 2009, DMCA notices relating to Blogger are also
14 received via a web form, which is available to complainants on Google's website.
15 Attached as Exhibit I is a true and correct copy of the Blogger DMCA web form.

16     32.    When a notice is received, it is entered into an electronic Blogger
17 "queue" for tracking purposes. The notices are reviewed by members of Google's
18 ███████ team responsible for processing Blogger DMCA complaints to confirm they
19 include the required information. If a notice does not include the required
20 information, Google asks the complainant for more information.

21     33.    After confirming that the required information is provided, the removals
22 team compares the copyrighted work claimed to be infringed to the allegedly
23 infringing material. Once confirmed, ███████████████████████████
24 Google immediately takes it down, notifies the Blogger account holder of the DMCA
25 complaint, and notifies the complainant that the notice was processed.

26     34.    ███████████████████████████
27 ███████████████ It is important that the complainant identify the specific
28 location of each alleged infringement (by post URL or blog entry date), because

01980.51320/2993831.1

DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR
SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

without proper notice, Google has no way of knowing what is actually at issue and which uses are infringing, in contrast to those uses that are licensed, a fair use, or otherwise acceptable to the owner.

35. Google sends any counter-notifications received to the original complainant. If within fourteen days the complainant fails to notify Google that it has filed a lawsuit, Google reinstates the allegedly infringing content on the Blogger website in question.

### Google's Repeat Infringer Policies

36. Google has established and diligently implemented repeat infringer policies for all of its products or services that have subscribers or account holders. Google tracks how many DMCA notices are received regarding each particular account by noting a "strike" against the account.

37. Blogger is a product or service with account holders. Upon receipt and verification of a DMCA notice directed to Blogger, the team will note a strike against the account holder. If a blog has been the subject of ▮▮ DMCA notices, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the entire blog is taken down and the account is terminated. The number of strikes against an account is tracked in both Google's internal system and in spreadsheets. Attached as Exhibit J is a true and correct copy of excerpts of the current Blogger repeat infringer tracking spreadsheets. The complete electronic version of this spreadsheet is contained on a CD submitted herewith as Exhibit II. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

38. AdSense is another product or service that has account holders. Upon receipt and verification of a DMCA notice directed to AdSense, Google disables the ads displayed at or linking to the allegedly infringing URL identified in the notice, and notifies the AdSense account holder of the DMCA notice. ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

01980.51320/2993831.1

1  ███████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ███████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ███████████████████████████████████████████████

6  ███████████████████████████████████████████████

7  ███████████████████████████████████████████████

8  ███████████████████████████████████████████████

9  ██████████████████████  If an AdSense account holder has been the

10  subject of ████ DMCA notices, ███████████████████████

11  ████████████████████████████████  the ████████████ Team terminates

12  that AdSense account. The number of strikes against an AdSense account is tracked

13  in both Google's internal system and in spreadsheets. Attached as Exhibit K is a true

14  and correct copy of excerpts of the AdSense repeat infringer tracking spreadsheets.

15  The complete electronic version of this spreadsheet is contained on a CD submitted

16  herewith as Exhibit II. ████████████████████████████████

17  ███████████████████████████████████████████████

18  ███████████████████████████████████████████████

19  ███████████████████████████████████████████████

20  ███████████████████████████████████████████████

21  █████████████████████████████████████

22      39.    Google does not actively prevent copyright owners from collecting

23  information needed to issue a DMCA notice.

24  **Perfect 10's Notices**

25      40.    Google has received a number of claimed DMCA notices from Perfect

26  10 ("P10"). Other than these notices, Google is and was unaware of any facts and

27  circumstances from which infringement of P10's alleged copyrights was apparent.

28

01980.51320/2993831.1

1    41.  The Group B Notices. Attached as Exhibit L are true and correct copies
2  of claimed DMCA notices Google received from P10 dated May 31, 2004 (Exhibit
3  L1), June 1, 2004 (Exhibit L2), June 4, 2004 (Exhibit L3),  June 16, 2004 (Exhibit
4  L4), June 28, 2004 (Exhibit L5), July 6, 2004 (Exhibit L6), July 11, 2004 (Exhibit
5  L7), July 19, 2004 (Exhibit L8), October 11, 2004 (Exhibit L9), November 2, 2004
6  (Exhibit L10), November 8, 2004 (Exhibit L11), November 15, 2004 (Exhibit L12),
7  November 16, 2004 (Exhibit L13), November 18, 2004 (Exhibit L14), November 26,
8  2004 (Exhibit L15), December 1, 2004 (Exhibit L16), December 9, 2004 (Exhibit
9  L17), December 21, 2004 (Exhibit L18), December 27, 2004 (Exhibit L19),
10  December 29, 2004 (Exhibit L20), December 31, 2004 (Exhibit L21), January 3,
11  2005 (Exhibit L22), January 16, 2005 (Exhibit L23), January 21, 2005 (Exhibit L24),
12  January 25, 2005 (Exhibit L25), February 3, 2005 (Exhibit L26), February 7, 2005
13  (Exhibit L27), February 11, 2005 (Exhibit L28), February 17, 2005 (Exhibit L29),
14  February 23, 2005 (Exhibit L30), March 6, 2005 (Exhibit L31)[1], March 27, 2005
15  (Exhibit L32), April 3, 2005 (Exhibit L33), April 3, 2005 (Exhibit L34), April 11,
16  2005 (Exhibit L35), May 1, 2005 (Exhibit L36), May 7, 2005 (Exhibit L37), June 12,
17  2005 (Exhibit L38), June 19, 2005 (Exhibit L39),  July 16, 2005 (Exhibit L40), July
18  26, 2005 (Exhibit L41), August 30, 2005 (Exhibit L42), September 27, 2005 (Exhibit
19  L43), December 7, 2005 (Exhibit L44), December 22, 2005 (Exhibit L45), December
20  23, 2005 (Exhibit L46)[2], February 13, 2006 (Exhibit L47), and April 24, 2007
21  (Exhibit L48) (hereinafter referred to as "the Group B Notices").

---

[1]  Google has no record of having received the February 17, 2005 and March 6,
2005 notices. P10 produced them during the preliminary injunction proceedings, and
Google processed both at that time. *See* Ex. II. Both notices were sent to an incorrect
fax number (650-618-1499).
[2]  The July 16, 2005 notice (Exhibit L40) was addressed to AOL. The November
15, 2004, February 23, March 27, April 3 and December 23, 2005 notices (Exhibits
L12, L30, L32, L34 and L46) were addressed to Amazon. These notices were
(footnote continued)

DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR
SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

42. The Group B Notices each contained a cover letter and a three-column spreadsheet claiming to identify material allegedly infringing P10's copyrights. The first column listed allegedly infringing URLs, the second listed the corresponding search terms, and the third listed the allegedly infringed P10 copyrighted material.

43. The May 31 (Exhibit L1), June 1 (Exhibit L2), June 4 (Exhibit L3), and June 16, 2004 (Exhibit L4) notices were in a slightly different format, consisting of e-mail communications sent to Google listing a number of URLs at which allegedly infringing copies of P10 images were displayed.

44. The Group B Notices contained a variety of defects. For example, in many instances, they failed to identify any copyrighted work at all, leaving the field blank and providing only a model name. In other instances, they listed various media containing dozens, hundreds, or even thousands of images, without specifying which image was at issue, such as (1) entire websites like perfect10.com, amyweber.net, and ambersmith.net, (2) multiple pages from Perfect 10 Magazine, (3) an unidentified "Perfect 10 DVD," and (4) an unspecified "Perfect 10 Model Boxing DVD." P10 did not provide Google with these DVDs.

45. Many of the URLs in the Group B Notices were (1) duplicative of URLs previously identified by P10 in other notices, (2) incomplete because they incorrectly contained ellipses in the middle of the partial URL, misspellings, or extra spaces, and/or (3) were associated with web pages displaying multiple images, and thus, Google could not determine which image P10 was referring to. Moreover, several of the URLs identified in the first column of the Group B Notices were not even in Google's search index. In other words, links to those URLs would not appear in Web or Image Search results, so there was nothing to block.

---

forwarded to Google because Google powered those search results at the time. Google processed the notices, as reflected in the spreadsheets attached as Exhibit II and Exhibit 1 to the Haahr Declaration.

01980.51320/2993831.1

46. Additionally, the vast majority of the URLs listed in the Group B Notices were web page URLs, but the Group B notices largely failed to include the image URLs that would allow Google to block the hosted image to which other pages had linked. At many of those web page URLs, multiple images were displayed. By way of example, attached as Exhibit M is a true and correct copy a printout of the web page www.russiancelebrities.org/rclGallery.asp?GID=4, which was one of the 316 URLs identified in P10's July 11, 2004 notice (Exhibit L7). The web page displays more than 60 different images of female models.

47. As explained above, Google cannot fully process a removal from Image Search without an image URL. Thus, for all of the allegedly infringing URLs with the suffix ".jpg" or ".gif" that my team could confirm to be image URLs, my team processed them with the Image Search DMCA procedures described above and prevented all links to those allegedly infringing image URLs from appearing in Image Search. When P10 only provided a web page URL, my team was unable to confirm which, if any, image on the page was allegedly infringing, and therefore, Google processed those web page URLs pursuant to Google's Web Search DMCA procedures described above. ████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████

48. The Group C Notices. Attached as Exhibit N are true and correct copies of claimed DMCA notices Google received from P10 dated December 9, 2005 (Exhibit N1), March 20, 2007 (Exhibit N2), June 28, 2007 (Exhibit N3), July 2, 2007 (Exhibit N4), July 12, 2007 (Exhibit N5), July 31, 2007 (Exhibit N6), October 16, 2007 (Exhibit N7), December 13, 2007 (Exhibit N8), January 24, 2008 (Exhibit N9), March 17, 2008 (Exhibit N10), July 9, 2008 (Exhibit N11), November 26, 2008 (Exhibit N12), November 27, 2008 (Exhibit N13), April 24, 2009 (Exhibit N14), May

01980.51320/2993831.1

1 | 7, 2009 (Exhibit N15), May 30, 2009 (Exhibit N16)[3], June 4, 2009 (Exhibit N17), and
2 | June 13, 2009 (Exhibit N18). These notices are hereinafter collectively referred to as
3 | "the Group C Notices." The Group C Notices each contain (1) a cover letter, (2) a
4 | spreadsheet, and (3) a several-hundred gigabyte hard drive or one or more DVDs full
5 | of electronic files grouped into various folders and sub-folders.[4]

6 | 49. The cover letters for the Group C Notices stated that the accompanying
7 | hard drive or DVDs contained infringing copies of P10 images in various folders.
8 | For at least eight of the eighteen Group C notices, the cover letters acknowledged that
9 | P10 located allegedly infringing images not on Google, but by subscribing and
10 | logging on to various Usenet services directly via password-protected "Usenet" sites,
11 | running searches, and downloading raw image files directly from those servers.

12 | 50. The spreadsheets accompanying the Group C Notices did not identify
13 | any particular P10 images infringed. The March 20, 2007 notice (Exhibit N2) made
14 | no attempt whatsoever to identify copyrighted works. The cover letters for the other
15 | Group C Notices directed that if Google wished to see and compare the P10 images
16 | corresponding to each alleged infringement, it had to search for them amongst P10's
17 | entire 15,000+ image collection from perfect10.com. Those Group C Notices sent
18 | after the June 28, 2007 notice (Exhibit N3) referred Google to the image collection
19 | from perfect10.com as contained on the hard drive P10 had sent on June 28, 2007.

20 | 51. The Group C Notices also failed to identify the location of any allegedly
21 | infringing material. In the spreadsheets accompanying the Group C Notices, the first
22 | column listed the top-level URL for various websites, without specifying the location

23 |

24 | [3] The May 30, 2009 notice (Exhibit N16) was addressed to Earthlink, and was
25 | forwarded to Google because Google powered Earthlink search results at the time.
   | Google processed the notice, as reflected on Exhibit HH.
26 | [4] Seven of the Group C Notices (Exhibits N1, N2, N12, N13, N16, N17 and N18)
27 | did not include an accompanying spreadsheet, and five (Exhibits N12, N13, N16,
   | N17 and N18) attached electronic files rather than a DVD or hard drive.
28 |

1   within that site of an infringing image. The second and/or third columns failed to
2   specify the location of the works at issue on the accompanying hard drive or DVDs.
3   They only listed the electronic folder in which the electronic files containing
4   allegedly infringing material were saved.

5       52.     The hard drive and DVDs contained a myriad of nested electronic
6   folders and subfolders containing thousands of files of alleged infringements. By
7   way of example, attached as Exhibit O are screen shots of the layers of folders on one
8   of the DVDs provided with the July 2, 2007 notice (Exhibit N4). Pages 1-5 of the
9   exhibit show the hundreds of folders and subfolders on the DVD. Pages 6 - 15 of the
10  exhibit show a screen shot of the many hundreds of files nested within just one of the
11  subfolders on the DVD, entitled "hotpinkwet.com."

12      53.     The files of allegedly infringing material on the hard drive and DVDs
13  provided with the Group C Notices are in the form of (1) raw image files such as
14  JPEG files, and (2) multi-page screen shots of Google search results.

15      54.     Attached as Exhibit P is an example of a "raw image" file P10
16  submitted with its March 17, 2008 notice (Exhibit N10). According to P10's cover
17  letters, the raw image files on the Group C hard drive and DVDs were located by
18  running searches on Usenet sites, not on Google. Thus, for many of the domain
19  names listed, the Group C Notices admit that P10 did not locate the infringing
20  material via Google's search services. None of the raw image files display a web
21  page URL or image URL. Many of the raw image files displayed copyright notices
22  of other companies (such as Playboy), and thus evidently were not P10 images.

23      55.     Attached as Exhibit Q is an example of a multi-page screen shot
24  provided with P10's July 31, 2007 notice (Exhibit N6). Many screen shots were
25  hundreds or thousands of pages long. Some screen shots did not include full URLs of
26  the screen or image depicted. Other screen shots appear to have been manipulated
27  such that the image depicted could not be found at the particular URL depicted.
28  Attached as Exhibit R is an example of a screen shot provided with P10's July 31,

01980.51320/2993831.1

-14-

1   2007 notice (Exhibit N6) depicting framing or inline linking of images in Google
2   search results, which appears to have been manipulated to navigate away from the
3   framed page. This is evident from the fact that the framed page has the same web
4   page URL (circled), yet in each of these examples, different content is shown in the
5   framed page. This exhibit illustrates why Google cannot simply use the circled web
6   page URL to suppress allegedly infringing material, because doing so would not
7   address all of the images P10 claims are infringing. This exhibit also demonstrates
8   how P10 would often send Google screen shots of allegedly infringing material
9   located using other search engines, such as Yahoo, rather than sending notices
10  pertaining to Google's Search services.

11              **Google Notifies P10 of Deficiencies in P10's Notices**

12          56.    Google timely advised P10 of the various defects in its notices that
13  hindered or precluded Google from completely processing them.

14          57.    For example, Google received a purported DMCA notice from P10
15  dated May 31, 2004. Google emailed P10 the very next day, asking that P10 re-
16  submit the notice in a format compliant with the DMCA and setting forth the steps it
17  needed to take to do so. Attached as Exhibit S is a true and correct copy of Google's
18  June 1, 2004 correspondence. That same day, P10 re-sent its May 31, 2004 notice
19  with additional information regarding the search terms used to identify some of the
20  allegedly infringing URLs listed therein. Google processed the May 31, 2004 and
21  June 1, 2004 notices as one notice, since the URLs listed were identical.

22          58.    On June 4, 2004, P10 re-sent Google its June 1, 2004 notice, but with
23  some additional URLs added. Attached as Exhibit T is a true and correct copy of
24  Google's June 16, 2004 correspondence explaining the various defects in P10's June
25  4, 2004 notice.

26          59.    On June 16, 2004, P10 re-sent its June 4, 2004 notice with still more
27  URLs added to the list.

28

60. On June 28, 2004, P10 sent another notice to Google which listed a total of 316 allegedly infringing URLs. Just eight days later, on July 6, 2004, P10 re-sent Google an identical list of 316 allegedly infringing URLs. Another five days later, on July 11, 2004, P10 again re-sent Google an identical list. In other words, in a span of two weeks, P10 submitted three purported DMCA notices to Google containing identical lists of allegedly infringing URLs, without disclosing that its June 28, July 6, and July 11, 2004 notices contained identical lists of URLs.

61. On July 15, 2004, after P10 appeared to have ceased supplementing its lists of infringing URLs, Google emailed P10 requesting that it send an electronic soft copy list (such as a list in Microsoft Word format) of the URLs P10 contended infringed its copyrights (as opposed to, for example, trademark rights), in order for Google to process the large number of URLs in the list as quickly as possible. Attached as Exhibit U is a true and correct copy of Google's July 15, 2004 letter.

62. On July 19, 2004, P10 emailed Google an Excel spreadsheet listing infringing URLs, including the 316 listed in the June 28, July 6, and July 11 notices.

63. On July 27, 2004, Google emailed P10 to report that the processing of the June 1 and June 28 notices was nearly finished. To facilitate the processing, however, Google requested that P10 provide soft copies of the URLs contained in those notices. Google also acknowledged receipt of P10's July 11, 2004 notice. Google also asked that P10 provide only those URLs that were not included in one of P10's earlier notices, to avoid redundant processing efforts and to make sure that each notice was processed completely. Attached as Exhibit V is a true and correct copy of Google's July 27, 2004 correspondence. P10 did not respond to Google's requests.

64. Approximately two months passed with no communication from P10. Then, in late September 2004, P10's counsel sent Google a draft Complaint, indicating that P10 would file it if the parties could not resolve their dispute immediately. Despite having not received the requested electronic soft copies of P10's June 1 and June 28, 2004 notices, Google's removals team immediately began

01980.51320/2993831.1

the laborious process of manually typing in the many hundreds of URLs listed in those notices, for further processing. █████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

65.     Attached as Exhibit W is a true and correct copy of Google's December 20, 2004 letter to P10, pointing out several deficiencies in P10's notices.

66.     Attached as Exhibit X is a true and correct copy of Google's August 1, 2005 letter to P10, explaining the numerous deficiencies in P10's recently-received notices.

67.     Attached as Exhibit Y is a true and correct copy of Google's December 21, 2005 letter to P10, regarding the numerous deficiencies in P10's recently-received notices.

68.     Attached as Exhibit Z is a true and correct copy of Google's January 31, 2006 letter responding to P10's previous correspondence, and reiterating the multiple deficiencies in P10's recent notices.

69.     Attached as Exhibit AA is a true and correct copy of Google's correspondence to P10 dated April 26, 2007, describing deficiencies in P10's latest DMCA notice.  As the notice included eleven pages of allegedly infringing URLs, Google advised P10 that processing the notice would be faster if P10 provided Google with a soft copy of the notice.  P10 did not do so.

70.     Attached as Exhibit BB is a true and correct copy of Google's August 31, 2007 letter to P10, detailing the deficiencies in several of P10's recent notices, and providing corrective instructions.  Among other things, Google again asked P10 to provide notices in an electronic format.  P10 did not do so.

71.     Attached as Exhibit CC is a true and correct copy of Google's October 31, 2008 letter to P10, identifying various deficiencies in P10's recent notices.

72.     Attached as Exhibit DD is a true and correct copy of Google's May 5, 2009 letter to P10 regarding the deficiencies in P10's recent notice.

01980.51320/2993831.1

1   73.   Attached as Exhibit EE is a true and correct copy of Google's May 20,
2   2009 letter to P10, regarding the deficiencies in P10's recent notice.

3   74.   At no time did P10 ever respond to Google's letters by resubmitting its
4   notices in an intelligible and DMCA-compliant format.  To this day, P10 continues to
5   send notices in these unintelligible formats and refuses to provide Google with soft
6   copy electronic spreadsheets listing individual web page and image URLs.

### Processing P10's Notices

8   75.   P10's notices were so unlike any others Google received, in both their
9   volume and incomprehensibility, that Google went above and beyond the DMCA's
10  requirements in order to process them, by (1) notifying P10 of the defects and how to
11  correct them; ███████████████████████████████████████████
12  ██████ (3) blocking discernable URLs from search results; and (4) enforcing
13  Google's three strikes policies for services with subscribers or account holders.

14  76.   ████████████████████████████████████████████████ my
15  team carefully reviewed the notices to ascertain whether they identified an allegedly
16  infringing URL that could be reviewed.   This exercise was effectively made
17  impossible, since P10 never specifically identified the work that Google should
18  compare with the alleged infringing material.  Instead, for the vast majority of the
19  allegedly infringing URLs identified in P10's notices to Google, P10 described the
20  corresponding copyrighted work as either: (1) entire websites, such as perfect10.com,
21  amyweber.net, and ambersmith.net, each of which contained hundreds of distinct
22  images, and most of which were viewable only with a username and password also
23  not provided by P10; (2) ranges of pages in various issues of Perfect 10 Magazine
24  that were never provided to Google; (3) the unidentified "Perfect 10 Model Boxing
25  DVD", which was never provided to Google; or (4) the unidentified "Perfect 10
26  DVD", also never provided to Google.  Thus, our team was unable to verify P10's
27  allegations of infringement because P10 failed to provide Google with specific
28  copyrighted works or detailed descriptions of those works that Google could use to

01980.51320/2993831.1
DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR
SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

compare to the content displayed at the allegedly infringing URLs (when such URLs were actually provided).

77. Google nevertheless processed P10's notices as best it could. My team checked all discernable URLs (when a complete URL was provided), and ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ After verifying the URLs that it could, my team sent them to Google's engineering team, ████████ ████████████████████████████████████████████████████████████ Preventing web page URLs from appearing in Web Search results automatically removes the cached link to the allegedly infringing material from Web Search results as well.

78. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

79. Attached as Exhibit FF is a true and correct copy of excerpts of my spreadsheet reflecting the processing of P10's notices dated May 31, 2004 through June 19, 2005. ████████████████████████████████████████ ████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 █████████

23    80.    Attached as Exhibit GG is a true and correct copy of excerpts of my

24 spreadsheet reflecting the processing of P10's notices dated July 16, 2005 through

25 April 24, 2007.   This spreadsheet includes much of the same categories of

26 information as Exhibit FF, and uses the same codes and abbreviations. ███████

27 ████████████████████████████████████████████████████

28

01980.51320/2993831.1
DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR
SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

81. The URLs that were ultimately prevented from appearing in Web and Image Search results as a result of P10's notices were tracked in my spreadsheets and/or ▮▮▮▮▮▮▮▮▮▮▮▮ by the engineering team.

## A. Google's Processing of the Group B Notices

82. Google was able to complete its processing of the majority of the Group B notices within one to two weeks of receipt. In some cases, these notices (which often contained hundreds of URLs) were processed in as little as two days. Where P10 refused to cooperate by sending complete URLs, electronic soft copies of lists of URLs, and the like, my team's processing efforts were delayed.

83. As referenced above, P10 would often send several identical or slightly revised versions of the same notice, without specifying the revisions made, thereby forcing my team to re-review and re-process hundreds of URLs.

84. Similarly hindering my team was P10's refusal to consistently provide lists of URLs in electronic soft copy form. A soft copy URL, which may be copied and pasted directly to/from the browser address bar, allows Google to immediately access the specific page that allegedly contains infringing material. Though P10 initially sent a few soft copy notices at Google's request, it inexplicably stopped doing so immediately prior to filing this lawsuit. In late 2004 and 2005, P10 provided the necessary electronic soft copies of URL lists only sporadically. P10 has not sent a single electronic soft copy list of URLs with its notices since 2005. Every time P10 refused to abide by Google's DMCA policy in this respect, Google had to undertake the laborious task of manually typing in the hundreds or thousands of URLs listed. Given the poor quality of many of P10's faxes, this was often an impossible task, as both manual re-typing and use of optical character recognition ("OCR") programs resulted in numerous errors and guess work. Exhibit L37 illustrates a poor quality fax received from P10.

85.     My team's processing efforts were expeditious, especially in light of the sheer volume of the notices, their numerous defects, P10's refusals to cure those defects, and the pendency of this litigation. ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████     We even worked over our Thanksgiving and Christmas holidays to ensure that the notices were timely processed.

**B.    Google's Processing of the Group C Notices**

86.     In 2007, P10 stopped sending DMCA notices in hard copy spreadsheet format, and instead started sending cover letters accompanied by DVDs and hard drives containing dozens or hundreds of folders nested several layers deep. Those folders in turn contained thousands of pages of screenshots of various websites, and thousands of raw image files that P10 claimed to have downloaded directly from password-protected websites (i.e., images that P10 did not locate using Google's search engine). These DVDs and hard drives were, for all practical purposes, impossible to process.

87.     One such "notice" was sent on July 2, 2007. It (like the other Group C Notices) was organized differently than earlier P10 notices. The DVDs provided with this notice contained thousands of screen shots of allegedly infringing material. Upon receipt, my team immediately ██████████████████████████

███████████████████████████████ attempted to further process the notice. These employees began reviewing the accompanying DVDs, examining the thousands of pages of screenshots page by page, and manually typing in the discernable URLs. ████████████████████████████████

█████████████████████████████████████████████████ P10 is the only copyright holder who has refused to provide notices in a format amenable to the standard processing done by the ██████ team. █████████████

██████████████████████████████████████████████████████████

[REDACTED] This process also led to a handful of Blogger removals.

88.    I created two spreadsheets, similar to those attached as Exhibits FF and GG, to track Google's efforts to process the Group C Notices. Attached as Exhibit HH are true and correct copies of excerpts of those spreadsheets. [REDACTED]

[REDACTED]

[REDACTED] The URLs Google blocked from appearing in search results are tracked in both Exhibit HH and [REDACTED].

89.    For the Court's convenience, attached as Exhibit II is a DVD containing true and correct copies of the complete versions of all four [REDACTED] processing spreadsheets, as well as the Blogger and AdSense DMCA processing spreadsheets (referenced and excerpted in hard copy, above).

90.    Upon receipt of the other Group C Notices, Google expeditiously reviewed the notices to determine whether they could be further processed, and notified P10 of the defects therein. P10 never re-submitted any of the Group C Notices in corrected form, despite having been advised repeatedly of their deficiencies. P10 continues to send notices in this unintelligible format, despite

DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

1 Google's instructions to the contrary. Indeed, P10 submitted purported notices in this
2 same defective format as recently as May 7 and June 13, 2009.

3     91.    Over the past four-plus years, Google has ████████████
4 █████████████████████████████████████████████████████████████████
5 ████ thereby blocking them from appearing in Web or Image Search results in
6 response to user queries. ████████████████████████████████████████
7 █████████████████████████████████████████████████████████████████
8 █████████████████████████████████████████████████████████████████
9 These processing efforts are documented in Exhibits FF, GG, HH, and II, ████████
10 ████████ among other places.

11     **C.**    **Google's Enforcement of its Repeat Infringer Policies**

12     92.    Despite the fact that none of P10's notices were directed to a Google
13 service with account holders or subscribers, Google carefully reviewed them to
14 ensure that its repeat infringer policies were enforced.

15     93.    For instance, not one of P10's notices was sent to the attention of
16 Google's Legal Support for Blogger DMCA Complaints. None of P10's notices
17 stated that it was complaining of copyright infringement via Blogger. And, none of
18 P10's notices contained the specific information necessary for Google to locate
19 allegedly infringing material on a Blogger site, namely the post URL or date of the
20 blog entry. Instead, P10's notices routinely provided only the top-level domain for
21 the blog (such as www.elmanaba.blogspot.com), or web page URLs that included
22 numerous blog posts and images. By way of example, attached as Exhibit JJ is an
23 excerpt from www.elmanaba.blogspot.com, identified in P10's December 22, 2005
24 notice (Exhibit L45), which displays multiple images. Nevertheless, to the extent
25 possible, my team expeditiously processed P10's notices for Blogger. As my team
26 processed the notices for Web and Image Search, they scrutinized them for any
27 references to Blogger websites, as reflected by a "blogger.com" or "blogspot.com"
28 domain name. The ████████ team identified sixteen notices that referenced Blogger

URLs: the February 7, 2005 (Exhibit L27), February 17, 2005 (Exhibit L29), April 3, 2005 (Exhibit L34), April 11, 2005 (Exhibit L35), June 12, 2005 (Exhibit L38), June 19, 2005 (Exhibit L39), July 16, 2005 (Exhibit L40), July 26, 2005 (Exhibit L41), August 30, 2005 (Exhibit L42), September 27, 2005 (Exhibit L43), December 7, 2005 (Exhibit L44), December 22, 2005 (Exhibit L45), December 23, 2005 (Exhibit L46), February 13, 2006 (Exhibit L4), July 2, 2007 (Exhibit N4) and June 4, 2009 (Exhibit N17). The ████████ team then forwarded all such URLs to the members of the ████ team responsible for further processing regarding Blogger. The Blogger team removed the offending blog post wherever the identity of that post could be discerned (given P10's failure to provide the specific post URL), and noted a strike against the blog account in question, pursuant to Google's ████████ repeat infringer policy. Google terminated ██ blog accounts ████████████████ in response to any DMCA notices (including P10's). Attached as Exhibit KK are true and correct copies of excerpts of various processing spreadsheets and e-mails reflecting Google's processing of P10's DMCA notices implicating Blogger.

94. ████ P10's notices failed to specify when, if ever, they were complaining of AdSense content and did not include the information Google needs to process an AdSense DMCA complaint (as explained in Google's published AdSense DMCA policy), ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ██████████████████████████████████████████████

8 ████████████████████████ Attached as Exhibit LL is a true and correct copy of

9 excerpts of various processing spreadsheets reflecting AdSense terminations carried

10 out in response to P10's DMCA notices.

11     95.    Google's published DMCA policy for AdWords requires complainants

12 to (1) direct DMCA notices to Google's Legal Support for AdWords Complaints at a

13 special fax number, and (2) provide, among other things, the ad text and visible URL

14 for each infringing ad result. Google cannot identify allegedly infringing AdWords

15 ads without this information. ████████████████████████

16 ██████████████████████████████████████████████

17 ██████████████████████████████████████████████

18 ██████████████████████████████████████████████

19 ████████████████████████ None of P10's DMCA notices were directed to Google's

20 Legal Support for AdWords, nor did they provide the required information for

21 AdWords complaints, such as the AdWords ad text in question.

**Counter-notifications Received in Response to P10's Notices**

23     96.    Google received many counter-notifications in response to removals of

24 URLs identified in P10's purported DMCA notices. Attached as Exhibit MM are true

25 and correct copies of various of these counter-notifications. In accordance with

26 Google's standard procedure, the URLs listed in these counter-notifications were

27 reinstated in Google search results. Google sent each of these counter-notifications to

28 P10, but P10 never responded to them.

01980.51320/2993831.1

DECLARATION OF SHANTAL RANDS POOVALA IN SUPPORT OF DEFENDANT GOOGLE'S MOTIONS FOR SUMMARY JUDGMENT RE: GOOGLE'S ENTITLEMENT TO SAFE HARBOR UNDER 17 U.S.C. § 512

1     97.   Google even received an e-mail from P10 stating that one of its own
2 notices had improperly listed websites which held a valid license to display the P10
3 images Norman Zada had sworn were infringing. Specifically, two weeks after
4 Google processed P10's December 22, 2005 notice, P10 informed Google that it had
5 inadvertently listed as infringing a number of URLs which in fact were affiliates of
6 copyright holders from whom P10 had purchased images. Thus, those affiliates had
7 licenses to display the P10 images in question, and were not actually infringing.
8 Accordingly, Google reinstated the URLs that had been suppressed from Search
9 results, and the Blogger content that had been removed. Attached as Exhibit NN is a
10 true and correct copy of P10's January 2006 counter-notification to its own notice.

11     98.   The January 2006 counter-notification is a perfect example of why
12 Google can only suppress links to the specific web page or image URL provided by a
13 complainant. Google cannot otherwise identify which uses are licensed, a fair use, or
14 otherwise acceptable to the owner.

15                           **Processing Communications for P10's Notices**

16     99.   Attached as Exhibit OO are true and correct copies of various Google
17 communications informing P10 that Google had processed P10's notices.

18     100.   Attached as Exhibit PP is a true and correct copy of a communication
19 Google received from P10 regarding Google's processing of P10's notices.

20     I declare under penalty of perjury under the laws of the United States of
21 America that the foregoing is true and correct. Executed June 29 , 2009 at
22 Mountain View, California.

23
24                                   Shantal Rands Poovala
25
26
27
28

01980.51320/2633256.17