1  [COUNSEL LISTING ON FOLLOWING PAGE]

2

3

4

5

6

7

8

9           UNITED STATES DISTRICT COURT

10          CENTRAL DISTRICT OF CALIFORNIA

11

12  PERFECT 10, INC., a California corporation,

13          *Plaintiff,*

14          vs.

15  GOOGLE INC., a corporation; and
    DOES 1 through 100, inclusive,

16

17          *Defendants.*

18  AND COUNTERCLAIM

19

20

21

22

23

24

25

26

27

28

CASE NO. CV 04-9484 AHM (SHx)

**<u>Before Judge A. Howard Matz</u>**

**JOINT STATUS REPORT OF PLAINTIFF PERFECT 10, INC. AND DEFENDANT GOOGLE INC.**

Date:   November 14, 2011
Time:   10:00 a.m.
Place:  Courtroom 14, Courtroom of Judge A. Howard Matz

Discovery Cut-Off Date:  None Set
Pretrial Conference Date: None Set
Trial Date: None Set

1   Jeffrey N. Mausner (State Bar No. 122385)
    David N. Schultz (State Bar No. 123094)
2   Law Offices of Jeffrey N. Mausner
3   6222 Amigo Ave.
    Tarzana, CA 91335
4   Email: Jeff@mausnerlaw.com
    Telephone: (310) 617-8100
5   Fax: (310) 476-8138

6   Attorneys for Plaintiff Perfect 10, Inc.

7   QUINN EMANUEL URQUHART & SULLIVAN, LLP
8     Michael T. Zeller (Bar No. 196417)
      michaelzeller@quinnemanuel.com
9   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
10  Telephone: (213) 443-3000
    Facsimile: (213) 443-3100
11    Charles K. Verhoeven (Bar No. 170151)
      charlesverhoeven@quinnemanuel.com
12  50 California Street, 22nd Floor
    San Francisco, California 94111
13    Rachel Herrick Kassabian (Bar No. 191060)
      rachelkassabian@quinnemanuel.com
14  555 Twin Dolphin Drive, 5th Floor
    Redwood Shores, California 94065
15
    Attorneys for Defendant Google Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

Counsel for Plaintiff Perfect 10, Inc. ("Perfect 10") and Defendant Google Inc. ("Google") conducted a meet and confer on October 20, 2011.  Pursuant to this Court's Order Setting a Status Conference, dated October 7, 2011 (the "Order") (Docket No. 1010), the parties now submit this Joint Status Report.

## I.      BASIS FOR SUBJECT-MATTER JURISDICTION

**Google's Position**

This action arises under the Copyright Act, 17 U.S.C. § 101 et seq. and the Lanham Act, 15 U.S.C. § 1051 et seq.  This Court has jurisdiction over the subject matter of these actions pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b) and principles of supplemental jurisdiction.

Google disputes subject matter jurisdiction with respect to copyrights for which Perfect 10 has not obtained valid, issued registrations.  This Court previously instructed that a "cutoff date" would be set, by which P10 would have to identify all of the copyrights it would be asserting in this case.  Google respectfully requests that this Court now set that cutoff date for **December 31, 2011**.  Under Google's proposed pretrial and trial schedule set forth below, this date will give Google an opportunity to take discovery on all of the copyrights at issue, and to depose Zada, Perfect 10, and the various relevant third parties just once on all of the copyrights potentially at issue.

**Perfect 10's Response**

Perfect 10 responds that, at an earlier status conference, this Court stated that a date will be set before trial by which Perfect 10 will have to identify each Perfect 10 copyrighted work it claims was infringed, and each such work will be included in any trial of this action.

II.     **A SHORT SYNOPSIS OF THE PROCEDURAL HISTORY AND MAIN CLAIMS REMAINING IN THE CASE**

**Perfect 10's Position**

As requested in the Order, Perfect 10's portion of the Report, set forth below, addresses the current procedural history and status of this case, the implications, if any, of the Court of Appeals for the Ninth Circuit's August 3, 2011 decision on future proceedings, and issues pertaining to future proceedings in this case.

A.     **IMPLICATIONS OF THE NINTH CIRCUIT'S DECISION**

In its August 3, 2011 decision, the Ninth Circuit specifically declined to rule on any issue raised by this Court's July 26, 2010 Order Granting In Part and Denying In Part Google's Motions for Partial Summary Judgment (the "SJ Order").  The Ninth Circuit likewise declined to rule on the merits of any of Perfect 10's claims for relief addressed in this Court's July 30 Order Denying Perfect 10's Motion for Preliminary Injunction (the "PI Order").  Instead, the Ninth Circuit affirmed this Court's denial of Perfect 10's motion for preliminary injunction solely on the basis that "Perfect 10 has not demonstrated that it would likely suffer irreparable harm in the absence of a preliminary injunction." *Perfect 10, Inc. v. Google Inc.,* 2011 WL 3320297, at *1 (9th Cir., August 3, 2011).  As the Ninth Circuit specifically stated:

> As part of its interlocutory appeal of the district court's denial of its motion for a preliminary injunction, Perfect 10 also sought review of the district court's grant of partial summary judgment in favor of Google based on its ruling that Google is entitled to the safe harbor protection of the DMCA for its caching feature, Blogger service, and (in part) its web and image search [the SJ Order].  While partial summary judgment decisions are not normally appealable, Perfect 10 argues that we may consider this interlocutory because it is "inextricably intertwined" with the denial of merits of the preliminary injunction decision, and review of the partial summary judgment ruling is "necessary to ensure meaningful review" of that decision.  [citations omitted.]  **Because Perfect 10 has failed to show irreparable harm, we need not address its likelihood of success on the merits, and therefore also need not address the relationship between the**

3

**preliminary injunction and summary judgment orders.**

*Id.* at *3 n.3 (emphasis added).  Because the Ninth Circuit did not address the SJ Order, and because the SJ Order did not resolve all of the claims in this case, it is an interlocutory, non-final order that is subject to revision by this Court at any time before final judgment.  As Fed.R.Civ.P. 54(b) specifically states, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *See also American Canoe Assoc. v. Murphy Farms, Inc.,* 326 F.3d 505, 514–15 (4th Cir.2003) ("a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted").  Moreover, Perfect 10 is entitled to proceed to trial on all of the claims that were the subject of its motion for preliminary injunction, because: (i) the PI Order only addressed the question of whether Perfect 10 was likely to succeed on the merits of these claims (and not whether either party was entitled to judgment on these claims); and (ii) the Ninth Circuit specifically declined to address Perfect 10's "likelihood of success on the merits." *Perfect 10,* 2011 WL 3320297, at *3 n.3.

Although the Ninth Circuit's decision did not address the substance of the SJ Order or the PI Order, the Ninth Circuit panel questioned certain aspects of these rulings, and made other relevant comments, during the course of oral argument on April 11, 2011.  These matters are discussed below.

### 1.   Image Recognition

Judge Ikuta raised several questions regarding this Court's discussion of image recognition technology.  First, Judge Ikuta questioned why this Court had stated in the PI Order that the only evidence submitted by Perfect 10 in support of its

assertion that Google possessed image recognition technology was "speculation" by Dr. Zada [*see* PI Order (Docket No. 953) at 11]:

> **I know that Google does have that capability.** And they have the pages there that were sent to the District Court. And there was the McPhatter Declaration, and there was the Tin Eye material. So, they had more than the Zada Declaration. I'm wondering whether that was not shown to the District Court or why the District Court said that all that was presented was the Zada Declaration.

Transcript of April 11, 2011 Oral Argument ("Transcript"), at 29:3-11 (emphasis added).[1]  Furthermore, Judge Ikuta appeared to have difficulty with the notion that Google could not remove P10 Images using image recognition:

> **They [Google] now really assisted all of these infringing sites to multiply themselves immensely. I don't think there can be a big dispute about that.** And, then, Perfect 10 says, well, look, you have this similar images search. You could go through and get all of the images that they've indicated are infringing, that only they have the right to display, and you could block all those URLs.
>
>     That argument has some appeal given Google's current existing technology that it's using. . . .**Does [Google] know of the infringement? Yes. And could it take steps to block these sites. And they argue, yes, they have the technology already.**
>
>     **Why doesn't that meet the contributory infringement standard or test?**

Transcript, 26:15-27:4 (emphasis added).  When she made those statements, Judge Ikuta was not even aware of Google's "search-by-image" capability, which was only made available to the public in June 2011 and which Google has likely had for its

---

[1] For the Court's convenience, a copy of the Transcript of Oral Argument before the Ninth Circuit is attached as Exhibit 12 to the Declaration of Dr. Norman Zada in Opposition to Google's Motion For Review of and Objections to Magistrate Judge Hillman's August 20, 2010 Order Denying Google's Motion To Quash Subpoenas Directed to Shantal Rands Poovala, filed October 24, 2011 ("Zada Decl.") (Docket Nos. 1015-1, 1015-4).  The hearing on Google's motion is set for the same time as the Status Conference.

1  own internal use for years.  This capability allows Google to search on a P10 Image

2  identified in one of Perfect 10's notices sent under the Digital Millennium Copyright

3  Act (the "DMCA") and find the exact location of all of the identical copies of that

4  image on Google's system.  *See* Plaintiff Perfect 10, Inc.'s Memorandum Of Points

5  And Authorities In Opposition To Defendant Google Inc.'s Motion For Review Of

6  And Objections To Magistrate Judge Hillman's August 10, 2010 Order Denying

7  Google's Motion To Quash Subpoenas Directed To Shantal Rands Poovala, filed

8  October 24, 2011 ("Perfect 10's Opposition") (Docket No.1015) at 7-9, 17-18; Zada

9  Decl. (Docket Nos. 1015-1 to 1015-4), ¶¶2-4, Exhs. 1-3.

10             **2.    Vicarious Liability**

11        Several judges questioned this Court's holding in the PI Order that Perfect 10

12  had not established that it was likely to succeed on the merits of its claim that

13  Google was vicariously liable for hosting infringing images on its servers while

14  placing ads around those images.  For example, Judge Ikuta asked Google's

15  attorney:

16        Could you address the district court's discussion on the vicarious
       liability on the financial benefit and whether the use of the AdSense
17      and the clicks is enough to give a direct financial or a direct enough
       financial benefit?
18

19  Transcript, 32:13-17.  After Google's attorney responded, Judge Ikuta continued:

20        **So, the images of the women attract people to the site, and,
       then, when they're there, they click on the ads.  Isn't that the whole
21      idea behind AdSense?**
22

23  Transcript, 32:23-33:1 (emphasis added).  Furthermore, Chief Judge Kozinski noted

24  that to "use Blogger you have to click on an agreement or agree to the terms of use.

25  And I am guessing the terms of use involves promises not to display illegal material.

26  . . . **Well, how is that different than kicking somebody off a flea market? . . .**

27  **You're not going to rely on the difference between physical space and cyber**

28  **space . . ."**  Transcript, 33:3-6; 34:23-24; 35:12-13 (emphasis added).

Google's attorney responded to these statements by asserting, among other things, that "there is no infringing material still on Blogger that has a URL that can be discerned." Transcript, 35:22-23. This assertion is demonstrably false. For example, on May 2, 2011, three weeks after Google's attorney made this assertion, Google sent a letter to Perfect 10 stating that Google had removed approximately 8,000 infringing P10 thumbnails from its Image Search results, based on DMCA notices that in some cases were sent by Perfect 10 to Google five months earlier. Many of the URLs that Google belatedly blocked were of images hosted by Google on its Blogger or Blogspot servers. Zada Decl. ¶14, Exh. 13. Moreover, Google has failed to remove Web Search links to the same infringing web pages. Finally, Google admittedly has refused to process any portion of 75 of the 87 notices sent by Perfect 10, which were of the same format as the notices that Google processed when it removed these 8,000 infringing P10 thumbnails. Zada Decl. ¶14, Exh. 13.

### 3. Whether Google's Display of Full-Size Images on Blogger Constitutes Direct Infringement Under The Server Test.

Judge Kozinski suggested that Google's display of full-size P10 Images hosted on Blogger constituted direct infringement under the "server test" developed by this Court and upheld by the Ninth Circuit. Judge Kozinski noted that "those images are on Google's own servers," and added: "So then you get to the other Perfect 10 case, right? Which talked about carrying things on, you know, a server." Transcript, 31:15-16, 20-22. Google's attorney responded by asserting, among other things, that "there is no evidence . . . of any Blogger URLs that Google didn't disable." Transcript, 32:6-8. That statement is demonstrably false. There were many Blogger URLs that Google had failed to disable as of the oral argument before the Ninth Circuit on April 11, 2011. Furthermore, there are Blogger URLs that Google has still not disabled as of today. Zada Decl. ¶¶2-4, 14, Exhs. 1-3, 13.

### 4.   Whether Perfect 10's Forwarding of DMCA Notices to Chillingeffects.org Constitutes Copyright Infringement

During oral argument, Chief Judge Kozinski was concerned that Google was forwarding DMCA notices to chillingeffects.org that contained live links and images.  He asked Google's counsel, "Does Google really have to send live links to Chilling Effects?'  Transcript, 36:2-3.  Whether Google's forwarding of DMCA notices containing live links and images to chillingeffects.org constitutes direct and/or contributory copyright infringement remains a key issue in this case.  This is particularly true because Perfect 10 has uncovered new evidence that the DMCA notices it has sent to Google are now being substantially altered before being published on chillingeffects.org.  These altered notices, which merely list the infringing URLs, establish several critical points.  First, they demonstrate that, contrary to Google's assertions, Perfect 10's Group C Adobe notices have provided the URLs required by the DMCA.  Google has simply chosen not to process these notices by copying and pasting those URLs from the Adobe documents.   Second, these altered notices show that Google does not need to send chillingeffects.org Perfect 10's entire notice, with full-size images and live links, in order to further Chilling Effects' purported research.   Finally, these altered notices demonstrate that Google could alter Perfect 10's older notices by removing all of the P10 Images and live links.  However, Google has not done so.  In fact, Google has refused to respond to Perfect 10 DMCA notices which have asked Google to remove direct links to the infringing images and live links in those notices.  Zada Decl. ¶5, Exh. 4.

### 5.   The Group B Notices

Chief Judge Kozinski suggested during oral argument that all of the Group B spreadsheet-type notices sent by Perfect 10 to Google were compliant, at least in form.  He noted that this Court "approved the Group B notices . . . in form.  So some of them were not complete, but in form it approved the Group B notices."  Transcript, 4:16-21.

### 6.     The 95 PI Notices

Judge Ikuta noted that this Court did not address the 95 DMCA notices that were not at issue in connection with the SJ Order, but were raised by Perfect 10 in connection with its motion for preliminary injunction (the "PI Notices"). Transcript, 7:14-16.  Google's attorney agreed with Judge Ikuta.  In response to Judge Ikuta's question, "How about the 95 notices that [Perfect 10] claim[s] the district court overlooked in the preliminary injunction motion?"  Google's attorney conceded that "they've not yet been considered by the district court."  Transcript, 25:11-16.

### 7.     DMCA Notices Containing Copies Of Infringing Images

Chief Judge Kozinski indicated that he did not see anything wrong with providing copies of infringing images in DMCA notices.  In fact, he asked counsel for Perfect 10 why it couldn't include in its notices images in JPEG format or images without live links.  Transcript, 20:7-9.

### 8.     Whether Google Needs to Block Entire Infringing Websites

Judge Ikuta appeared to suggest that Google should use its image recognition technology to block an entire infringing website, and not just one or two links to that site.  Judge Ikuta asked Google's counsel:  "Does [Google] know of the infringement?  Yes.  And could it take steps to block these sites.  And [Perfect 10] argue[s], yes, they [Google] have the technology already.  Why doesn't that meet the contributory infringement standard or test?"  Transcript, 26:24-27:4.

### 9.     Damage To Perfect 10

Judge Ikuta noted that it was logical to believe that Perfect 10 was being damaged because potential customers would not subscribe to its website when they were able to get Perfect 10's copyrighted images for free using Google's search engine:  As she stated, "What's wrong with the res ipsa loquitur argument? . . . **You say, well, if I can get it for free just by putting a model's name into the Google's search engine, why am I going to subscribe and buy it.  I mean, that has a lot of**

9

1   **common sense appeal."**  Transcript, 21:15-16, 20-23 (emphasis added).  *See also*

2   *id.,* 22:17-20.

3       **B.     MATERIAL NEW EVIDENCE**

4       As discussed in detail in Perfect 10's Opposition, various facts material to this

5   case have emerged since this Court issued the SJ Order and the PI Order in July

6   2010.  *See* Perfect 10's Opposition at 6-9, 16-18.  These include the following:

7       **1.     Google's August 2011 Non-Prosecution Agreement**

8       In August 2011, Google entered into a criminal Non-Prosecution Agreement

9   with the Department of Justice and the United States Attorneys' Office for the

10  District of Rhode Island (the "Non-Prosecution Agreement").  Under the terms of

11  the Non-Prosecution Agreement, Google admitted to knowingly and repeatedly

12  violating Federal criminal laws against the "unsafe and unlawful importation of

13  prescription drugs" for years, by allowing Canadian online pharmacies to advertise

14  prescription drugs for sale to Google users in the United States through Google's

15  AdWords advertising program.  As a result, Google paid a $500 million penalty, one

16  of the largest penalties ever levied against a United States corporation.  Zada Decl.

17  ¶¶6-8, Exhs. 5-7.

18      A Wall Street Journal article discussing the Non-Prosecution Agreement

19  stated that, "[i]n the years leading up to the [Justice Department] investigation,

20  **Google executives testified repeatedly in Congress that the company had**

21  **'rigorous' controls to stop unlawful advertisements**.  Those included retaining a

22  series of third-party services to screen out sites that didn't comply with U.S. law."

23  Zada Decl. ¶6, Exh. 5, pp. 3-4 (emphasis added).  The article added that Peter

24  Neronha, the Rhode Island United States Attorney who led the probe, said that

25  **"those efforts amounted to 'window dressing,' allowing Google to continue**

26  **earning revenues from the allegedly illicit ad sales even as it professed to be**

27  **taking action against them."**  *Id.* (emphasis added).  Mr. Neronha stated that Larry

28  Page, Google's co-founder, "knew what was going on," and added: "Suffice it to say

that this is not two or three rogue employees at the customer service level doing this on their own. . . .**This was a corporate decision to engage in this conduct**.” *Id.* (emphasis added).

The above discussion demonstrates that Google's testimony before Congress was at least misleading, if not untruthful, and that Google's **six years** of unlawful conduct was known and approved at the highest corporate level.  The illegal activity which Google admittedly aided and abetted involved trademark infringement, copyright infringement, patent infringement, and the sale of counterfeit goods.  Zada Decl. ¶¶6-12, Exhs. 5-11.

This situation is eerily similar to Google's conduct in this case.  Here, as well, Google has contended that it is a responsible and innocent Internet Service Provider that “went beyond what the law requires” to process Perfect 10's DMCA notices, and “regularly blocks links to content (including thumbnails) from search results for policy and legal reasons . . .”  Google Partial Summary Judgment Motion for Web and Image Search (Docket No. 428) at 1:19-20, 2:25-27.  Perfect 10 has long contended, however, that Google has been obstructing discovery and has been providing false or misleading statements to this Court.  The circumstances surrounding the Non-Prosecution Agreement, and other recent conduct by Google [*see* Perfect 10's Opposition at 16-17 n.7; Zada Decl. ¶¶6-12, Exhs. 5-11], support Perfect 10's contentions.  This is particularly true because Perfect 10 has discovered that, notwithstanding the terms of the Non-Prosecution Agreement, Google is continuing to host thousands of blogspot.com websites which promote illegal pharmacies and simultaneously display Google ads and infringe trademarks, patents, and copyrights.   Zada Decl. ¶¶6-12, Exhs. 5-11.  If Google is willing to aid and abet the sale of illegal, potentially life-threatening drugs, and then provide false or misleading testimony about its conduct to Congress, Google is certainly capable of knowingly contributing to copyright infringement and lying about that as well, as Perfect 10 has claimed.

## 2.   Google's "Search By Image" Capability

In June 2011, Google made available to its users a powerful "search-by-image" capability.  Zada Decl. ¶¶2-4, Exhs. 1-3.  Google has likely had this capability for its own internal use for years.  Google's "search-by-image" capability now allows Google users to search on an actual image and find the exact locations of hundreds of identical copies of that image in Google's Image Search and Web Search results.  Zada Decl. ¶¶2-4, Exhs. 1-3.

The consequences of this new evidence of Google's capabilities are profound.  First, the existence of Google's "search-by-image" capability contradicts Google's assertions that the inclusion of images in DMCA notices makes those notices more difficult to process and that Perfect 10's "Group C" notices, which included copies of allegedly infringing P10 Images, were unreasonably burdensome to process.  Google could have simply taken any Perfect 10 DMCA notice which contained identified Perfect 10 infringing images and removed all such images from its system, almost automatically, using its search-by-image capability.  Second, Google's search-by-image feature reveals the massive amount of infringement that exists on Google's system – hundreds of thousands of infringing P10 Images and links.  Zada Decl. ¶¶2-4, Exhs. 1-3.  This level of infringement makes Google's current policy of requiring copyright holders to cut and paste tens of thousands of URLs, one by one, simply unworkable.  Finally, the fact that Google can use this "search-by-image" capability to locate all copies of a particular P10 Image on its system means that Google knows (or should know) of that infringement.  Zada Decl. ¶¶2-4, Exhs. 1-3.  *See* Perfect 10's Opposition at 7-9.

## Google's Position

The Court's recent Minute Order requested that the parties file "a joint status report … setting forth the most recent and now current procedural history and status of this case and the implications, if any, of the Ninth Circuit Court of Appeals decision of August 3, 2011 on future proceedings."  The Court did not ask for

lengthy legal briefing, extraneous arguments or self-serving misinterpretations of the oral argument before the Ninth Circuit Court of Appeal, which unfortunately is what Perfect 10 has elected to include in this Report.  Nor did the Court invite Perfect 10 to baselessly second-guess the Court's carefully crafted DMCA Order – but Perfect 10 has done that too.  Google objects to those portions of Perfect 10's position statement and will not waste time responding to them here.  If the Court would like a substantive response to Perfect 10's arguments above, Google respectfully requests the opportunity to submit a separate brief addressing them.

Set forth below are the answers to the Court's questions:

A.     <u>Recent and Current Procedural History</u>

Set forth below is a list of recent procedural events in this case:

<u>July 26, 2010</u>:     This Court adjudicated the vast majority of Perfect 10's copyright infringement claims in issuing its Order granting in part Google's DMCA summary judgment motions, which determined that Google was entitled to DMCA safe harbor for all of Perfect 10's claims of copyright infringement related to Google's cache and Blogger hosting service and for all but approximately 34 infringements related to Google Web and Image Search.  Dkt. No. 937 ("DMCA Order").

<u>July 30, 2010</u>:   This Court denied in full Perfect 10's Second Motion for a Preliminary Injunction, confirming that only "those relatively few links for which P10 conferred valid notice of infringement" remain at issue.  Dkt. No. 953 ("PI Order")

<u>August 24, 2010</u>:  Perfect 10 appealed the PI Order and DMCA Order to the Ninth Circuit.  Dkt. No. 971.

<u>August 25, 2010</u>:  This Court stayed all proceedings during Perfect 10's appeal in the interests of "judicial economy" since the DMCA Order disposed of most of Perfect 10's copyright claims.  Dkt. No. 978.

1    April 11, 2011:  Perfect 10's appeal was argued and submitted to the Ninth

2  Circuit Panel.

3    August 3, 2011:  The Ninth Circuit affirmed the PI Order in full and did not

4  disturb the DMCA Order.  *Perfect 10, Inc. v. Google Inc.*, 2011 WL 3320297.

5    August 17, 2011:  Perfect 10 filed a motion for rehearing with the Ninth

6  Circuit, arguing that the Panel's failure to address the DMCA Order will require

7  Perfect 10 "to try the remaining small portion of the case" before again appealing

8  those issues.  9th Cir. Case No. 10-56316, Dkt. No. 62-1.

9    September 21, 2011:  The Ninth Circuit denied Perfect 10's petition for

10  rehearing ( Dkt. No. 1004), and issued the mandate, which lifted the  stay in this

11  Court (Dkt. No. 1006).

12    **B.    Implications of the Ninth Circuit decision on future proceedings**

13    In short, the Ninth Circuit decision did not reach (and thus left intact) this

14  Court's DMCA Order as well as the portion of this Court's Second PI Order finding

15  that P10 was not likely to succeed on any of its claims.  Thus, because the Ninth

16  Circuit's opinion reached only the issue of the absence of irreparable harm, the

17  opinion does not impact the substantive issues remaining for this Court to decide.[2]

18

19

20

21

22

23

24    [2]   Perfect 10's references to various comments made by the Panel during oral argument are misleading, incomplete and taken out of context, as a review of the

25  complete transcript confirms.  In any event, those comments are not a part of the

26  Ninth Circuit's opinion, and thus do not govern or bind this Court on remand – as

27  Perfect 10 acknowledges in its "Response" section above.  <u>Rangel v. United States</u>, 155 F. Supp. 2d 949, 954 (N.D. Ill. 2001).

28

**Perfect 10's Response**[3]

Google's portion of Section II, sent to Perfect 10 on October 28, 2011, contains at least two key misstatements, both of which are addressed below:

1)      Google mistakenly contends that this Court's SJ Order (which Google refers to as the "DMCA Order") held that "Google was entitled to DMCA safe harbor . . . for all but approximately 34 infringements related to Google Web and Image Search." Joint Status Report at 13:14-17.  Google is simply wrong.  Its assertion that this Court granted Google a safe harbor for all but approximately 34 infringements is contradicted by the very language of the SJ Order, in which this Court held only that Perfect 10 "has demonstrated that at least some of [the Group B] notices were valid under the DMCA" and that Google's motion for partial summary judgment was denied "for at least some of the Group B notices."  SJ Order at 14, 15 (Docket No. 937).  Nowhere in the SJ Order does the Court state that only 34 infringements are still at issue.  In fact, as noted in Section III.A.1, below, that issue remains to be decided at trial.

Moreover, Google's assertion is contradicted by the colloquy at the May 10, 2010 hearing on Google's Partial Summary Judgment Motions, which addressed this Court's tentative ruling on the motions.  At one point during the hearing, this Court stated:

---

[3] This Joint Status Report was drafted as follows:  Perfect 10 sent its initial portions of the document to Google on October 25, 2011.  Google then sent its initial portions of the document to Perfect 10 on October 28, 2011.  Perfect 10 sent any additions and changes to Google on October 30, 2011 and Google sent its additions and changes and filed the Joint Status Report on October 31, 2011.  Accordingly, because Perfect 10 does not have the opportunity to comment on Google's additions and changes in this Joint Status Report, Perfect 10's portions of the Joint Status Report entitled "Perfect 10's Response" respond only to the version of the Joint Status Report sent to it by Google on October 28, 2011.

> Well, if the outcome of the tentative remains the same, one thing I don't have a clue as to how the future course of this litigation would unfold is how the valid Group B notices - - and there are some - - would remain the subject of the litigation, who would be able to identify them . . .

Transcript of Hearing on May 10, 2010 (Docket No. 881) at 18:7-11.  In response, Google's attorney noted that "even if everything in Group B was still at issue, we're now into the thousands as opposed to the tens of thousands or millions . . ." *Id.* at 20:20-22.  Nowhere did the Court or Google's attorney contend that only 34 infringements remained at issue after the Court's tentative ruling, which was similar to the SJ Order with respect to the analysis of the Group B notices.

2)      Google mistakenly contends that this Court stayed all proceedings during Perfect 10's appeal "since the DMCA Order disposed of most of Perfect 10's copyright claims."  Joint Status Report at 13:26-27.  In fact, as Perfect 10 has previously explained, [*see* Perfect 10's Opposition at 2 n.1], it agreed to a stay during the pendency of its appeal to conserve its limited resources and so that this case would not be proceeding simultaneously before two different courts. Indeed, this Court's August 25, 2010 Order staying proceedings before this Court (Docket No. 978) specifically states that "it is in the best interests of judicial economy to stay discovery, motion practice, and all other proceedings in the District Court . . . until the Ninth Circuit rules on Perfect 10's appeal . . ."

In addition, Google misleadingly characterizes Perfect 10's portion of the Joint Status Report as "lengthy legal briefing, extraneous arguments or self-serving misinterpretations of the oral argument before the Ninth Circuit Court of Appeal." Joint Status Report at 13:1-2.  This Court's Minute Order asked the parties to set forth the implications, if any, of the Ninth Circuit's August 3, 2011 decision on future proceedings.  Accordingly, it was appropriate for Perfect 10 to point out to this Court the relevant comments with respect to the SJ Order and the PI Order made by the Ninth Circuit panel at oral argument on April 11, 2011.  This is

particularly true where, as here, it is undisputed that, in its August 3, 2011 decision, the Ninth Circuit specifically declined to rule on any issue raised by the SJ Order or the merits of any of Perfect 10's claims for relief addressed in the PI Order.[4]

Similarly, it is appropriate for Perfect 10 to inform this Court, following a stay of proceedings for more than one year, that material new evidence that has emerged following this Court's issuance of the SJ Order and the PI Order may be relevant to future proceedings in the case.  It is telling that Google fails to address, let alone dispute, any of the facts set forth above regarding either the Non-Prosecution Agreement or the public release of Google's "search-by-image" capability.

## III.   ISSUES REMAINING IN THE CASE

### Perfect 10's Position

### A.   Perfect 10's Copyright Infringement Claim

Perfect 10 contends that Google is liable for the infringement of most, if not all, of Perfect 10's copyrighted images.  Perfect 10 has sent Google numerous DMCA notices that comply both with the applicable statutory requirements and with the standards set out by this Court in the SJ Order, some of which are discussed below.  Nevertheless, Google either has not processed these notices at all, or has not sufficiently disabled access to the infringing material identified in the notices, as required by the DMCA.

#### 1.   The Group B Notices

Two key issues left open by this Court's SJ Order are which of the 8,000 URLs in Perfect 10's 48 spreadsheet-style "Group B" notices are compliant, and

---

[4] Contrary to Google's implication [*see* Joint Status Report at 14 n.2], Perfect 10 does not contend that the comments of the Ninth Circuit panel are binding on this Court.  Nevertheless, it is appropriate for this Court to be aware of any questions raised by the Ninth Circuit panel, particularly if Perfect 10 moves for reconsideration of any aspect of the SJ Order.

1  whether Google expeditiously processed any of Perfect 10's Group B notices.

2  Google has effectively conceded that it did not fully process any of the Group B

3  notices sent to it by Perfect 10 until September 2006, when it first removed links to

4  known infringing web pages from its Image Search results.  Rebuttal Declaration of

5  Bill Brougher, filed September 9, 2009 (Docket No. 533), ¶2; Declaration of Dr.

6  Norman Zada in Opposition to Google's Motions for Partial Summary Judgment,

7  filed August 12, 2009 (Docket No. 491), ¶¶27-28, Exhs. 15-17.   Furthermore, there

8  should be no dispute that Google did not process any identified links in Perfect 10's

9  May 31, 2004 notice (or any other Group B notice) until at least October 11, 2004.

10  Finally, because Google did not have a policy in place to process compliant notices,

11  it should have no safe harbor for any Perfect 10 DMCA notice until at least

12  September 2006.  *See Perfect 10, Inc. v. CCBill, LLC,* 488 F.3d 1102, 1109-10 (9th

13  Cir.), *cert. denied,* 552 U.S. 1062 (2007).

14          Moreover, as noted above, Perfect 10 identified at least 8,000 infringing

15  URLs in its Group B DMCA notices.  Those URLs provided Google with an

16  enormous amount of actual knowledge of infringement, which Google has not acted

17  upon.  For example, Google is currently providing at least 230 direct infringing links

18  to the same P10 Image of Jana Mikusova, even though Google has acknowledged

19  that Perfect 10 identified that image in at least ten separate Perfect 10 DMCA

20  notices going back to 2005, including in several Group B notices.  Zada Decl. ¶¶2-3,

21  Exhs. 1-2.  For this reason as well, Perfect 10 contends that Google is not entitled to

22  any safe harbor.

23                    **2.      The 95 PI Notices**

24          As discussed in Section I.F, above, both the Ninth Circuit and Google agree

25  that this Court has not ruled on the sufficiency of any of the PI Notices – the 95

26  shorter notices that were not at issue in connection with the SJ Order but were

27  raised by Perfect 10 in connection with its motion for preliminary injunction.

28  *See* Transcript, 25:11-16.  Perfect 10 contends that all of these notices complied

with the DMCA, but Google either failed to process these notices at all or did not process them expeditiously.

### 3.     Image Search Notices That Complied With This Court's SJ Order (the "Group D Notices")

After this Court issued its SJ Order in July 2010, Perfect 10 began sending to Google a series of short DMCA notices that were designed to satisfy the standards enunciated by this Court in the SJ Order.  Perfect 10 printed out Google's Image Search results, identified which images on each page were P10 Images, and provided text boxes next to the images which provided either the page of Perfect 10 Magazine in which the image appeared, or the URL to the image on Perfect 10's website.  Zada Decl. ¶5, Exh. 4.  Nevertheless, Google has failed to process most of these "Group D" notices.  Although Google partially processed some of these notices by removing approximately 8,000 P10 thumbnails from its Image Search results, it waited as long as five months to take such action.  Moreover, Google neglected to remove any links to the identified infringing webpages from its Web Search results.  In sum, Google has failed to process most of the Group D notices, and has not processed any of these notices expeditiously.  Zada Decl. ¶14, Exh. 13.

### 4.     Notices Sent Using Google's Image Search Form (the "Group E" Notices)

For several months in 2011, from sometime in or about February until sometime in August, Google accepted DMCA notices via an Image Search form that it provided for reporting copyright infringements.  Sometime in or about August 2011, however, Google disabled this Image Search form.  Zada Decl. Exh. 2, p. 9.

Google's Image Search form was very time-consuming to fill out and did not allow Perfect 10 to keep a record of the information that was contained in each DMCA notice.  It took Perfect 10 approximately five minutes to identify just one Image URL and one Web Page URL using Google's Image Search form.  Nevertheless, because Google was continuing to claim that every Perfect 10 DMCA

notice was deficient, Perfect 10 spent the time necessary to identify 300 infringing
Image URLs and 300 infringing Web Page URLs using the Image Search form.  In
this way, Google could not claim that Google had no knowledge of the infringement
identified in the forms it had agreed to accept.  In many of these notices, Perfect 10
informed Google that Perfect 10 had exclusive rights to the images it had identified,
and that Google should use its image recognition capability to remove all such
images from its system.  Despite Google's ability to remove all such images using
its recently released "search-by-image" capability, Google has failed to take such
action.  Zada Decl. ¶¶2-3, Exhs. 1-2.  *See also* Section II.B, above.

### 5. Spreadsheet Notices Containing The Same Information Requested In Google's Image Search Form (the "Group F" Notices)

After Google disabled its Image Search form in or about August 2011, Perfect
10 began sending Google spreadsheet-style notices that included the same
information that Google had requested in its Image Search form.  An example of
one such notice is found at pages 9-12 of Exhibit 2 to the Zada Declaration.
Although these notices contain the very information requested by Google, and
therefore should be compliant, Google has failed to remove from its system all
copies of the images identified by Perfect 10 in these notices.  Zada Decl. ¶¶2-3,
Exhs. 1-2.

### 6. Notices Created Using Google's "Search-By-Image" Capability (the "Group G" Notices)

After Google failed to use its "search-by-image" capability to remove
identical identified infringing P10 Images from its system, Perfect 10 sent several
DMCA notices to Google, beginning in or about September 2011, that used this
capability.  Perfect 10 printed out Google's search-by-image results, included these
results in its notices, and asked Google to remove all such results.  Perfect 10
provided the location of the authorized image on its website or in its magazine when

available.  These "Group G" notices complied with the requirements of the DMCA and the standards set out by this Court in the SJ Order, because they provided the URL to the infringing webpage, a copy of the infringing image, and the location of the authorized image.  Nevertheless, as far as Perfect 10 can determine, Google has only partially processed these notices.

### 7.     Notices Concerning Google AdWords Affiliates (the "Group H" Notices)

Perfect 10 has sent compliant DMCA notices to Google that identify infringements on websites that are Google AdWords affiliates, such as giganews.com.  This Court did not address these notices in its SJ Order or its PI Order.  Google has refused to process these "Group H" notices or end its AdWords affiliation with Giganews, even though Perfect 10 has demonstrated to Google that Giganews is infringing full-length movies and other obviously copyrighted works and is purporting to offer large amounts of child pornography, as well as infringing thousands of P10 Images.

### 8.     Notices Concerning Links To DMCA Notices Published By Chilling Effects (the "Group I" Notices)

As discussed in Section I.D, above, Google is forwarding Perfect 10's DMCA notices to chillingeffects.org and is then linking to the full-size infringing P10 Images found in these notices.  Accordingly, Perfect 10 has sent DMCA notices to Google that identify direct Google links to the full-size infringing P10 Images hosted by chillingeffects.org.  Nevertheless, Google has refused to remove those links.  Zada Decl. ¶5, Exh. 4.

In sum, even though Google has received more than 2,200 Perfect 10 DMCA notices during the past ten years, and even though Google possesses extremely powerful image recognition capability that would allow it to remove the infringing images identified by Perfect 10, the infringement on Google's system has vastly increased.  For example, Google has provided 13,900 direct links to the same

21

repeatedly identified infringing celebrity fake image of Angelina Jolie, which uses Ms. Jolie's head and a P10 Image for her body.  Zada Decl. ¶4, Exh. 3.  Although Google knows the locations of those images, it refuses to remove them.  As Perfect 10 intends to demonstrate at trial, the DMCA was not designed to protect Internet Service Providers such as Google that refuse to remove known infringing material from their systems.

### B.    Additional Remaining Issues Concerning Perfect 10's Copyright Infringement Claim

This Court's rulings have not yet addressed Google's AdSense and AdWords programs, or other Google programs in which Google hosts infringing P10 Images, such as Google Groups, Picasaweb, and Google Sites.  Perfect 10 contends that Google cannot receive a safe harbor for either AdSense or AdWords because: (i) Google has no policy for processing compliant DMCA notices concerning AdWords.  Consequently, under *CCBill*, it is not entitled to a DMCA safe harbor; and (ii) the DMCA does not provide a safe harbor for Google's conduct in placing ads next to infringing images and receiving revenue from clicks on those ads placed next to infringing images.[5]

In addition, Perfect 10 has compiled a great deal of evidence showing that Google has not expeditiously removed known infringing P10 Images from its Blogger servers.  *See, e.g.,* Zada Decl. ¶14, Exh. 13.  Accordingly, even if this Court declines to reconsider the SJ Order's grant of a safe harbor to Google with respect to Blogger for Perfect 10's Group C notices, Google should not receive a safe harbor for later notices.

Finally, Perfect 10 has learned that Google is now offering a Web Search with Images feature, whereby infringing thumbnails appear next to Google's Web Search

---

[5] For this reason, Perfect 10's Group C notices remain relevant to the issue of Google's liability for placing ads next to infringing P10 Images.

1   results.  In addition, Google places Google ads next to those infringing thumbnails.

2   Zada Decl. ¶15, Exh. 14.  Perfect 10 contends that such conduct constitutes

3   copyright infringement, and the placement of Google ads next to infringing P10

4   thumbnails in Web Search that were created by Google is not a fair use.

5         **C.**     **Perfect 10's Other Claims For Relief**

6        In addition to its copyright infringement claim, Perfect 10 has alleged claims

7   against Google for trademark infringement, trademark dilution, unfair competition,

8   and violation of rights of publicity, all of which remain in the case.

9   **Google's Position**

10       Set forth below is a summary of what remains to be decided by this Court in

11  light of its previous rulings.

12        **A.**     **Remaining Copyright Infringement Claims**

13       This Court's DMCA Order vastly reduced the scope of Perfect 10's copyright

14  infringement claims.  Not only did the Court grant Google summary judgment of

15  DMCA safe harbor as a general matter, it also made specific rulings which can be

16  applied to P10's subsequent DMCA notices via simple motion practice.  Google

17  intends to initiate a pre-filing conference of counsel on these issues in due course.

18          **1.**     **Only 34 Alleged Infringements Remain at Issue Regarding**

19                  **the DMCA Notices Ruled Upon by the DMCA Order.**

20       The claimed copyright infringements at issue in the DMCA notices

21  determined to be defective in the DMCA Order are now moot because Google is

22  entitled to DMCA safe harbor for these alleged infringements, and Perfect 10 cannot

23  obtain any monetary damages under the statute.  17 U.S.C. § 512(b), (c) and (d).

24  Even the limited injunctive relief available under section 512(j) of the DMCA is

25  moot since the allegedly infringing material identified in the defective notices has

26  already been removed from Google search results and Blogger pages.  See IO

27  Group, Inc. v. Veoh Networks, Inc., 586 F.Supp.2d 1132, 1155 (N.D. Cal. 2008)

28  (finding injunctive relief "moot" where the allegedly infringing content was already

removed and dismissing the plaintiff's infringement claims because an opinion on the copyright issues "would be merely advisory" since defendant was entitled to DMCA safe harbor).[6]  Of the handful of Group B DMCA notices for which the Court did not grant Google DMCA safe harbor, applying the Court's rulings results in just 34 alleged infringements still at issue in the case.[7]

## 2.   The 95 Post-DMCA Motion Notices Referenced in P10's Second PI Motion Can Be Resolved By Motion Practice.

In its Second PI Motion, P10 referenced 95 DMCA notices it sent between July 2009 and April 2010.  The validity of those 95 DMCA notices and the propriety of Google's responses thereto can be adjudicated by applying this Court's rulings in the DMCA Order, as most (if not all) of those notices are in the same format as the notices at issue in the DMCA Order, and Google has processed them to the fullest extent possible.

## 3.   P10's Post-DMCA Order Notices Can Also be Resolved by Motion Practice.

Since the DMCA Order issued on July 26, 2010, P10 has sent approximately 2,000 additional notices to Google.  The validity of those DMCA notices and the propriety of Google's responses thereto can be adjudicated by applying this Court's rulings in the DMCA Order, as most (if not all) of those notices are in the same

---

[6]  Thus, Perfect 10's claim above that it is entitled to proceed to trial on all of the issues in its Second PI Motion is incorrect.  The vast majority of those issues were resolved by the DMCA Order.

[7]  P10's portion of this Joint Report simply references the total number of URLs in the Group B notices as a whole (approximately 8,000), without regard to the fact that the Court's rulings granted Google summary judgment on the overwhelming majority of them.  Contrary to P10's "Response" below, the question of which alleged Group B infringements remain following the DMCA Order is not an issue for trial, because the Court has resolved these issues as a matter of law.  All that remains is the mechanical exercise of listing which specific infringements within each of the Group B Notices (if any) were not ruled invalid as a matter of law.

format as the notices at issue in the DMCA Order, and Google has processed them to the fullest extent possible.

**B.      P10's Trademark Infringement, Trademark Dilution, Rights of Publicity, Unfair Competition, Unjust Enrichment, and Misappropriation Claims**

Perfect 10's complaint also includes trademark, publicity, unfair competition, unjust enrichment and misappropriation claims.  P10 has devoted essentially no effort whatsoever to these ancillary claims, and has resisted discovery on them as well.  Google has recently filed a motion to compel directed at these claims, which motion is set for hearing before Magistrate Judge Hillman on November 21.

Moreover, with respect to P10's publicity claims, this Court already has determined that P10 is not likely to succeed thereon because Google did not violate those rights.  Dkt. No. 953, at 21-22.  Additionally, Perfect 10's publicity and other state and common law claims are preempted, in whole or in part, by the Copyright Act, 17 U.S.C. § 301, and/or the Communications Decency Act, 47 U.S.C. § 230. Google also asserts a number of other affirmative defenses regarding these claims, as set forth in its Answer to Perfect 10's Second Amended Complaint.  Google intends to initiate a pre-filing conference of counsel on these issues in due course.

**Perfect 10's Response**

Much of what Google states in its portion of Section III is demonstrably untrue.  Perfect 10 has spent many months creating and sending to Google the best DMCA notices of which it is aware – short notices based on this Court's SJ Order.

Even though Google is a technological superpower with the ability to process virtually any DMCA notice, Google has not processed hundreds of Perfect 10 DMCA notices at all.  In fact, Google has repeatedly refused to process DMCA notices that other Internet Service Providers have processed.   When Google complained that a Perfect 10 DMCA notice is deficient, it has not provided Perfect 10 with any other feasible way of identifying so much infringement on Google's

system.  Furthermore, Google has not adequately processed the notices it claims to have "processed."  Many of those notices identified specific images to Google and stated that no one other than Perfect 10 had any rights to such images.  Nevertheless, Google is continuing to provide hundreds of links to the same repeatedly identified P10 Images that it knows are infringing.  **Google is even allowing its users to conduct searches on known infringing P10 Images, which enables these users to locate hundreds of additional copies of the same infringing images in Google's system, as well as countless other infringing P10 Images on those same infringing web pages**.  *See* Section II.B.2 above.  Such conduct satisfies the Ninth Circuit's test for contributory liability.  The following specific points address Google's primary misstatements:

1) Google's assertion that only 34 alleged infringements remain at issue with respect to the DMCA notices addressed in the Court's SJ Order [*see* Google's Position, Section III.A.1, above] is simply wrong, for all of the reasons set forth in Perfect 10's Response, found in Section II, above.  *See* Joint Status Report at 15:4-16:10.  Nowhere in the SJ Order does the Court state that only 34 infringements are still at issue.

2) Google's claim that the DMCA notices sent by Perfect 10 after the SJ Order have ignored this Court's rulings and Google's DMCA policies is also wrong.  First, as discussed in Section III.A.4, above, Perfect 10 has sent Google approximately 300 notices using Google's Image Search form.  Nevertheless, Google has not adequately processed those notices.  Zada Decl. ¶¶2-3, Exhs. 1-2.  Perfect 10 used Google's Image Search form even though the form was very time-consuming to complete**.**  It takes approximately five minutes to specify one infringing Image URL and one infringing Web Page URL, find and provide the exact location of the authorized image, check the accuracy of the information, and maintain the separate records necessary to track what was sent, because Google's Image Search form does not provide that information.  As a result, it would take

**years** for Perfect 10 to identify the hundreds of thousands of infringing links on Google's system using Google's Image Search form.

Second, contrary to Google's claim, Perfect 10 has sent spreadsheet notices to Google that provided the very information requested in Google's Image Search form. *See, e.g.,* Zada Decl., Exh. 2, pp. 9-12. These notices are discussed in Section III.A.5, above. Google has not adequately processed these notices either. Zada Decl. ¶¶2-3, Exhs. 1-2.

Third, contrary to Google's unsupported assertion, Perfect 10 has also sent Google numerous notices that comply with the guidelines set out by this Court in its SJ Order. These notices, discussed in Section III.A.3, above, provided Google with the exact locations of the authorized images Perfect 10 claimed were infringed. *See* Zada Decl., Exh. 2, pp. 9-15; Exh. 4, pp. 4-7. These notices were short, and did not include subfolders. They included the same information required by Google's Image Search form, and were in spreadsheet form in many cases. *See, e.g.,* Zada Decl., Exh. 2, pp. 9-12. Nevertheless Google has also failed to adequately process these notices.

      3)    Google's complaint that the number of DMCA notices sent to it by Perfect 10 increased after this Court issued its SJ Order is misguided. Perfect 10 needed to send additional DMCA notices in order to follow the guidelines set forth by the Court in the SJ Order. The notices about which Google now complains are much shorter, identify far fewer images, and do not contain subfolders. Perfect 10 also needed to send additional DMCA notices because Google failed to process earlier notices that Perfect 10 had sent. Therefore, Perfect 10 was forced to repeatedly identify the same infringing images and websites. Had Google merely processed Perfect 10's notices as required under the DMCA (which Google certainly was capable of doing), there would not be any infringement of P10 Images on Google's system.

4)      Google has the technological capability to permanently end the infringement of P10 Images on its system.  Any claim by Google that it cannot locate and remove such infringement, particularly when Perfect 10 has provided Google with copies of its own infringing webpages, has the same level of credibility as the false testimony that Google submitted to Congress regarding the actions it took against illegal online pharmacies.  *See* Section II.B.1, above.[8]

5)      Perfect 10 has produced substantial evidence of Google's unfair competition, trademark violations, and violations of rights of publicity.  Perfect 10 will be producing additional, new evidence regarding these matters in the next two months.  It is simply not accurate to say that Perfect 10 is resisting discovery.

## IV.    REALISTIC RANGE OF PROVABLE DAMAGES

### Perfect 10's Position

Perfect 10 is able to prove that there are hundreds of thousands of infringing P10 Images on Google's system, that Google could remove these images from its system but has chosen not to do so, and that this infringement has been continuing for at least ten years.  Perfect has lost over $60 million since inception in 1996.  Perfect 10 cannot sell access to its images, when hundreds of thousands of those images are available for free from Google.  Perfect 10 can also prove that Google has substantially assisted in dispersing tens of millions of infringing copies of Perfect 10 images to users around the world, thus destroying the value of Perfect 10's library and business.  *See* discussion in Section II.A.1 and II.A.9, above;

---

[8] As stated in the article attached as Exhibit 7 to the Zada Declaration, "The DOJ's pharmacy investigation undermines Google's credibility on questions of compliance with the law and good faith in enforcing its supposed policies.  Previously, when Google argued that it was difficult to find bad ads, trademark-infringing domains, or copyrighted content, the world could only wonder what made these tasks so difficult for Google. Now we know: at least sometimes, Google's difficulties were a farce; behind the scenes, Google employees were encouraging and supporting the very unlawful conduct they claimed to oppose."

Transcript, 26:15-17:4 ("They [Google] now really assisted all of these infringing sites to multiply themselves immensely.  I don't think there can be a big dispute about that.") (Comments of Judge Ikuta); Transcript, 21:20-23 ("[Y]ou say, well, if I can get it for free just by putting a model's name into the Google's search engine, why am I going to subscribe and buy it.  I mean, that has a lot of common sense appeal." (Comments of Judge Ikuta).  Perfect 10 also contends that any monies that Google has received from ads it has placed next to P10 Images rightly belong to Perfect 10.  *See* discussion in Section II.A.2, above; Transcript, 32:23-33:1  ("So, the images of the women attract people to the site, and, then, when they're there, they click on the ads.  Isn't that the whole idea behind AdSense?")  (Comments of Judge Ikuta).  At this point, there are too many issues that remain to be decided to provide a meaningful estimate of provable damages.

**Google's Position**

This Court has already determined that Google is entitled to DMCA safe harbor for the vast majority of Perfect 10's copyright infringement claims, which provides a complete defense to any monetary recovery for copyright infringement in this case.  17 U.S.C. § 512(b), (c), and (d).  Nor is there a realistic prospect of damages for Perfect 10's other claims.  Perfect 10 has failed to articulate any plausible, non-speculative theory of actual damages.  Indeed, Perfect 10 admits that it has never had a profitable year -- from the inception of its adult entertainment business operations through the present day.  Moreover, P10 arguably has waived its right to pursue actual damages through its discovery responses.  Perfect 10's claims for monetary relief will be further limited by 17 U.S. C. § 504, 15 U.S.C. § 1114(2), Cal. Bus. Prof. Code § 17200, and the Due Process Clause of the United States Constitution and/or the California Constitution.

**Perfect 10's Response**

Perfect 10 has not waived the right to receive actual damages.  Perfect 10 has repeatedly advised Google, since April 2006, that it intends to seek actual damages,

1   and/or profits of the infringer, and/or statutory damages, and that it will elect which

2   measure of damages it chooses to seek at the appropriate time.

3   **V.     INSURANCE COVERAGE**

4       Google does not believe that it has insurance coverage for this matter that is

5   applicable at this time.

6   **VI.     DISCOVERY AND EXPERTS**

7   **Perfect 10's Position**

8       Perfect 10 intends to take all of the ten depositions it is permitted under the

9   Federal Rules of Civil Procedure.  Depositions that Perfect 10 plans to take include,

10  without limitation, depositions of Larry Page and possibly other Google corporate

11  officials regarding such issues as Google's knowledge and approval of illegal acts

12  committed by the company, including Google's knowledge and approval of

13  copyright infringement.

14  **Google's Position**

15      **A.     Discovery taken to date, and subjects on which discovery may be**

16          **needed**

17      <u>Fact Discovery Taken to Date</u>.  Google is in the process of taking discovery

18  on a number of subjects, including, but not limited to, Perfect 10's business and

19  operations; Perfect 10's past and present financial condition; Perfect 10's claimed

20  copyright and trademark registrations that remain at issue in the case; the alleged

21  assignments of publicity rights at issue in the case; any remaining alleged

22  infringements of Perfect 10's alleged copyrights and/or trademarks; and any

23  damages Perfect 10 claims to have suffered (and on what theories).

24      Perfect 10 has served Google with 451 requests for production of documents,

25  715 requests for admission, and 39 interrogatories.  Google has responded to all of

26  these Requests (to the extent a response was required under the Federal Rules).

27  Google will continue to supplement and update its responses to Perfect 10's

28

1   propounded discovery relevant to Perfect 10's remaining claims pursuant to the

2   Federal Rules.

3       Google has served Perfect 10 with 396 requests for production of documents,

4   1648 requests for admission, and 21 interrogatories.  The parties are meeting and

5   conferring on the insufficiency of Perfect 10's responses.

6       Perfect 10 has taken five depositions to date, including Google's Rule

7   30(b)(6) deposition.  Google has taken seven depositions, and has met and conferred

8   with Perfect 10 regarding taking Perfect 10's Rule 30(b)(6) deposition.  During the

9   parties' October 20, 2011 meet and confer, Perfect 10 agreed to further meet and

10  confer with Google regarding the length of the Perfect 10 Rule 30(b)(6) deposition

11  after Perfect 10 identifies the remaining claims it is asserting.  This Court's prior

12  ruling authorized 42 hours for Dr. Zada's deposition (8/18/08 Hearing Tr. at 32:16-

13  23), not including the time Dr. Zada may spend testifying as Perfect 10's Rule

14  30(b)(6) designee.  See 8/18/08 Hearing Tr. at 32:16 to 33:14 (stating that the Court

15  "may increase" the allotted time for Dr. Zada's deposition and noting that additional

16  time might be required for Perfect 10's Rule 30(b)(6) deposition).

17      Fact Depositions of Perfect 10 Personnel.  In addition to several prior

18  depositions already completed, Google also intends to depose the following Perfect

19  10 personnel:

20  - Perfect 10, Inc., via Rule 30(b)(6)

21  - Norman Zada

22  - The five additional Perfect 10 models for whom P10 claims publicity

23      rights, namely Irina Voronina, Monika Zsibrita, Sasha Brinkova (aka

24      Katerina Pondelickova), Shannon Hobbs, and Talia Harvalik

25  - Bruce Hersh—Pefect 10's accountant

26  - John Ancell—Perfect 10's artistic director

27  - Eileen Koch—Perfect 10's PR agent and publicist

28  - Jennifer Snow—Assistant to the Publisher

- Rebecca Chaney—Assistant to the Publisher
- Sean Chumura—Perfect 10's webmaster

Contrary to P10's "Response" below, these depositions will not be duplicative. For instance regarding the nine models, unless P10 will stipulate that the five models remaining to be deposed (1) did not transfer their exclusive publicity rights to P10, (2) consented to non-P10 websites using their names and likenesses, and (3) suffered no damage to their reputations or careers as a result of the alleged conduct by Google (as the four who have been deposed have testified), Google has no choice but to take those depositions.

Third-Party Fact Discovery.  Google has taken certain third party discovery from various entities associated with Perfect 10, including P10's former business partners and various assignors of the copyright registrations Perfect 10 is asserting in this action.  Google may need to take certain additional third party discovery as the case proceeds.

Expert Discovery.  Perfect 10 has yet to designate any experts, but when it does, Google will take discovery regarding the same.  Google also expects that it will designate experts.

Discovery Motion Practice.  Numerous of Perfect 10's discovery responses remain deficient, and Google anticipates that additional motion practice will be necessary to resolve these and other deficiencies.

Google recently filed a Motion to Compel regarding P10's responses to Google's non-copyright interrogatories and document requests, which motion is set for hearing before Magistrate Judge Hillman on November 21, 2011.  Perfect 10 also has failed to properly answer virtually all of Google's requests for admission regarding Perfect 10's non-copyright claims, and has refused to give any response whatsoever to the majority of those requests.  A motion to determine sufficiency of the responses likely will be necessary.  Further, to the extent Perfect 10 intends to notice the depositions of Google's senior corporate executives who have absolutely

1  nothing to do with this case, including co-founder Larry Page, Google will move for

2  a protective order precluding such depositions.

3      **B.**    **Whether discovery should be in phases**

4      Google does not believe discovery should be conducted in phases.

5      **C.**    **What issues exist or are likely to arise, and what agreements have**

6          **been reached regarding identification maintenance and production**

7          **of electronically stored information**

8      No agreements have been reached on the identification, maintenance or

9  production of electronically stored information, but the parties have engaged in

10 motion practice on that issue, which resulted in an order by Magistrate Judge

11 Hillman requiring Perfect 10 to remedy its deficient electronic document

12 identification and preservation procedures.  Dkt. No. 735.

13     Google has produced its documents in searchable .tif and .jpg format, with

14 OCR capabilities, and with sequential control numbers and individual

15 confidentiality designations – as is standard practice in modern litigation.  In

16 contrast, Perfect 10 has produced its over three million pages of documents in PDF

17 and other native file formats (which are frequently not text searchable), without

18 control numbers or other identifying information, without individual confidentiality

19 designations, and in folders created for this litigation rather than as the documents

20 are kept in the ordinary course of business.  Because many of Perfect 10's native

21 files are not text-searchable, much of its production is incomprehensible for

22 practical purposes.  Even for those portions that are text-searchable, running a

23 simple full-text search on those files can take hours because of the manner in which

24 they were produced.

25     **D.**    **Whether applicable limitations should be changed or other**

26         **limitations imposed**

27     Given the number of models whose publicity rights Perfect 10 is asserting

28 (nine), the number of Perfect 10 personnel, professional service providers and

1  business partners with relevant documents and testimony, and the number of

2  assignors of various copyrights Perfect 10 is asserting, Google requests leave to take

3  ten fact depositions, in addition to the ten fact depositions permitted under the

4  Federal Rules, for a total of twenty fact depositions.[9]  Perfect 10 indicated during the

5  parties' meet and confer that it would consider stipulating to allow Google to take

6  additional depositions, but it did not agree to a specific number.

7      To the extent Perfect 10 designates expert witnesses, Google will need to

8  depose them as well.

9      Based on its current understanding of the case, Google does not believe that

10  any other limitations should be changed or other limitations imposed.

11      **E.    Whether the court should enter other orders related to discovery**

12      At present, Google does not believe that the court should enter other orders

13  related to discovery.

14      **F.    How many depositions each side will conduct**

15      As set forth above, Google intends to take the ten fact depositions allowed by

16  Rule 30, and seeks leave to take ten additional fact depositions, for a total of twenty

17  depositions.  Google will also seek to depose each expert designated by Perfect 10.

18      **G.    Time of expert witness disclosures under Rule 26(a)(2)**

19      Google proposes that expert witness disclosures be staggered based on the

20  parties' respective burdens of proof, pursuant to Google's proposed schedule below.

21  **Perfect 10's position**

22      Once again, Google's discussion of discovery in Section IV includes various

23  misstatements.  First, Google did not produce its documents in fully searchable

24  format.  On the contrary, the documents produced by Google were primarily poor

25  quality, altered versions of Perfect 10 DMCA notices.  Google took Perfect 10's

---

[9]  Google reserves the right to request additional depositions as needed.

1  fully searchable, color Adobe notices with live links and converted them to

2  unsearchable, hard-to-read, disjointed documents. Excluding Google's production

3  of these poor quality, altered versions of Perfect 10's DMCA notices, Google has

4  produced less than 1/40[th] of the number of documents that Perfect 10 produced.

5  Furthermore, Google produced its documents in a disorganized mess, whereas

6  Perfect 10 organized its production into folders and subfolders.

7          Second, contrary to Google's assertion, Perfect 10's policy has been to

8  minimize discovery disputes by producing whatever responsive documents it could

9  find, in response to any reasonable request. Perfect 10, on the other hand, has tried

10 its best to minimize discovery disputes. Perfect 10 has so far produced at least 300

11 gigabytes of responsive documents. Magistrate Judge Hillman has already dealt

12 with these discovery issues.

13         Third, Google misstates this Court's earlier comments regarding the time

14 available for Dr. Zada's deposition. The Court indicated that 42 hours was the

15 maximum time available for Dr. Zada's deposition when four separate defendants –

16 Microsoft, Amazon, A9, and Google – were seeking to depose Dr. Zada. This Court

17 has never stated that Google alone could depose Dr. Zada for 42 hours.

18 Furthermore, although the Court left open whether there could be an additional Rule

19 30(b)(6) deposition of Dr. Zada, it also indicated that the time used to depose Dr.

20 Zada in any Rule 30(b)(6) deposition might also be included in the maximum time

21 available to depose Dr. Zada. *See* Transcript of hearing on August 18, 2008 (Docket

22 No. 383), 31:20-34:12.

23         Perfect 10 opposes Google's request to take more than 10 depositions,

24 because these depositions will be unnecessarily expensive and burdensome.

25 Moreover, many depositions that Google seeks to take, particularly those of Perfect

26 10 models, will be duplicative. Perfect 10 reserves the right to oppose Google's

27 request to take more than 10 depositions on additional grounds as well.

28

# VII.   <u>SUMMARY JUDGMENT</u>

**<u>Perfect 10's Position</u>**

Perfect 10 is considering filing the following motions in advance of trial of this case:

1)    A motion for partial summary judgment that certain types of DMCA notices sent by Perfect 10 to Google, which have not yet been addressed by this Court, comply with the DMCA's statutory requirements.  Some of the notices would likely include those described in Section III.A, above, including notices sent using Google's Image Search form.  Perfect 10 believes that this case will be tried much more efficiently if this Court issues a clear ruling which identifies examples of compliant DMCA notices.

2)    A motion for partial summary judgment regarding Google's forwarding of DMCA notices to Chilling Effects, which would address Google's subsequent failure to respond to DMCA notices sent by Perfect 10 which asked Google to remove links to known infringing P10 Images on chillingeffects.org, among other issues.  *See* Section I.D, above.

3)    A motion for reconsideration of certain aspects of the SJ Order based on the emergence of new material facts, including those discussed in Section II, above, concerning the Non-Prosecution Agreement and Google's "search-by-image" capability.

**<u>Google's Position</u>**

Google anticipates filing additional motions for summary judgment or partial summary judgment on multiple issues, including but not limited to:

- The deficiency of Perfect 10's DMCA notices submitted since July 2009 (and/or the adequacy of Google's response thereto);[10]
- Google's entitlement to immunity under the Communications Decency Act, 47 U.S.C. § 230(c) with respect to certain of plaintiff's state law claims;
- Preemption of one or more of Perfect 10's state law claims by the Copyright Act, 17 U.S.C. §301;
- Google's non-infringement of Perfect 10's copyrights (as necessary);
- Google's non-infringement of Perfect 10's trademarks;
- Google's non-violation of any rights of publicity owned by Perfect 10;
- Perfect 10's inability to establish trademark dilution; and
- Perfect 10's inability to establish actual damages.

Additionally, at the close of discovery, Google intends to review the propriety of summary judgment as to any remaining claims.

## VI.   <u>SETTLEMENT</u>

**<u>Perfect 10's Position</u>**

Perfect 10 has repeatedly sought to settle the case, and has made several settlement offers to Google.  Google has refused to make any settlement offers or counter-offers to Perfect 10.

**<u>Google's Position</u>**

While the parties have engaged in some settlement communications, those communications have not been fruitful.

---

[10]   While Perfect 10 indicates in its portions that it wishes to be the moving party on DMCA issues, this Court has already ruled that Google, as the party bearing the burden of proving this affirmative defense, is the proper moving party.

## VIII.  ESTIMATED LENGTH OF TRIAL

**Perfect 10's Position**

Perfect 10 demands a jury trial and estimates that the trial of this case will last ten court days.

**Google's Position**

Google also requests a jury trial.  Perfect 10's failure to answer basic discovery requests regarding the identity of the alleged copyright infringements it is asserting, as well as its failure to engage in discovery on its non-copyright claims, makes it difficult to estimate the length of the trial that might be required to adjudicate Perfect 10's remaining claims.  See Dkt. No. 364 (Perfect 10 Statement).  At this time, Google's best estimate is 30 court days.

## IX.   PRESUMPTIVE SCHEDULE OF PRETRIAL DATES

**Perfect 10's Position**

This case has been pending for almost seven years.  During that period, Perfect 10 has suffered enormous damage.  Moreover, as discussed above, Google is continuing to commercially exploit, and provide direct links to, hundreds of thousands of copies of infringing P10 Images, even though Perfect 10 has sent over 2,200 DMCA notices to Google, many of which clearly comply with the standards set out by the Court in the SJ Order.

Accordingly, Perfect 10 asks this Court to set a date for the trial of this case sometime within the next twelve months.

**Google's Position**

Google proposes the following schedule, as reflected in Column 2 of the chart below (Google has inserted Perfect 10's proposal is in Column 3 for the Court's convenience):

## Proposed Schedule

| Event | Google's Proposed Date | Perfect 10's Proposed Date |
|---|---|---|
| **Trial date and length** | May 7, 2013 (30 days) | October 30, 2012 (10 days) |
| File findings of fact and conclusions of law and summaries of direct testimony | April 29, 2013 | |
| Final Pretrial Conference | April 22, 2013 | October 15, 2012 |
| Lodge Pretrial Conf. Order | April 8, 2013 | September 14, 2012 |
| Last day for hand-serving motions in limine | March 25, 2013 | September 7, 2012 |
| Last day to meet before pretrial conference | March 11, 2013 | August 27, 2012 |
| Last day for hearing dispositive motions | November 19, 2012 | August 27, 2012 |
| Last day for hand-serving and filing dispositive motions | October 22, 2012 | July 30, 2012 |
| Non-expert discovery cutoff | July 23, 2012 | July 16, 2012 |
| Deadline for P10 to identify all asserted copyrights | December 31, 2011 | |

## Additional Matters to be Determined at Scheduling Conference

| Event | Google's Proposed Date | Perfect 10's Proposed Date |
|---|---|---|
| **Expert discovery cutoff** | September 24, 2012 | September 3, 2012 |
| Rebuttal Expert Witness Disclosure | September 10, 2012 | August 13, 2012 |
| Opening Expert Witness Disclosure | August 6, 2012 | July 16, 2012 |

1    While Google has proposed dates consistent with this Court's Presumptive

2    Schedule of Pretrial Dates, P10's proposed schedule (in column 3 above) is in many

3    respects inconsistent with the Court's instructions.  (*See* Judge Howard A. Matz

4    Presumptive Schedule of Pretrial Dates, available on the Court's website.)  For

5    instance, this Court's Presumptive Schedule indicates that the deadline for filing

6    summary judgment motions must be after the close of expert discovery (as one

7    would expect).  P10's proposed deadline for filing dispositive motions, however, is

8    a month before the close of expert discovery.

9    Similarly, P10's proposed schedule is unworkable because it fails to provide

10   sufficient time to complete expert discovery.  P10 proposes that the parties have less

11   than a month to prepare rebuttal expert reports, but in cases involving trademark

12   infringement claims such as this one, litigants typically retain experts to conduct

13   consumer surveys.  To the extent rebuttal surveys are necessary, the time frame

14   proposed by P10 is not long enough for a rebuttal survey to be commissioned,

15   designed, and conducted, and then a rebuttal report prepared.

16   Further, under P10's proposed schedule, the deadline to file dispositive

17   motions would be just three months before the trial date, which Google believes will

18   not give the Court sufficient time to resolve those motions before trial given its

19   heavy docket and the burdensome nature of P10's claims and briefing.

20   For all of these reasons, Google requests that its proposed schedule be

21   adopted by the Court.

22   **X.    OTHER ISSUES AFFECTING THE STATUS OR MANAGEMENT OF**

23   **THE CASE**

24   **Perfect 10's Position**

25   Perfect 10 believes that, for this case to be expeditiously resolved, it is very

26   important that Google be required to provide an example of what constitutes a

27   compliant notice for a variety of different infringing situations that have arisen in

28   this case.  In that way, the jury will have concrete examples of compliant notices to

1  compare with the notices sent by Perfect 10. In particular, Google has not provided

2  an example of what constitutes a compliant Web Search notice when there are many

3  infringing images on the same web page, which is often the case. Nor has Google

4  provided an example of a compliant notice for identifying infringing images sold by

5  an infringing Google AdWords affiliate, such as giganews.com.

6  **Google's Position**

7      **Perfect 10's Request for a "Complaint" Notice.** In its statement above, P10

8  claims that the jury will need an example of a "compliant" DMCA notice. P10 is

9  incorrect. This is not a triable issue -- this Court has already resolved the issue of

10  validity (or lack thereof) of P10's DMCA notices. The only issue left for trial at the

11  moment is whether Google expeditiously processed the 34 alleged infringements

12  that survived the Court's DMCA Order. Moreover, even if the jury needed to

13  consider such issues, it is the province of the Court to enter jury instructions

14  regarding the appropriate legal standards to apply. Hypothetical "sample" notices

15  would be unhelpful, irrelevant, and confusing to the jury.

16      **Perfect 10's Destruction of Documents.** Through Google's depositions of

17  Perfect 10 personnel, Google has learned that Perfect 10 failed to institute even the

18  most basic of document retention procedures, and worse, that an unknown number

19  of emails and other documents related to Perfect 10's claims were destroyed as a

20  result of this failure. Google promptly brought these issues to the attention of

21  Magistrate Judge Hillman, who issued a Document Preservation Order on January

22  15, 2010 requiring Perfect 10 to (i) preserve remaining relevant documents and (ii)

23  file a declaration describing the scope and extent of its document destruction. Dkt.

24  No. 735. Perfect 10's declaration failed to comply with the Magistrate Judge's

25  Order, yet Perfect 10 has refused to provide additional information regarding its

26  document destruction and insufficient document preservation. Additional motion

27  practice likely will be necessary to determine the scope of Perfect 10's document

28  destruction and address the resulting prejudice to Google.

**Perfect 10's Response**

The issue discussed by Google has already been addressed by Magistrate Judge Hillman. It involved an accidental loss of emails on Wendy Augustine's computer because of a virus attack on her computer. Google has brought up this irrelevant issue, which has already been decided, as a smokescreen to distract from its admitted criminal conduct. Ms. Augustine was a model who worked for Perfect 10 organizing events and assisting in the filing of copyright registrations. There is no comparison between the failure of Ms. Augustine's hard drive, which contained no emails of any real significance, and Google's admission that it aided and abetted criminal wrongdoing over at least a six-year period. Google's admissions of criminal wrongdoing, which apparently were approved at the highest levels of the company, and the false testimony submitted by Google to Congress, call into question the truthfulness of all of the declarations Google has submitted in this case. *See* Section II.B.1 above.

## XI.   SUBSIDIARIES, PARENTS, AFFILIATES

**Perfect 10's Position**

None.

**Google's Position**

None.

## XII.   MAGISTRATE JUDGE

Google does not consent to the designation of a Magistrate Judge to conduct all proceedings.

JOINT STATUS REPORT

DATED:  October 31, 2011          LAW OFFICES OF JEFFREY N. MAUSNER


                                   By /s/ Jeffrey N. Mausner (with permission)
                                   Jeffrey N. Mausner
                                   Attorneys for Plaintiff Perfect 10, Inc.



DATED: October 31, 2011           QUINN EMANUEL URQUHART &
                                   SULLIVAN, LLP

                                   By /s/ Rachel Herrick Kassabian
                                   Rachel Herrick Kassabian
                                   Attorneys for Defendant Google Inc.